UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
COUNTY OF NASSAU,                                            08-CV-0082 (TCP) (WDW)

                                    Petitioner,        **DECLARATION IN
                                                       OPPOSITION TO
                                                       MOTION TO VACATE, AND
          - against -                                  IN SUPPORT OF CROSS-
                                                       MOTION TO CONFIRM,
                                                       ARBITRATION AWARD**

JUDITH L. CHASE, JOSEPH M. ZORC
and ZORC & CHASE,

                                    Respondents.
------------------------------------------------------------------X


          DENNIS J. SAFFRAN, an attorney duly admitted to practice before this Court, declares that

the following is true and correct under the penalty of perjury:

1.        I am a Deputy County Attorney and Chief of the Appeals Bureau in the office of LORNA B.

          GOODMAN, Nassau County Attorney, counsel for Petitioner.  I submit this declaration in

          opposition to Respondents' motion to vacate, and in support of Petitioner's cross-motion to

          confirm, an arbitration award.

2.        The reasons for denying the motion to vacate and granting the cross-motion to confirm are

          set forth in the accompanying Memorandum of Law.

3.        The purpose of this declaration is two-fold.  First, for the Court's convenience, additional

          copies of certain key documents referenced in this Memorandum, which were submitted with

          either the original petition and/or the motion to vacate, are attached hereto.  These are:

•         Exhibit A.     Award of Arbitrators dated October 17, 2007 (also submitted as Exh. C to
                         Petition and as part of Exh. A.6 to Motion to Vacate);

•         Exhibit B.     Order clarifying Award dated November 28, 2007 (also submitted as Exh.
                         E to Petition, and as part of Exh. A.6 to Motion to Vacate);

- Exhibit C.   Respondent's (*i.e.*, County's) Pre-Hearing Brief dated June 19, 2006 (also submitted as Exh. B.2 to Motion to Vacate);

- Exhibit D.   Respondent's (*i.e.*, County's) Post-Hearing Brief dated July 31, 2007 (also submitted as Exh. B.4 to Motion to Vacate);

- Exhibit E.   Agreement For Legal/Regulatory Services between the County of Nassau and Zorc & Chase, dated August 24, 1993 (also submitted as Exh. A to Petition and, in various formats, as Exh. Volume C or C-5 to Motion to Vacate)

4.   In addition, a true copy of the following document, with which I am familiar based upon a review of the files maintained by this office, is submitted herewith:

- Exhibit F.   Respondent's (*i.e.*, County's) Post-Hearing Reply Brief dated August 27, 2007;

WHEREFORE, for the reasons discussed in the accompanying Memorandum of Law, Petitioner respectfully requests that the court deny the motion to vacate and grant the cross-motion to confirm the arbitration award..

Dated: Mineola, New York
        April 16, 2008

Dennis J. Saffran
(DJS-6170)

- 2 -

# EXHIBIT A

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
-------------------------------------------------------X
Judith L. Chase, Esq., Joseph M. Zorc, Esq. and
Zorc & Chase,

                Claimants,                  Case No. 13 194 02690 04

  -and-

Nassau County, NY

                Respondent.
-------------------------------------------------------X

## AWARD OF ARBITRATORS

      THE UNDERSIGNED ARBITRATORS, having been duly qualified pursuant to

paragraph 13 of the "Agreement for Legal/Regulatory Services" (the "Retainer

Agreement") effective as of August 2, 1993, between Zorc and Chase and Respondent

the County of Nassau (the "County"), and the Arbitrators having executed their oaths,

and having conducted 12 days of evidentiary hearings in this matter, do hereby Find

and Award as follows:

      At issue here is the Claimants' entitlement to payment of legal fees for legal

services claimed to have been provided by Claimant to the County in 2002 pursuant to

the Retainer Agreement.  The Retainer Agreement set forth Zorc and Chase's hourly

fees plus additional percentage fees contingent upon successful results.  Any

entitlement pursuant to that contingency arrangement for the successes to which

Claimants refer is not before us.  Of the total Zorc and Chase billed the County for legal

services in 2002, the County has paid 50% of the fees charged in the amount of

$678,962.50.  At issue here is the remaining 50% of the legal fees for 2002 and certain

additional charges claimed by Zorc and Chase for "reformatting" its bills in the amount of $38,500 and for "case management" in the amount of $153,375 for which Zorc and Chase had not originally billed the County.

Based upon our review of the extensive documentary evidence and our evaluation of the credibility of the witnesses, we deny Claimants' claims set forth in the Demand for Arbitration in their entirety.  Our conclusions are based upon the following analysis:

A.  We Find that Claimants' bills to the County for legal services for 2002 were not accurate, not reasonable, and not credible for the following reasons:

1.  Zorc and Chase billed extraordinarily high hours for 2002 given the very minimal legal work shown to the Tribunal.  This is especially so, since in 2002 Zorc and Chase made no court appearances, participated in limited agency appearances or external meetings, submitted no briefs or memoranda of law, and prepared and/or submitted very few letters.

2.  It is not credible that on such a high number of days, Mr. Zorc and Ms. Chase allegedly performed exactly the same work for exactly the same number of hours.  65% of all time entries in 2002 for Mr. Zorc and Ms. Chase were identical.  An overwhelming number of all telephone calls in 2002 were by both Mr. Zorc and Ms. Chase for the same number of hours.  Ms. Chase's explanations on these points were not persuasive.  To the extent they reflect collaborative efforts among counsel, we Find, based on the evidence presented, that it was not reasonable to duplicate efforts to the great extent reflected in the bills.

3.  It is not credible that Mr. Zorc and Ms. Chase performed so much work and

2

rendered so many billable hours while they were in Italy and in the Virgin Islands in 2002.

4.   It is not credible that especially in January and February 2002, and especially given their states of health, that Mr. Zorc and Ms. Chase each had many days with billable hours approaching 18 hours a day.  When asked to explain, they advised that they were faced with significant deadlines, although the "deadline" for the County's work was several months in the future.  Additionally, much of the alleged work of Mr. Zorc and Ms. Chase during this deadline period consisted of updates of congressional staff changes.  It also does not seem credible that if there were pressing deadlines leading to 18 hour work days that Mr. Zorc and Ms. Chase would spend so much time obtaining and reviewing information regarding congressional staff changes.  Moreover, no memos or records were produced to establish that all the hours billed by Zorc and Chase for tracking congressional staff changes during this time period were actually rendered.

5.   Zorc and Chase's bills for services rendered in 2002 reflect 182 hours of legal time for *quantum meruit* research.  However, the memorandum of law regarding *quantum meruit* submitted by Zorc and Chase in May 2003, reflected virtually no changes from a memorandum of law drafted years earlier by Zorc and Chase.  More incredibly, by way of explanation, during the hearings (not during discovery, although the Tribunal had ordered all such documents produced during discovery), Zorc and Chase produced another memorandum of law regarding *quantum meruit* dated November 2003 which was never submitted to anyone, but allegedly contained significant changes purportedly reflecting the 2002 research.  It makes no sense that

3

extensive research allegedly done in 2002 was no where reflected in a submitted memorandum of law in May 2003, but was reflected in a memorandum of law which was later written but not submitted to anyone in November, 2003, about a year after the end of 2002.

6.  The Zorc and Chase time sheets contained 242 references to work done by attorneys at Zorc and Chase in connection with legal documents. Yet, virtually no such documents were produced by Zorc and Chase to the County in response to document requests and virtually no such documents were introduced by Zorc and Chase in evidence at the hearings.

7.  Zorc and Chase engaged one associate whose time records were produced because that associate billed Zorc and Chase based upon his contemporaneous time sheets. With no credible explanation, Zorc and Chase changed the time set forth on the associate's time sheets when it billed the County.

8.  Many of Zorc and Chase's very busy days in early 2002 were also occupied with rendering services for another municipality thereby leading to further question as to the number of hours allegedly rendered each day. Based upon a review of both the issues referred to on the bills and related to the legal work performed for the other municipality, there was serious question as to whether Zorc and Chase billed the County for work done for the other municipality, which had a cap on its billing of $75,000.00 per annum.

9.  A significant portion of the Zorc and Chase bills was for paralegal work. However, Zorc and Chase kept no time sheets for the paralegals, had no record of their work, produced no records of payment to these paralegals, and with one exception,

4

could not even identify the names of the paralegals.

   10.  Some of the Zorc and Chase work allegedly performed in May 2002 consisted of reviewing 32 decisions of the Environmental Protection Agency.  However, this work seemed entirely duplicative of work performed and billed for by Zorc and Chase in 2001.  The only difference appeared to be that the 2001 work was billed to District 2 but the 2002 work was billed to both Districts 2 and 3.

   11.  Zorc and Chase did not retain contemporaneous records of lawyer time. Rather, their practice was to have Ms. Chase take notes on her computer of her time and Mr. Zorc's time.  These notes were used by Ms. Chase and overwritten when bills were prepared for the County many months later, and for some months as much as a year later.  In preparing the final bills, Ms. Chase consolidated all attorney time descriptions into one block billing entry.  Without the benefit of the original notes, it was not possible to compare contemporaneous notes with the final bills or to analyze the actual work performed by each attorney as recorded contemporaneously.  The Retainer Agreement (paragraph 9) required Zorc and Chase to keep records of its time for a 5 year period.  No such credible records were maintained.

   B.  We Find that the County acted reasonably in asking for more information about the Zorc and Chase 2002 bills including a request by the County that such bills be reformatted to comply with the Retainer Agreement.  Our conclusion is based upon the following:

   1.  The Retainer Agreement required Zorc and Chase to invoice on a monthly basis.  Zorc and Chase completely failed to do so.  In fact, none of the bills for 2002 were received by the County in 2002.  Given the failure to comply with the Retainer

5

Agreement and the great delays in receipt of the Zorc and Chase bills, it was reasonable that the County would seek better explanation in connection with the accuracy of the bills.

2. The Retainer Agreement required that the Zorc and Chase bills reflect hours spent by each attorney on a daily basis. Zorc and Chase completely failed to comply, instead using "block billing" lumping the work of Mr. Zorc, Ms. Chase, and the associate together in one time entry. This was understandably problematic for the County because Mr. Zorc and Ms. Chase had different billing rates than the associate. Moreover, it was impossible to determine from the bills which attorney had performed which services and how long each task had taken.

3. We reject Zorc and Chase's argument that the County waived its right to ask for bills in conformity with the Retainer Agreement because prior County administrations had paid bills rendered in Zorc and Chase's "block billing" format. We find that it was entirely reasonable for the County to request that all unpaid bills for 2002 comply with the Retainer Agreement.

4. We Find that the County acted in good faith when in April and May 2003 they paid 50% of the Zorc and Chase bills after requesting reformatting. The evidence does not establish that the request for reformatting was part of a plan by the County to fire Zorc and Chase or to discriminate against Zorc and Chase in any way. To the contrary, the evidence established that the work of all outside law firms was being reviewed by the new County administration, and, in fact, the County appeared desirous of continuing its relationship with Zorc and Chase.

C. We Find that Zorc and Chase's reaction to the County's request for

6

reformatted bills was highly improper and that the reformatted bills themselves were also not accurate, not reasonable and not credible for the following reasons:

1. Zorc and Chase's initial hostile reaction to the County's request for reformatting was entirely inappropriate and its initial written statement to its client that it would take 32 working days to reformat 24 bills was a gross exaggeration.

2. After enormous resistance, Zorc and Chase finally did reformat its bills. The reformatting was performed for many of the bills nearly 2 years after the services were rendered. The reformatting was done without reference to any notes, time sheets, or other contemporaneous records of services rendered, since Mr. Zorc and Ms. Chase did not maintain such records although, as noted above, they were required to do so.

3. Many of the reformatted bills contained errors including hours billed which did not match the original bills. Every single error was in favor of Zorc and Chase.

4. In many instances, the reformatting effort by Zorc and Chase seems to have consisted of little more than taking one paragraph of the original bill and breaking it into two paragraphs for the reformatted bill.

5. Because Zorc and Chase had the detailed time sheets of their associate for 2002, it would have been relatively easy for them to respond, at least in part, to the County's requests for more information by providing the County with the associate's time sheets. Zorc and Chase refused to do so and provided no reasonable explanation for this refusal.

D. The Tribunal had serious doubts as to Zorc and Chase's credibility regarding the veracity and accuracy of both the original bills and the reformatted bills because of the highly questionable and arguably unprofessional conduct of Zorc and Chase toward

7

its client as follows:

1.  The testimony and conduct of Mr. Zorc and Ms. Chase about their original meeting with County officials in the new administration was directly contradicted by their own prior testimony regarding such meeting.

2.  Zorc and Chase appeared to engage in a course of conduct designed to intimidate County officials. Specifically, Zorc and Chase sent a "Notice of Claim" threatening to personally sue various County attorneys for millions of dollars because the County sought reformatting of the bills and was allegedly delaying its review of the original bills.

3.  Zorc and Chase threatened to publish articles in local newspapers in Nassau County charging County officials with wrongdoing because of their request for reformatting and alleged failure to review the bills.

4.  At least one County attorney was left one or more voice mails by Mr. Zorc threatening her personally with RICO claims.

5.  Zorc and Chase accused County officials of "diverting funds".

6.  Zorc and Chase sent County officials a poem composed by Mr. Zorc which contained derogatory statements about County officials and claimed that various named County officials were engaged in personal improprieties, including a statement that a senior County official was "in the sack, with a French minister."

7.  Despite the above bizarre conduct, Zorc and Chase strenuously objected to the County's termination of their services arguing (although not relevant to this arbitration) that the County had wrongfully breached the termination clause of the Retainer Agreement.

8

E.  We reject Zorc and Chase's claim that it was entitled to be paid on the basis of an account stated for the following reasons:

1.  We Find that the County timely objected in writing to the Zorc and Chase bills.

2.  We Find that Zorc and Chase's position that the County had to react immediately in objecting to a bill even though Zorc and Chase took months to render the bill is untenable.  In fact, the times between receipt of many bills and objection by the County were often far less than the times between when the legal services were allegedly rendered and when the bills were actually received by the County from Zorc and Chase.

3.  We Find that the County's payment of 50% of the Zorc and Chase bills was a good faith accommodation and did not constitute any admission by the County of the total amount due.  To the contrary, the County explicitly reserved all rights regarding the other 50% claim which constitutes the essence of the demand in this arbitration.

F.  Based upon the reasons set forth above and based upon the existence of the Retainer Agreement, we deny Zorc and Chase's claims based upon *quantum meruit*.

G.  Based on our evaluation of the witness' credibility and the evidence, we Find that the payment of 50% of the legal fees already paid by the County for the legal services rendered by Claimant in 2002 completely satisfied the County's obligation to pay Claimants for its claims in this arbitration.

H.  We deny Zorc and Chase's claims for $38,500 in additional fees for reformatting the bills and for an additional $153,375.00 for "case management fees", which were additional fees added by Claimant long after the bills were originally submitted to the County, for the following reasons:

9

1.  The Retainer Agreement does not provide for such additional charges.

2.  As noted above, we find the reformatting effort was fairly requested by the County but was not responded to appropriately or in good faith by Zorc and Chase. We also find that the reformatted bills themselves were neither accurate nor credible.

3.  The case management fees were added long after the original bills were submitted to the County and are conceded estimates allegedly accounting for time intervals of less than 30 minutes but with no contemporaneous written substantiation. Moreover, some of the case management fees were allegedly for management of various legal tasks performed on days when, according to the time sheets, no other legal tasks were performed.

I. We Find that the County is entitled to an award of legal fees in this matter for the following reasons:

1.  Pursuant to American Arbitration Association Commercial Rule 43(d)(ii), both parties requested that the Tribunal award attorneys fees to the prevailing party. Zorc and Chase has submitted a fee application for $1,466,307.00 and the County has submitted a fee application of $90,062.50. We find that the County was the prevailing party in this arbitration.

2.  We find that this arbitration was unduly protracted because Zorc and Chase did not comply with the Tribunal's discovery orders and did not comply with the directions and/or suggestions of the Tribunal regarding the conduct of the hearing. Specifically, we find that Zorc and Chase unnecessarily prolonged the hearings by continuously providing evidence and strenuous and prolonged arguments about the following irrelevant matters:

10

(a) Work allegedly performed by Zorc and Chase in years other than 2002.

(b) Alleged accomplishments by Zorc and Chase for the County, particularly in years prior to 2002.

(c) Whether there was a valid termination of the Retainer Agreement by the County.

(d) Whether County officials were knowledgeable and/or competent regarding the legal issues which were the subject of the Zorc and Chase retention.

(e) Irrelevant information regarding prior and pending arbitrations.

(f) Continuous argument about the need for an expeditious conclusion of the arbitration coupled with continuous requests for delays and accusations of unfair treatment when the Tribunal attempted to accelerate the proceedings.

J. Based upon the above, we Award as follows:

1. All claims of Claimants are denied in their entirety.

2. Within 30 days of the date of this Award, Claimants shall pay to the County the sum of $90,062.50 representing the County's attorneys' fees.

3. The administrative fees of the American Arbitration Association totaling $8,500.00 and the compensation and expense of the arbitrators totaling $164,969.65 shall be borne by the Claimants. Therefore, the Claimants shall reimburse the Respondent the sum of $82,484.81, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by the Respondent.

4. The expense of all transcript and hearing room rentals shall be borne by Claimants.

5. Any and all claims not decided herein are deemed denied.

11

6.  This Award may be executed in counterparts.


| Date | Eugene I. Farber |
| --- | --- |

_10/17/07_

| Date | Michael G. Berger |
| --- | --- |

| Date | Edna R. Sussman |
| --- | --- |


I, Eugene I. Farber do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

| Date | Eugene I. Farber |
| --- | --- |


I, Michael G. Berger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_10/17/07_

| Date | Michael G. Berger |
| --- | --- |


I, Edna R. Sussman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

| Date | Edna R. Sussman |
| --- | --- |

12

6.  This Award may be executed in counterparts.

_10/17/07_____          _____
Date                              Eugene I. Farber

_____  _____
Date                              Michael G. Berger

_____  _____
Date                              Edna R. Sussman

I, Eugene I. Farber do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_10/17/07_____          _____
Date                              Eugene I. Farber

I, Michael G. Berger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____  _____
Date                              Michael G. Berger

I, Edna R. Sussman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____  _____
Date                              Edna R. Sussman

12

4.  The expense of all transcript and hearing room rentals shall be borne by Claimants.

5.  Any and all claims not decided herein are deemed denied.

6.  This Award may be executed in counterparts.

_____          _____
Date                             Eugene I. Farber

_____          _____
Date                             Michael G. Berger

_Oct. 17, 2007_                  _Edna R. Sussman_ (signature)
Date                             Edna R. Sussman

I, Eugene I. Farber do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                             Eugene I. Farber

I, Michael G. Berger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                             Michael G. Berger

I, Edna R. Sussman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_Oct. 17, 2007_                  _Edna R. Sussman_ (signature)
Date                             Edna R. Sussman

12

American Arbitration Association
*Dispute Resolution Services Worldwide*

*Northeast Case Management Center*
Catherine Shanks
Vice President
Christopher Fracassa, Yvonne L. Baglini
Assistant Vice Presidents

950 Warren Avenue, East Providence, RI 02914
telephone: 866-293-4053 facsimile: 401-435-6529
internet: http://www.adr.org/

<u>**Via First Class Mail**</u>

December 19, 2007

Judith L. Chase & Joseph Zorc, Esq.
Zorc & Chase
1719 19th Street, NW
Washington, DC  20009-1605

Ralph Reissman, Esq.
County Attorney
Nassau County Executive Building
One West Street
Mineola, NY  11501

Re: 13 194 02690 04
    Judith L. Chase, Esq., Joseph M. Zorc, Esq.
    and Zorc & Chase
    and
    Nassau County, NY

Dear Parties:

Enclosed please find the hard copy of the duly executed Order of the Clarification of Award for this matter, previously transmitted to you electronically on November 29, 2007.

We are this date closing our files. Please note that the case file will be destroyed fifteen (15) months after the date of this letter.

We appreciate the opportunity to assist the parties in the resolution of this matter.

Sincerely,

*C. J. Batchelder*

Carol J. Batchelder on behalf of Hannah R. Cook
Case Manager
401 431 4708
cookh@adr.org

*Supervisor Information: Heather Santo, 401 431 4702, SantoH@adr.org*

Encl.

cc:    Eugene I. Farber, Esq.        w/o encl. via email
       Edna R. Sussman, Esq.               "
       Michael G. Berger, Esq.             "

# EXHIBIT B

AMERICAN ARBITRATION ASSOCIATION
COMMERCIAL ARBITRATION TRIBUNAL
-------------------------------------------------------------x
Judith L. Chase, Esq., Joseph M. Zorc, Esq. and
Zorc & Chase,

                Claimants,               **Case No. 13 194 02690 04**

 -and-

Nassau County, NY

                Respondent.
-------------------------------------------------------------x

## <u>ORDER</u>

      THE UNDERSIGNED ARBITRATORS, having received a request for clarification of the Award dated October 17, 2007 from Respondent, and the Arbitrators being advised that Claimant has submitted no opposition to such request for clarification, it is hereby Ordered as follows:

     Paragraphs J(3) and J(4) of this Panel's Award dated October 17, 2007 are amended as follows:

    1.  The second sentence of paragraph J(3) is amended to read as follows:

"Therefore, within 30 days of the date of this Award, the Claimants shall reimburse  Respondent the sum of $82,484.81, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by the Respondent."

    2.  Paragraph J(4) is amended to add a second sentence as follows:

Within 30 days of the date of this Award, Claimants shall reimburse Respondent for the same."

__11- 28-07_____

Date

_____
Eugene I. Farber

_____          _____
Date                                     Michael G. Berger

_____          _____
Date                                     Edna R. Sussman


I, Eugene I. Farber do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_11-28-07_____          _____
Date                                     Eugene I. Farber


I, Michael G. Berger, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                                     Michael G. Berger


I, Edna R. Sussman, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

_____          _____
Date                                     Edna R. Sussman

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION
-----------------------------------------------------------X
JUDITH L. CHASE, JOSEPH M. ZORC
and ZORC & CHASE,

                      Claimants,

THE COUNTY OF NASSAU,

                      Respondent
-----------------------------------------------------------X

Case No. 13Y 194 02690 04

Case Manager:  Hannah R. Cook

Arbitrators:   Eugene I. Farber, Esq.
               Edna R. Sussman, Esq.
               Michael G. Berger, Esq.

## RESPONDENT'S PRE-HEARING BRIEF

## INTRODUCTION

In this arbitration, the fifth of six separate proceedings filed by the two-lawyer firm of

Zorc & Chase against Nassau County, Claimants assert they are owed $907,462.00,

representing the 50% balance of Claimants' legal fees for work allegedly performed in

2002.  Respondent Nassau County, having made an initial good-faith 50% payment in

2003 while in the process of scrutinizing and questioning Claimants' billing practices and

statements, disputes Claimants' right to any further payment for the 2002 calendar year

because:

1. Claimants billed Nassau County in 2002 for work that Claimants performed in prior years, for which Nassau County had already paid.

2. In breach of their contract, Claimants failed to submit billing statements on a monthly basis, in some instances, more than two years late, long after work had been performed.

3. Claimants failed to create and maintain contemporaneous time records setting forth the name of the attorney, the activity performed, or the time incurred in performing that activity.

4. With no contemporaneous time records, Claimants' attempts to reformat their bills, in some instances two years after the work was allegedly performed, are inaccurate, unreliable, and based on mere guesswork and conjecture.

5. Joseph Zorc never created or maintained any time records of his activities for 2002.

6. In reformatting their bills, Claimants created an entirely fictional billing entry for "Case Management" of more than $150,000 based on pure conjecture.

7. For the enormous amount of billings claimed for 2002, $1,586,550.00 for two attorneys, one associate attorney and unidentified paralegals, Claimants produced only a remarkably small amount of work product.

8. Claimants charged identical time for the identical activity for both Joseph Zorc and Judith Chase for a full 33% of their 2002 entries, constituting 66% of their time charges for 2002.

9. Claimants billed excessively for attorney's time spent performing non-legal tasks and activities.

10. Claimants billed Nassau County for unidentified and undocumented paralegals who maintained no time sheets or computer entries of their time.

11. Claimants billed Nassau County excessively for alleged research that resulted in no work product.

12. Claimants made minimal effort to apprise the County, their client, of the legal work they were performing or of the substantive and procedural decisions they were making on the County's behalf.

Respondent submits that, having been paid 50% of their time charges for 2002, Claimants have been more than sufficiently compensated. There simply is no credible way for Zorc & Chase to support their claim for more than $900,000 based on their deeply flawed and suspicious time entries. Accordingly, the claim must be denied in its entirety.

## BACKGROUND

**The Contract.** In 1993 the County entered into a legal services contract with the law firm of Zorc & Chase. Briefly, the County sought Zorc & Chase's assistance in securing grant funding, available under the Clean Water Act, to help pay for costs associated with the County's construction of wastewater treatment facilities. In general, the firm was to

2

work with the County to identify sources of funding that might be available through programs administered by the federal Environmental Protection Agency and the New York State Department of Environmental Conservation and to pursue claims on the County's behalf.

The parties agreed upon payment of an hourly rate of, *inter alia,* $250 for Joseph M. Zorc and for Judith L. Chase, $175 for Robert Mittendorf (an engineer and attorney who works with Zorc & Chase) and $50 for paralegals. The contract also provided that, under certain circumstances, the firm might be eligible to receive a contingent fee in addition to fees based on the hourly rate. Zorc & Chase was to render monthly invoices to the County (Proposal, incorporated in the contract, General Conditions, ¶ A: "Invoices will be rendered monthly"), and the County was to pay those invoices "monthly, in arrears, as promptly as possible upon [the firm]'s submission of itemized standard County claim vouchers specifying the Services performed on a per individual and per hour basis."

**Events Giving Rise to Arbitration.** Zorc & Chase performed services under the contract from 1993 until the contract's termination in 2003. Ultimately, the firm's efforts resulted in the County's receipt of some $77 million in grant funding, and the firm in turn has been paid $10.7 million, including $9.5 million in hourly fees (consisting of $2.25 million paid in 2002-2003 before the contract's termination and $385,000 awarded in the second arbitration) and another $1.2 million as, or in lieu of, a contingent fee, awarded in the third arbitration). The parties agree on the amount of funding the County has *actually* received, but disagree about whether the firm's efforts have also established the County's *entitlement* to receive significant additional funds.

Most of the firm's work was performed during the tenure of Thomas Gulotta as

3

County Executive. In 2001, Thomas Suozzi was elected County Executive. When he took office in January 2002, he appointed Lorna Goodman as County Attorney. Upon taking office, Goodman found more than $1 million worth of outstanding invoices for work that had been done by Zorc & Chase from 2000 through the first half of 2001 and that had not been paid by the prior administration.

In April 2002 Jane Houdek joined Ms. Goodman's office as a Deputy County Attorney specializing in environmental regulatory matters. Ms. Goodman assigned Ms. Houdek to work on sewage treatment plant matters, including construction grants, and gave her the task of reviewing Zorc & Chase's outstanding bills. Trying to clear the billing backlog, Ms. Goodman and her staff presented the outstanding Zorc & Chase bills to the Legislature in May 2002, after only minimal review, and secured the full $1.1 million payment for them. For its part, the firm in March 2002 apologized for having fallen behind in invoicing and promised to "submit additional months' bills as promptly as possible." But the firm did not fulfill that promise. Without explanation, the firm's invoicing continued to lag. The bill for August 2001, for example, was not sent out by the firm until September 2002. The firm's delay in submitting bills was accompanied by a failure to provide the County with any estimates of how much unbilled work remained to be invoiced, thus undermining the County's ability to budget for bills that would be received in the future.

From the County Attorney's point of view, those were only some of many causes for concern. The financially pressed County was trying to reduce its reliance on outside counsel. Of all the outside law firms with whom it was then doing business, Zorc & Chase was the most expensive. The firm's bills for work ostensibly performed during the second

4

half of 2001 – bills that did not arrive until the fall of 2002 – were enormous. The County has two sewage disposal districts – Districts 2 and 3 – each of which was being billed separately. Zorc & Chase's bill for work performed for just District 3 in September 2001 was $122,475; the bill for just District 2 in October 2001 was $125,775. Altogether, the firm was claiming to have performed over $1.5 million worth of work in 2001. Yet the two-lawyer firm was handling only regulatory matters – no litigation, no corporate activity, nothing that involved drafting complex documents or meeting tight schedules. The firm submitted relatively few briefs, memoranda or other legal documents to the agencies it was dealing with; it generated only modest amounts of correspondence. Indeed, all of the legal work reflected in the firm's bills was being performed by Ms. Chase and Mr. Zorc themselves, Mr. Mittendorf and unnamed paralegals. Ostensibly, Ms. Chase and Mr. Zorc were working very long hours: each of them frequently billed the County for more than eight hours a day and often recorded days longer than that, even on weekends.

At the same time, the County's attorneys found it difficult to understand just how Zorc & Chase was spending its time. The firm made minimal effort to keep the County Attorney's office apprised of its work for the County. The firm's voluminous bills were unhelpful. Although seemingly filled with details, they presented that material cryptically, making it more confusing than enlightening. They were not in a standard format for legal bills. They contained no breakdown by matter, attorney and billed time. Instead, for each day the firm provided a narrative, often covering many different activities on different matters, with a summary number of hours for each attorney for that day. For a typical day, a bill might show that various forms or records were reviewed or compiled, telephone calls were made, meetings were held, and so on, and that Ms. Chase, Mr. Zorc and Mr.

5

Mittendorf each worked eight or more hours. The bill would not explain which attorney worked on which matter or performed which activity, nor would it show how long a particular task took. Moreover, since bills were coming in a year after the work they recounted, the bills provided no insight into what Zorc & Chase was working on in 2002. Against that backdrop, the County's attorneys began their review of the almost 100 pages of Zorc & Chase bills that had finally arrived in the fall of 2002 and covered activity ostensibly performed in the second half of 2001. Notably, no bills at all for work performed in 2002 had been submitted by Zorc & Chase and indeed, none were submitted until after January 15, 2003.

In a conference call on December 13, 2002 Ms. Goodman, joined by Chief Deputy County Attorney Elizabeth D. Botwin and the County Commissioner of Public Works, Peter Gerbasi, spoke to Ms. Chase. An agreement was reached that, while the County's detailed review of the firm's work and the outstanding bills was ongoing, the County would pay 50% of the invoiced fees. Zorc & Chase agreed that from then on bills would be submitted monthly, as required by the contract.

The resolution that the parties had reached quickly broke down. The County Attorney's Office did send the outstanding bills to be processed for payment, but in January 2003 Zorc & Chase was asked to reformat the bills to conform to the contract's requirement of bills "specifying the Services performed on a per individual and per hour basis." The County's demand that the bills be reformatted outraged Zorc & Chase, which accused the County Attorney of reneging on the December deal. The County, which assumed that Zorc & Chase followed standard law firm practice in recording billable time, expected that reformatting the bills to conform to the contract would be a simple matter of

6

extracting computer records the firm already had.

What the County did not know (and learned only during the first arbitration) was that Zorc & Chase did not keep individual time records using time slips or maintain standard computerized time records. (Nor did the County know that it was essentially the firm's only client, accounting for 95% of Zorc & Chase's business.) Instead, it was the firm's practice that at the end of the business day Ms. Chase would note on her computer the activities she, Mr. Zorc and any paralegals performed during the day and *aggregate* the time of each attorney and paralegals to come up to a day's work. Thus, for example, the firm had a record that on a particular day Ms. Chase and Mr. Zorc had each worked a total of eight hours on County matters but would have no reliable way of particularizing how much of that time each attorney had spent on each matter or specific task. Zorc & Chase refused to reformat its bills but did not explain that it lacked the information necessary to comply with the County's request, or that to comply would have required the attorneys to spend days trying to reconstruct, largely from memory, how much time each of them had devoted to services allegedly performed as much as 18 months earlier. (Eventually, the County paid 50% of the outstanding bills for services allegedly performed in the second half of 2001, or about $350,000, and 50% of the outstanding bills for services allegedly performed in 2002, or about $750,000. The County also paid Zorc & Chase in full for subcontractors' invoices.)

Zorc & Chase did submit their bill for December 2002 the following month, as they had promised. But that was the only bill timely submitted. After the County requested reformatted bills, the firm respond as requested until October 2003, when it finally submitted a reformatted bill for October 2001 and bills for January and February 2003.

7

The firm did not explain the difficulty it was having reformatting its bills, nor did it explain why it had taken more than half a year to submit bills for the first two months of 2003. (The firm subsequently submitted bills for March and April 2003 but has never billed the County for any work allegedly performed after that.)

On November 17, 2003 Zorc & Chase filed its first demand for arbitration against the County; by letter dated November 26, 2003, Ms. Goodman informed the firm that the County was terminating the contract. During February and March 2004, Zorc & Chase finally delivered to the County reformatted versions of the 2002 bills including, <u>for the first time</u>, bills for District 3 covering February, March and April 2002, never submitted in any form prior to this time.

**Prior Proceedings.** To date, Zorc & Chase has filed six arbitration demands against the County and has stated in court proceedings that it may file additional demands against the County and a lawsuit against County employees. The proceedings already concluded or in progress are:

*First Arbitration.* The first demand was for payment of the unpaid 50% of Zorc & Chase's claimed hourly fees, as reflected in the firm's bills, for the latter half of 2001. The total claim was for $344,043. On February 3, 2005 an AAA panel issued an award denying the claim in its entirety and ordering Zorc & Chase to pay the County $18,924. (The parties subsequently agreed to reduce the amount to $16,424. Zorc & Chase has never paid the award, which remains outstanding.)

*Second Arbitration.* On February 10, 2004 the firm filed a demand to arbitrate its claim for hourly fees reflected in its bills for the first four months of 2003. The County had paid nothing on those bills. The total claim was for $489,650. On January 27, 2005

8

an AAA panel issued an award to Zorc & Chase in the amount of $385,599. Although the award has never been confirmed, the County has paid it.

*Third Arbitration.* On March 1, 2004 the firm filed a demand to arbitrate a claim that it was entitled to an award in *quantum meruit* in lieu of a contingent fee under the compensation provision of the contract. The demand sought the *quantum meruit* award only with respect to the "successful results" allegedly achieved on four projects. The total claim was for $7.5 million. On October 14, 2005 an AAA panel issued an award to Zorc & Chase in the amount of $1,170,006. Again, although the award has not been confirmed, the County has paid it.

*Fourth Arbitration.* The fourth demand for arbitration was filed on June 1, 2004. The demand sought an award for fraud, defamation, tortious interference and violation of RICO. The total claim was for $5 million. On October 7, 2005, Zorc & Chase withdrew the demand.

*Fifth Arbitration.* Filed November 18, 2004, the fifth demand – the one before this Panel – is (as subsequently amended) for payment of the unpaid portion of Zorc & Chase's claimed hourly fees, as reflected in the firm's reformatted bills, for 2002. (In 2003, the County paid 50% of the face amount of the original bills, or $678,962.) The total claim is for $907,462.

*Sixth Arbitration.* On June 30, 2005, the firm filed a demand to arbitrate another claim of entitlement to an award in *quantum meruit* in lieu of a contingent fee under the compensation provision of the contract. The demand sought the *quantum meruit* award only with respect to the "successful results" allegedly achieved for certain projects not covered by the third arbitration demand. The total claim is for $8 million. The claim has

9

yet to be heard by an AAA panel.

*Tort Lawsuit.* The firm has said that it may bring a federal lawsuit, under 42 U.S.C. §

1983, against various County employees.

*Corollary Litigation.* After receiving Zorc & Chase's second and third demands for

arbitration, the County sought consolidation. After a series of motions in both federal and

State courts, and after decisions had already been issued in the first and second arbitrations,

the County, deciding that the issue had become academic, withdrew its pending appeal of

the State court's denial of consolidation. The parties then focused their attention in the

arbitration process.

## BILLS AT ISSUE IN THIS ARBITRATION

Zorc & Chase originally invoiced the County for services allegedly performed in 2002

through 21 bills submitted to the County after January 15, 2003. The 21 bills covered

services for each of the twelve months for District 2 and for nine months for District 3:

originally, no bills were submitted for District 3 for February, March and April 2002. The

total amount invoiced on those 21 bills was $1,386,225.00. The County objected to those

bills on the grounds that they failed to present the information (*i.e.*, a breakdown of hours

billed by attorney and activity) required by the contract, such information being necessary for

review and acceptance by the County of properly performed and invoiced work. On April 16,

2003 the County Attorney authorized payment to Zorc & Chase of 50% of that amount, or

$693,112.50. The County reserved its right to review Zorc & Chase's bills further and

determine whether additional payment was warranted upon submission of reformatted bills

providing the missing information.

Between February 19, 2004 and March 6, 2004, Zorc & Chase submitted 24 bills for

10

services allegedly performed in 2002. The 21 bills earlier submitted were reformatted, providing some – but by no means all – of the required breakdown of time by attorney and activity. Three additional bills were submitted, covering services allegedly performed for District 3 in February, March and April 2002.

The reformatted bills did not simply restate and break down the items. Instead, the 2004 bills included a new item – "case management" – that was repeated as an aggregate activity (or summary of miscellaneous activities) and reported at irregular intervals. Thus, for example, the invoices for January 2002 services for Districts 2 and 3 include five entries for "case management": for January 1-14, January 15-17, January 17, January 18-22, January 23-25 and January 26-31. Dozens of similar groupings totaling $155,225 of "case management" time throughout the course of the reformatted bills were added to the amounts previously invoiced for 2002, including the February, March and April 2002 bills received for the first time in March 2004.

With the new charges, Zorc & Chase's 2004 bills increased the amount invoiced and allegedly outstanding for 2002 services from $693,112.50 to $923,557.25 – including $155,225 for "case management" plus another $70,500 for services allegedly performed for District 3 in February, March and April 2002. Reviewing the contents of Zorc & Chase's bills, together with the testimony and exhibits relating to them, demonstrates that the County's decision to pay $693,112.50 for the services it actually received in 2002 was correct, based on the numerous problems inherent in Zorc & Chase's claim.

The first problem with Zorc & Chase's bills is the way in which, according to Chase, they were constructed and the lack of underlying documentation. Chase has testified that she kept track of time for herself, Zorc and paralegals. Zorc himself never created or maintained

a time record of any sort for any of his activities – a total of 2,316 hours – in 2002. According to Chase, at the end of each day, she would note on her computer how many hours she, Zorc and any paralegals had worked and the activities worked on. Chase's end-of-the-day summaries would, according to her, become the basis for the actual bills, which she would prepare by elaborating on the summaries (spelling out abbreviations, providing clarifying detail and so on). In discovery, Zorc & Chase has confirmed that they did not retain the computer entries that allegedly recorded an individual's time and, further, that there are no other documents on which the bills are based. And that, in turn, means that when Chase prepared the "reformatted" versions of the bills, she had no records to consult to enable her to allocate attorneys' time among different activities: instead, she relied (as she has confirmed) on her memory to reconstruct events and time charges from up to two years prior, and "logic." Chase's account is hard to credit, and indicates the lack of trustworthiness of Zorc & Chase billing statements.

Taking, for example, the work claimed for January 2, 2002, in her original bill dated December 16, 2002 Chase purports to have reconstructed activities performed by herself, Zorc and unnamed paralegals some 50 weeks earlier; even more removed in time is the reformatted bill, submitted in March 2004. Even if the issue of retrospective allocation of time in the reformatted bills is ignored, the question remains: years later, how Chase could have accurately accounted for Zorc's and the paralegals' times every day?

The much more realistic conclusion is that Chase did *not* have contemporaneous records at all, at least not on any consistent basis, and that most of what was ultimately submitted by Zorc & Chase was composed months after the events in question on the basis of some combination of memory, notes, review of incidental documents, sheer conjecture and

fabrication. Given that, there is no reason at all to suppose a basis for the firm's belated bills

for "case management" and for the months of February, March and April 2002 for District 3,

and those items should be dismissed out of hand. While Claimants will argue that they and

the County had, by January 2002, adopted a relaxed practice with respect to the contract

requirement of monthly billing, a two-year delay in billing was unprecedented. Moreover, the

County had unambiguously told Zorc & Chase that it would have to live up to the monthly

billing requirement in 2002 and afterwards. The firm's continued flouting of that requirement

entitled the County to reject those bills.

There are strong reasons to suspect that the remaining time in dispute has been

misreported, among them:

(1) After May 2003, the County obtained (through a FOIL request) redacted copies of

the bills Zorc & Chase had submitted to the Town of Amherst (N.Y.), one of the firm's (few)

other clients in 2002, as well as a copy of the firm's contract with Amherst. Significantly,

although the nature of the work Zorc & Chase was performing for Amherst was similar to that

performed for Nassau, the hourly fees for which Zorc & Chase could bill Amherst for any

given year were capped at $75,000. When the hours billed to Amherst are added to the hours

billed to the County, the pattern of hours allegedly worked is hard to credit, suggesting that

the bills were fabricated or the firm was double-billing. For example, with Amherst hours

included, Chase worked (in billable time) 18 hours on January 28, 10 hours on January 29, 13

hours on January 30, 11 hours on January 31, 19 hours on February 1, and 20 hours on

February 2 – a total of *91 billable hours* out of the 144 total chronological hours that exist in a

six-day period. Of that time, 52 hours were allegedly spent on County activity, yet nothing

urgent was happening on any County matters – there were no pending deadlines, no

13

documents that were being finalized, no "hearings." When the work performed for Amherst is compared to the bills rendered to the County, it seems clear the County was being billed for work performed for Amherst – which had a contract under which the firm's hourly fees were capped at $75,000.

(2) Over the years, Zorc & Chase's bills show that they repeatedly undertook the same research in areas of the law that were not changing rapidly (if at all) and without any pressing need based on submissions to be prepared for the County. For example, Zorc & Chase billed the County for a 1997 brief on the issue of *Quantum Meruit,* and then billed the County for nearly 200 hours in 2002 to barely revise the same brief, simply to note the existence of five additional case citations since the 1997 version.

(3) The mass production of binders, documents and exhibits Claimants are expected to introduce as evidence of their supposed "productivity" in order to justify their fees should not deceive the Panel: the great preponderance of the paperwork generated by Zorc & Chase in 2002 was not legal work, and did not require any great legal sophistication. Much of the time billed was for work the firm had performed, billed the County, and had been paid for in earlier years. Additionally, the work appears to have been unnecessary. One EPA decision markedly noted that "After considerable delay, Special Counsel [Zorc & Chase] submitted . . . numerous boxes of binders" including "apparently extraneous information (e.g., a great deal of backup documentation in support of the requested information)", and also submitted volumes of documents in draft form only, leading EPA to exclude them from consideration.

(4) In a highly troubling series of time entries, on July 16, 2002 Chase placed a telephone call to EPA's National Disputes Officer ("NDO") simply to request additional time for Zorc & Chase to submit certain documentation in connection with a pending petition.

14

Claimants' time records, however, show that both Judith Chase and Joseph Zorc each billed

the County for exactly the same activities on three days totaling *37 hours, or $9,250.00* to

obtain this adjournment as: "Prep for telecons" (16 hours on 7/15/02); "Continued prep for

telecons" and "telecons with NDO" (11 hours on 7/16/02) then, one week later, drafting a

letter to the NDO confirming the telephone call  (10 hours on 7/23/02) simply to obtain an

adjournment..

    (5)  Although Claimants billed over $500,000.00 for work supposedly performed in

District 3 in 2002, there is little to show for this work -- no briefs, no memoranda, no legal

analysis -- despite numerous time entries claiming that such legal work was performed.

## CONCLUSION

    These are but five examples to be presented in this proceeding to support

Respondent's defense to Zorc & Chase's claim.  When the Panel evaluates the testimony and

evidence, it should conclude that Claimants have been amply paid for their time charges in

2002, and that no additional payment or award is warranted.  Accordingly, the claim should

be denied in its entirety.

Dated:  June 19, 2006

Respectfully submitted,

LORNA B. GOODMAN
Nassau County Attorney
Attorney for Respondent

By: _____
    Ralph J. Reissman
Deputy County Attorney
One West Street
 Mineola, New York 11501
(516) 571-3406

15

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------------------------X
JUDITH L. CHASE, JOSEPH M. ZORC
and ZORC & CHASE,                                    Case No. 13Y 194 02690 04

                Claimants,        Case Manager:  Hannah R. Cook


   THE COUNTY OF NASSAU,                Arbitrators: Eugene I. Farber, Esq.
                                          Edna R. Sussman, Esq.
                    Respondent.        Michael G. Berger, Esq.
--------------------------------------------------------X


## RESPONDENT'S POST-HEARING BRIEF


                                    **LORNA B. GOODMAN**
                                    Nassau County Attorney

                                    By:  Ralph J. Reissman
                                    Deputy County Attorney
                                    One West Street
                                    Mineola, New York 11501
                                    Tel. (516) 571-3046

# TABLE OF CONTENTS

|  | PAGE |
|---|---|
| INTRODUCTION | 1 |
| CALCULATION OF AWARD | 6 |
| BACKGROUND | 8 |
| BILLS AT ISSUE IN THIS ARBITRATION | 9 |
| THERE WAS NO "ACCOUNT STATED" BETWEEN THE PARTIES | 12 |
| THREE KEY ISSUES IN THIS CASE | 14 |
| Z&C'S TIMEKEEPING AND BILLING PRACTICES MAKE THEIR BILLS INHERENTLY INNACURATE AND UNTRUSTWORTHY | 14 |
| THE FIRM'S BILLS FAIL TO MEET THE CONTRACTUALLY-MANDATED REQUIREMENTS FOR APPROVAL OF PAYMENT | 15 |
| SINGLE TIMEKEEPER'S FAILURE TO MAINTAIN CONTEMPORANEOUS RECORDS | 16 |
| LUMPING TIME | 18 |
| APPLICABLE LAW | 21 |
| THE REMEDY FOR BLOCK BILLING IS TO DENY PAYMENT, OR MAKE SIGNIFICANT ACROSS-THE-BOARD DISCOUNTS | 23 |
| THE FIRM SHOULD NOT BE COMPENSATED FOR DUPLICATIVE TIME AND TANDEM BILLING BY JUDITH CHASE AND JOSEPH ZORC | 24 |
| THE CONTRACT AND NEW YORK LAW PROHIBIT ANY RECOVERY FOR CASE MANAGEMENT OR REFORMATTING FEES | 26 |
| ALL AMENDMENTS TO THE CONTRACT HAD TO BE IN WRITING. Z&C'S CHARGES FOR CASE MANAGEMENT AND REFORMATTING, NEVER AGREED TO BY ANY COUNTY OFFICIAL, ARE THEREFORE VOID | 28 |

i

THE CONTRACT REQUIRED ALL AMENDMENTS TO BE IN WRITING        28

THE "FOUR CORNERS" RULE PROHIBITS
ALTERATION TO THE CONTRACT                                   29

NEW YORK GENERAL OBLIGATIONS LAW
§ 15-301(1) PROHIBITS ORAL AMENDMENTS                        29

AS A MUNICIPALITY, THE COUNTY
CANNOT BE LIABLE FOR EITHER EXTRA FEE                        30

THE COUNTY NEVER WAIVED THE REQUIREMENT
THAT THE FIRM'S BILLS SPECIFY THE SERVICES
PROVIDED ON A PER INDIVVDUAL AND PER HOUR BASIS              31

DISTRICT 3 BILLS CREATED IN 2004                             34

MYSTERY PARALEGALS                                          34

FICTIONAL BILLING STATEMENT FOR SEPTEMBER 2001              35

COMBINED NASSAU COUNTY AND AMHERST HOURS                    37

Z&C BILLED NASSAU COUNTY FOR AMHERST WORK                   39

VISITS TO HILL AND INTERNET RESEARCH RE:
CONGRESSIONAL STAFFING CHANGES                              41

TELEPHONE CALL TO EPA'S NATIONAL DISPUTE'S OFFICER          42

DUPLICATIVE OR NON-EXISTENT RESEARCH                        43

QUANTUM MERUIT BRIEFS                                       43

DUPLICATIVE OR NON-EXISTENT RESEARCH:
COMPARE BILLS IN DECEMBER 2001 AND MAY 2002                 45

LITTLE OR NON-EXISTENT WORK
PRODUCT IN DISTRICT 3:  GRANT 1139-03                       46

ODOR CONTROL                                                46

982 ANALYSES CREATED FOR THIS ARBITRATION                   47

CONCLUSION                                                  49

ii

## NOTE ON ABBREVIATIONS IN THE BRIEF

In the following discussion the following abbreviations will be used:

a.  "C. Vol." denotes those exhibits contained in Claimants' hearing exhibits.

b.  "RB" denotes those exhibits contained in Respondent's hearing exhibits.

c.  Page citations from the hearing transcripts will be indicated by a parenthesis containing the pages cited, for example, (2400-2403).

AMERICAN ARBITRATION ASSOCIATION
-----------------------------------------------------------X
JUDITH L. CHASE, JOSEPH M. ZORC
and ZORC & CHASE,                            Case No. 13Y 194 02690 04

                      Claimants,         Case Manager:  Hannah R. Cook

THE COUNTY OF NASSAU,            Arbitrators: Eugene I. Farber, Esq.
                                       Edna R. Sussman, Esq.
                  Respondent.        Michael G. Berger, Esq.
-----------------------------------------------------------X

### RESPONDENT'S POST-HEARING BRIEF

### Introduction

For the calendar year 2002, claimants Joseph Zorc, Judith Chase and their two-person law firm of Zorc & Chase ("Z&C") initially billed respondent Nassau County $1,357,925 in 21 monthly invoices.  These invoices were never delivered to the County prior to January 2003.  In Fall 2002 a dispute arose as to accuracy and reliability of the 21 invoices.  Nevertheless, in order to accommodate the firm, the County paid 50%, or $678,962.50, but expressly reserving its right to review and contest all of the bills before making any further payment.  Subsequently, Z&C added clams amounting to $262,625 consisting of (1) $70,750 for District 3 bills for February-April 2002, issued only in *March 2004*, (2) $153,375 for "case management" fees, a charge found nowhere in the parties' contract, and (3) a $38,500 "reformatting" fee for time claimants say they expended in attempting to revise their original bills to conform to the terms of the contract.  In addition, Z&C's "Simplified Statement of Claim" (CHE Tab 25) belatedly posts additional charges of $4,000 for "meetings at the County" on April 29, 2002, plus $375 in paralegal time on July 8, 2002, not included in the firm's original bills.  This amounts to a total claim in this arbitration of $945,462.50.

The County opposes payment of any further amounts to Z&C. After 12 days of hearings producing 4,100 pages of transcripts, claimants failed to prove their case. Instead, the evidence showed by a clear preponderance that Z&C is entitled to no award whatsoever. The County submits that, having been paid 50% of their time charges for 2002, claimants have been more than sufficiently compensated. There simply is no credible way for Z&C to support their claim of over $900,00 based on their deeply flawed and suspicious time entries, coupled with the firm's lack of work product, and a multitude of suspect and dubious testimony. Thus, Z&C's claim must be denied in its entirety, and the County should be awarded its attorney's fees and the costs of this arbitration.

Among the evidence supporting the County's case are the following facts:

1. In comparison to the enormous amount of billings claimants charged Nassau County for calendar year 2002 ($1,586,550 based on the reformatted bills), Z&C produced remarkably little work product: few external meetings, no court appearances, no legal briefs or memoranda. The limited "written" work product claimants belatedly produced, upon review, turned out to be virtual duplications of prior years' work, copies from their electronic database of downloaded cases, and documents of questionable authenticity. In fact, in pre-hearing discovery, when the County asked Z&C to produce the actual work product resulting from the hundreds of activities described in the firm's invoices, the result was surprisingly scant. By letter dated April 7, 2005, Deputy County Attorney David Goldin listed 242 specific references in the bills that established or suggested that a document was created, and asked Z&C to produce any notes, memos, briefs, etc. to support the billing references. In its responding letter of May 24, 2005, of those 242 references, Z&C could not identify a single completed legal brief or memoranda, and could locate a only a handful of notes from innumerable "internal conferences," "development of

arguments," "development of approaches," "development of concepts," "development of formats," "continued development of arguments" and "conceptualization and development of a possible two-pronged approach."

As stated in the firm's discovery responses, *see* Z&C's May 24, 2006 (RB-54), nearly all proof or documentation of the purported work (a) never existed, (b) was discarded, or (c) was "subsumed" into 2003 work which was "is outside the scope of this arbitration" (except, of course, for those undated documents Z&C coincidentally happened to find after the hearings began, *see* ¶ 16 *infra*).

2. In breach of their contract, Z&C failed to submit billing statements to the County on a monthly basis, *e.g.*, the County received Z&C's January 2002 bills in January *2003*. In some instances the firm submitted its invoices more than *two* years after the work was allegedly performed, *see, e.g.*, February, March and April *2002* bills submitted in March *2004*.

3. In further breach of their contract, Z&C failed to submit "itemized standard County claim vouchers specifying "the Services performed *on a per individual and per hour basis*" [Contract, RB-1, ¶ 6]. Instead of submitting bills identifying which attorney performed what work, and for what amount of time, the services described in Z&C's bills were reported as a daily block, lumping together multiple tasks performed by multiple attorneys, plus an unspecified number of anonymous "paralegals."

4. Z&C's practice of "block billing" or "lumping" made it impossible for the County to determine who was performing what service, for how long, or at what hourly billing rate; whether Z&C was duplicating work previously charged and paid for; whether the firm was billing attorney's hourly rates for clerical or non-legal work, such as compiling invoices, reorganizing file drawers, preparing binders and labels; or whether Z&C was billing excessively

3

for listed entries described as "internal conferences," "review of files, "preparation for telephone calls" and "conceptualization of strategies."

5.  In a belated attempt to comply with the Contract's requirement that all monthly invoices specify the services performed on a "per individual and per hour" basis, Z&C "reformatted" bills based on mere guesswork and conjecture.  Comparison of the original to the reformatted bills showed multiple instances where Z&C *inflated* the number of claimed hours for the same days, but *never reduced* the hours in the reformatted bills.

6.  In 65% of all billing entries for 2002, Joseph Zorc and Judith Chase jointly performed the same activities on the same days, billing exactly the same amount of time, a clear indication of duplicative "tandem billing."  Further, in a full 88%, or 309 out of 349 telephone conference calls in 2002, Joseph Zorc and Judith Chase billed the same amount of time for the same 309 calls, the great majority of the calls involving routine inquires to subconsultants, County employees and EPA personnel.

7.  Joseph Zorc, who billed the County $579,000 for 2,316 hours in 2002, never created any written or computerized individual time records.

8.  Z&C billed Nassau County $76,450 for 1,529 combined hours in time charges for an unspecified number of anonymous "paralegals" who never maintained any individual time records, and for whom Z&C has *never* documented any actual payment, as compared to its associate attorney (Robert Mittendorf) and subcontractors, *e.g.*, the engineering firm of Dvirka & Bartilucci)..

9.  For the act itself of reformatting its 2002 bills, Z&C unilaterally added a charge of $38,500, a charge never contemplated in the contract.  In attempting to explain the calculation of this charge, Judith Chase completely contradicted herself on two separate hearing days regarding

who did the reformatting, and how long it took to complete the reformat.

10.  In reformatting their 2002 bills, Z&C created an entirely fictional charge of $153,375 for "case management," again, a charge never contemplated in the contract.  Chase was never able to explain how or why the fees charged for "case management" were not already included in the firm's hourly fees, or how the firm could charge the County for "case management" on days when the firm's bills showed absolutely no work taking place.

11.  In attempting to mislead the Panel into believing that the firm complied with the contract's billing requirements, Z&C introduced an entirely fictional billing statement for September 2001, purportedly issued in September 2002, at the hearing on August 23, 2006.  However, Z&C's own documents, showing radically different time entries between two sets of September 2001 bills, demonstrated that this invoice was never issued at all, but instead, was manufactured in 2006; Chase was never able to explain those discrepancies.

12.  In a series of highly suspicious time entries, Z&C billed both Nassau County and another client, the Town of Amherst, an incredible number of days and hours.

13. The 2002 time records contain a disturbing number of highly suspicious entries, including 37 hours to prepare for and conduct a July telephone call to EPA's National Disputes Officer ("NDO"), simply to request additional time for Z&C to submit certain documents in for a pending petition; entries billed to Nassau County for work apparently performed in connection with Z&C's work for Amherst; entries for which there is absolutely no work product, despite significant time charges; and entries that show no discernable benefit to the County.

14.  By Chase's own testimony, the firm billed the County at least $150,000 in 2002 for "legal and regulatory research."  However, the record contains *no actual work product* of this research – no original briefs or memoranda.  Included in the $150,000 charged for "research" are

5

182 hours on the issue of quantum meruit. However, comparison of claimants' May 2003 memorandum with their 1997 version on the same topic, revealed that the 2003 version was a virtual copy, as Z&C *added only four new case citations* to the 1997 version in charging the County those 182 hours.

15. In another example of duplicated research, in May 2002 Z&C billed the County 33.5 hours for "Continued Legal and Regulatory Research re: Project Scope Issues," citing 32 specific legal cases. Shockingly, Z&C had *already* billed the County 34 hours in December 2001 for "researching" those same 32 cases.

16. In a belated attempt to justify their billings for District 3, Z&C created purported status reports for Grants 982-01 and 982-06. However, when Chase's testimony in this case was compared with her testimony in the parties' second arbitration, proving a clear contradiction between her accounts, it is clear that Z&C fabricated both documents for this arbitration.

17. Z&C's 2002 compensation for working on the "Odor Control" grants in District 3 was fully litigated and determined in the parties' third arbitration, hence, no additional recovery should be allowed. Accordingly, the sum of $22,500 should be deducted from any potential award to Z&C in this arbitration.

## CALCULATION OF AWARD

Factoring in all of the above, Z&C should not be granted any portion of its claims in this arbitration, based on the following calculations and reasoning.

a. The total claim in this arbitration is $945,462.

b. Deduct the fictional "case management" charge of $153,375.

c. Deduct $70,750 for the February-April District 3 bills, never issued until March 2004.

d. Deduct $4,375 for the April 29, 2002 "meeting with the County" and $375 for paralegals, never charged in neither the original nor reformatted bills.

e. Deduct $22,050 for the Odor Control charges already adjudicated in the third case.

f. From the original 21 bills forming the basis of Z&C time charges in 2002, $1,357,925, deduct 25% or $339,481 for overbilling, tandem billing, suspicious time entries, duplicative work and unnecessary work.

g. From the $76,450 charged for paralegal time in the original invoices, deduct 75%, or $57,337 (25% already have been deducted in (f), *supra*)because there is no documentary evidence that the firm even employed paralegals.

h. Deduct $45,500, or 182 hours at $250 per hour, in 2002 charges in researching quantum meruit, where virtually no work was done to justify this charge.

i. Deduct $9,250 for the 37 hours expended in asking the National Disputes Officer to adjourn the date to submit documents.

j. Of the $198,125 Chase and Zorc billed the County in January and February 2002, while in fact working on Amherst matters, deduct 50% or $99,062 for excessive, dubious hours.

k. Deduct $8,375 for duplicative work in May 2002 that was already charged in December 2001 for "research" (essentially downloading case excerpts) on the same 32 cases.

l. Deduct $11,500 for non-existent work product on Grant 1139-03 despite heavy billing.

These deductions leave a balance of $124,407. Of that $124,407 balance, the Panel should award nothing to claimants because:

a. In violation of contractual requirements and acceptable attorney billing practices, Z&C failed to provide timely billing statements based on reliable and trustworthy record keeping,

7

thereby preventing the County and this Panel from making a meaningful assessment and evaluation of the fees charged.

    b. In numerous instances, the amounts of time charged for the described tasks are dubious and suspicious.

    c. A great number of billing entries evidence "churning," that is, where claimants billed the County for unnecessary make-work.

    d. An overwhelming number of billings, particularly for Joseph Zorc and Judith Chase (66% of all time charges, and 88% of all telephone conference calls) show the wasteful and , duplicative use of multiple attorneys for the identical work.

    e. By Judith Chase's own testimony, the amounts of time charged for specific tasks were often based on sheer guesswork and conjecture, made years after the work was purportedly performed.

    In sum, claimants Z&C are entitled to no award resulting from this proceeding.

## BACKGROUND

**The Contract.** In 1993 the County entered into a legal services contract ("the "contract") with Z&C (RB-1). In entering into the Contract, the County sought the firm's assistance in securing grant funding available under the Clean Water Act, to help pay for costs associated with the County's construction and rehabilitation of two sewage disposal districts known as "Bay Park" (District 2) and "Cedar Creek" (District 3), as well as associated sewage conveyance systems. In general, the firm was to work with the County to appeal the denial of construction grant funding denied by the United States Environmental Protection Agency ("EPA") and the New York State Department of Environmental Conservation ("DEC"), and to pursue claims on the County's behalf. Each application for cost reimbursement for a particular phase of

8

construction was identified by a "grant project" number, such as "891-05" or "982-01."

The parties agreed upon payment of hourly rates, *inter alia*, of $250 for Joseph Zorc, $250 for Judith Chase, $175 for Robert Mittendorf, an associate attorney and engineer working with Z&C, and $50 per hour for paralegals. The Contract also provided that under certain circumstances the firm might be eligible to receive a contingent fee, not at issue here..

Significantly, Z&C was to render monthly invoices to the County (RB-1, p. 8, General Conditions, ¶ A: "Invoices will be rendered monthly"). For its part, the County was to pay those invoices "monthly, in arrears, as promptly as possible upon [Z&C's] submission of itemized standard County claim vouchers "*specifying the Services performed on a per individual and per hour basis,*" *id.* (emphasis added).

## BILLS AT ISSUE IN THIS ARBITRATION

The County received no invoice from Z&C for services performed in 2002 until January 10, 2003 (RB-2). Between January 10 and March 4, 2003 the County received 21 bills covering the 12 months of 2002 for District 2, and 9 bills covering January and May-December 2002 for District 3 (invoices for February, March and April 2002 for District 3 were never presented to the County until March 2004). The total charges for the 21 bills submitted in January 2003 came to $1,386,225.

Despite the Panel's repeated inquiries, Z&C failed to provide a logical explanation for the firm's failure submit the bills monthly, as required by the Contract (852-885). The County Legislature approved a funding amendment adding $3.8 million to &C's contract in May 2002, and paid Z&C $1.1 million in June 2002 (859-81). In March 2002 County Attorney Lorna Goodman had requested timely billing from Z&C (859-861). In June 2002 Deputy County Attorney Jane Houdek asked &C to submit their outstanding bills (859, 3272). Yet not one 2002

9

bill was received until January 10, 2002, as testified to by County Engineer Walter Henneberger (2170-2172). It was not just the 2002 bills which were untimely. While the first half of the firm's 2001 bills were paid in June 2002 after passage of the May funding amendment, the firm delayed transmission of its remaining 2002 bills until September and October 2002. These bills were impenetrable (2952), because they reported the firm's daily services as a block, lumping together multiple tasks performed by multiple attorneys, plus an unspecified number of anonymous paralegals, billing at different hourly rates.

Despite the firm's long delays in submitting its bills to the County, and although fully aware that even under conditions off timely submissions, the governmental payment process would take 8 weeks or more (RB-3; Chase testimony at 975), Z&C repeatedly harassed Houdek. In a telephone call on November 22, 2002 Zorc threatened Houdek that he would commence a breach of contract and civil racketeering action against her personally (RB-4).

Nonetheless, in December 2002 the County agreed to accommodate Z&C by paying, after only a brief review, 50% of Z&C's bills covering July-November 2001 (the County's letter erroneously states "July 2000") which the firm had first submitted only in *September 2002* (RB-5). However, the County expressly advised that it would "review the additional charges when we have the time and resources to perform the careful analysis necessary" (*id*.). For its part Z&C promised to henceforth submit its bills on a monthly basis no later than the 15th of the following month as required by the contract (RB-6).

The County fulfilled its commitment by processing the 50% payment covering Z&C's bills for August-December 2001 on April 2, 2003 (RB-7) and also accommodated Z&C by paying 50% of the 2002 bills on April 16, 2003 (RB-8). However, returning to the County's review of the 50% balance of the July-November 2001 bills, as Executive Chief Deputy County

Attorney Meredith Feinman began reviewing those bills, she observed that they failed to present the information required by the contract, *i.e.*, a breakdown of hours billed by each attorney for each activity. In Feinman's view, such information was necessary to enable the County to review and accept properly performed and invoiced work (3092-97). Thus, by letter dated January 14, 2003 (RB-9), and referring to the August 2001 bills only as an example, Feinman wrote to Z&C:

> Your bills, as submitted, cannot be processed because they do not comport with the contract provision that requires that the bill/vouchers specify the services performed on a per individual and per hour basis (¶ 6). Your bills fail to show which individual performed which activity, and how long such individual spent pm each individual activity. Please resubmit your bills with the detail required by your contract with the County.

Lest there be any misunderstanding of whether Feinman's letter applied only to the August 2001 invoice, or to *all* of Z&C's bills, *i.e.*, those being processed as well as all future bills, Z&C clearly understood Feinman's request to apply to *all* of the firm's invoices. In responding to Feinman's letter, the firm wrote on March 28, 2003:

> Although Ms. Feinman's letter only address the two August 2001 bills . . . it is obvious that her comments would be as applicable to all the Z&C bills, including those submitted (and paid) for services prior to August 2001 as well as those now awaiting payment for August 2001 through December 2002. (RB-10, fn. 1)

To further emphasize the County's requirement that Z&C's bills specify the individual performing each task and for how long, in processing the first 50% payment, Feinman had written in her April 2, 2003 letter (RB-7):

> All outstanding bills for legal services are being reviewed. It remains the County's position that you are required by your contract, to submit bills that specify the services performed on a per individual and per hours basis. Accordingly, I reiterate my request for the pertinent back up to your legal bills.
>
> Further, there can be no question that for billings [to be received] from January 14, 2003 forward, you were put on notice by my letter of that date that you are required to provide a records of hours billed stating the person(s) performing the services, and specifying, with reasonable specificity, the services provided and the payment requested as consideration for such services. Your assertion that you do not bill like other

attorneys is simply unacceptable.

To emphasize her objections even further, in authorizing the 50% payment of the 2002 bills, which had begun arriving only in mid-January 2003, Feinman had written in her April 16, 2003 letter (RB-8), "Such payment shall not be construed as a waiver of the County's rights to challenge, *inter alia*, the accuracy or appropriateness of any such bills."

### There was no "Account Stated" Between the Parties

It is important to note at this point that Feinman's repeated, express objections to the content and format of Z&C's billing statements constitute clear rejection of the firm' invoices, sufficient to defeat any claim of an "account stated." To prevail on such a claim, Z&C would have to prove that the County received and retained the invoices without registering its objections. *Bracken & Margolin, LLP v. Schambra*, 270 A.D.2d 221 (2nd Dept. 2000); *Thaler & Gertler, LLP v. Weitzman*, 282 A.D.2d 522 (2nd Dept. 2001). Here, at the very least, Feinman's letter of January 14, 2003, *before* she had even received the first of Z&C's 2002 bills, establishes beyond question that the County clearly and forcefully objected to *all* of the firm's 2002 invoices to the extent they did not conform to the contractual requirement they specify the individual, the task and the hours per task.

The County, which assumed that Z&C followed standard law firm practice in recording billable time, expected that reformatting the bills to conform to the contract would be a simple matter of referring to computer records the firm already had in place (3096-99). What the County did *not* know (and learned only during the first arbitration) was that Z&C did *not* keep individual time records using time slips, or maintain standard computerized time records. Feinman's direction that the bills be reformatted to the contract's requirements outraged Chase and Zorc, who flatly refused to reformat their bills to meet the contract's requirement that each

attorney's time be indicated for specific tasks. Per Z&C's letter of January 27, 2003 (RB-11, ¶ 4) the County was precluded "from unilaterally demanding – especially retroactively – a major, highly time consuming change to our billing practices." In its letter of March 28, 2003 (RB-10) Z&C claimed, "Ms. Feinman's letter seriously misinterprets the requirements of [the] Z&C Contract", and that the firm "conservatively estimated the time to completely rework out bills for services from August 2001 through December 2002 to be approximately 32 working days. Neither we nor the County can afford for us to waste this time performing a meaningless exercise" and "a pointless endeavor." *Id.*, p. 3. Then, on April 12, 2003, writing to County Attorney Goodman, Z&C argued that Feinman's "position has no legal or contractual validity. Our bills confirm to our contractual obligations. *They will not be restated*" (emphasis added). (RB-12).

Months passed while Z&C refused to resubmit contractually required bills in accordance Feinman's requests. Claimants did find time to write incendiary memos accusing the County Attorney of "diverting funds" (RB-13), and to compose a disparaging limerick about the County Attorney and her staff (RB-14). In September 2003 Zorc made a threatening telephone call to Houdek (RB-15):

> Challenging your right to practice law, the County Attorney and several others, I think you committed malpractice and are doing it day by day. In any event we will give you one last chance this weekend to get bills to Walter by Monday, out of your office. After that we will go way beyond the County Attorney's Office, take out newspaper ads….We're going to go for this baby.
>
> I want you to know that we are charging you for time on these for re-formatting bills. You are going to pay for it. You [are] going to pay for the interest. You pay for the re-formatting.

After these and further threats from Z&C, the County terminated the contract on November 26, 2003 (RB-15). Then, after commencing the first two arbitrations, between

February 19, 2004 and March 6, 2004, the firm submitted 24 bills for services allegedly performed in 2002 (*see*, Chart, RB-2). Z&C reformatted the 21 bills it had submitted earlier, with the reformats providing some – but by no means all – of the required breakdown of time by attorney and activity. Three new bills were submitted covering services allegedly performed in February, March and April 2002 for District 3 (C. Vol. 3B).

The reformatted bills did not simply restate and break down the items. Instead, the 2004 bills included a new item – "case management" – that was repeated as an aggregate activity (or summary of miscellaneous activities) and reported at irregular intervals, totaling $153,375.

### THREE KEY ISSUES IN THIS CASE

The three primary issues for the Panel to determine in this arbitration are:

(1) To assess the reliability and credibility of Z&C's billing practices; (2) To determine the validity of the added charge of $153,375 for "case management" and (3) To determine the validity of the $38,500 reformatting charge. After review of the firm's invoices, together with the testimony and exhibits presented at the hearings, this Panel should conclude that (1) The County's payment of $693,112.50 of to Z&C for 2002 invoices is sufficient and fair compensation for the services the County actually received from Z&C; (2) The added charge for "case management" is invalid as a matter of New York contract law; and (3) The added charge of $38,500 for "reformatting" the original bills is also invalid under New York contract law. The facts and reasons supporting these three findings are explained below.

### Z&C'S TIMEKEEPING AND BILLING PRACTICES MAKE THEIR BILLS INHERENTLY INNACURATE AND UNTRUSTWORTHY

Z&C billed the County 8,246 hours for claimed services in 2002 by three individual attorneys, Judith Chase (2,144), Joseph Zorc (2,316), Robert Mittendorf (2,257) and an unspecified number of anonymous paralegals (1,529 hours), *see*, Chart, RB-17). The very nature

14

of the firm's method of recording the hours for the three attorneys and anonymous paralegals, then irregularly submitting its invoices in block format many months, even years, after the work was performed, prevented the County from contemporaneously knowing the amount of time - and therefore money – it was spending on Z&C, or whether the firm was effectively managing the client County's legal needs (1861-63, 1921-22, 2358, 2951, 3092, 3246-48).

Z&C should not have been at all surprised that the new County Executive and his staff would be scrutinizing their bills. The County's fiscal mismanagement in prior years had put the County at the brink of bankruptcy and lead to the creation of a New York State agency – the Nassau Interim Finance Authority – to oversee the County's finances (1833-35)  Yet Chase and Zorc refused to recognize that they were no longer going to have free reign to bill whatever, and whenever, it wanted because they viewed themselves as irreplaceable (RB-10, 11, 12) and the County Attorney's office as fodder for limericks RB-14)

### THE FIRM'S BILLS FAIL TO MEET THE CONTRACTUALLY-MANDATED REQUIREMENTS FOR APPROVAL OF PAYMENT

Three critical problems with Z&C's billing practices are, first, the firm's practice of "block billing" or "lumping" multiple activities. By failing to define which individual performed each activity or for how long, Z&C made it impossible to determine whether the fees charged are reasonable, or are excessive, duplicative or unnecessary. Second, the firm had only one timekeeper (Chase) tracking time for three attorneys and multiple paralegals, and the firm never maintained individual documentation of the tasks and hours reported. Third, although purporting to record the individuals' time and activities daily, the timekeeper never edited and issued the final version until many months, even years, afterward, which became especially problematic in her attempt to reformat the bills.

Accordingly, the reformatted bills do not represent what the Contract required –reliable

15

record keeping of per individual per hour charges for the services being billed to the County. As is evident from Ms. Chase's testimony, Z&C's belated reformatting does not correct the lack of contemporaneous records. Breaking up lumped billing after the fact without the benefit of contemporaneous records does not alleviate the concern that the time is inaccurate, because it was not carefully and discreetly recorded (2588-2596). Nobody will ever know how long the services billed for really took (2595-96).

Further, answering Arbitrator Berger's question as to how long the firm was required to retain its records (4051-52), the answer in the contract is clear: 5 years from the date services were rendered, *see*, Contract, RB-1 at p. 8, ¶ 9 (requiring the firm to retain its books and records for 5 years, subject to audit by the Nassau County Comptroller). The firm breached the contract by failing to maintain *contemporary* time records for 5 years from the date of service.

### Single Time Keeper's Failure to Maintain Contemporaneous Records

The initial problem is the fact that Chase testified, as far as her work was concerned, she would perform as particular task and, when done working on that task, she would enter the time spent into her computer. If, however, if she performed additional activity on that or any other task, Chase would override the original entries, meaning that there was no longer any accurate record of the original entries:

> Q. But if the second entry was a variation from the first sentence, that first sentence was gone forever; is that correct?
>
> A. It was varied.
>
> Q. Well, you couldn't retrieve it again, could you?
>
> A. I don't think so.
>
> Q. And if you entered a specific time for that particular day and later on you changed the time, that original time entry was gone forever; is that correct? * * *

16

A. If I had changed the time, it would have been gone forever (1400-1401).

Joseph Zorc, for all of his 2,316 hours in 2002, *never* entered or maintained any time records, either in writing or on a computer (1391). Instead, according to Chase, several times during the day, he would tell Chase what he was working on and for how long, which information Chase then entered into her computer. If not at her computer when Zorc advised her of his time, Chase would "scribble it down on a piece of paper" and, when she returned to her computer, would enter Zorc's time, after which she discarded the piece of paper (1385-93).

While Mittendorf kept his own time and tasks on a daily basis, *see, e.g.*, Mittendorf's invoice for September 2001 (RB-18), Chase never directly entered his statements into her computer. Neither did Chase simply photocopy Mittendorf's detailed statements and send them to the County along with her time, Zorc's time and the paralegals' time, as the Panel itself suggested (1499-1502). Instead, Chase "edited" Mittendorf's statements (1397-98), that is, Chase commingled his detailed descriptions into her aggregate block bill and, as the Panel correctly perceived, deleted most of the detail of Mittendorf's original statements (1493-98).

As for the paralegals (1,529 hours in 2002), Chase never received any written time sheets from any paralegal in 2002 because she "found they were not helpful at all." According to Chase, a paralegal (or multiple paralegals, impossible to determine from the bills) would come to her office, obtain an assignment, go off and do the work, and return. Chase "would know how long the paralegal was gone," and then enter the time into her computer (1394). However, Z&C's bills for 2002 *never* identify (a) the name of any individual paralegal, (b) the number of paralegals working an a particular task or (c) the time an individual paralegal worked on a specific task. Instead, Chase would group unnamed paralegals into a combined billing entity and assign a *collective* number of hours to the unidentified paralegals. Chase conceded that it would

be impossible to determine from the bills which paralegal did what work or for how long (1396).

Q: So on that day, you might have put more than one paralegal – let's say two paralegals performed four hours each, you would have put that down in your computer?

A: I would have put it down as paralegals eight.

Q: So it was never distinguished at all in your computer?

A: Not in my computer, not in the bills, no.

Q: So there's no way for the County looking at this bill, even to this day, to figure out how many paralegals it was paying for on the day?

A: That's correct.  (1548-49)

The crucial problem was that with Chase being the only timekeeper of over 8,000 hours in 2002 for herself, for Zorc, for Mittendorf as his "editor," and for collective "paralegals," Chase was constantly overriding her prior computer entries but, save for Mittendorf's own time sheets, she could not, and did not, preserve any original record of which attorney (or paralegal) performed what task, and for how long.

## Lumping Time

Compounding that problem was Chase's practice of *combining* the tasks and times of all three attorneys and the collective paralegals into a single, undifferentiated block narrative covering the entire firm's time and activities for the entire day.  *See*, claimants' Vols. C-2A and 2B, original invoices for 2002.  Thus, per Feinman's January 14, 2003 letter (RB-9), when the County began reviewing the content of the invoices, the County had no way of determining which attorney was responsible for performing which task, or how much time was being charged for that task.  With Chase and Zorc billing at $250 per hour, Mittendorf charging at $175 per hour, and paralegals charging at $50 per hour, again, with no specificity as to the number of paralegals, it was literally impossible for the County to ascertain what it was paying for.

Taking, for example, Z&C's original billing entry for January 2, 2002 for District 2 (RB-19), Z&C presented a single block narrative of 11 different activities for all 3 attorneys, plus an unspecified number of anonymous paralegals, without identifying who did what activity, or for how long, for a combined total of 17 hours. In addition, on the same date for District 3 (*id.*) Chase repeated 4 of the 11 activities from District 2, again without identifying who did what, or for how long, adding 11 hours to the 17 already billed for District 2.

Thus, on January 2, 2002 Z&C charged the County 28 hours for 12 different tasks performed by three attorneys and unnumbered, unnamed paralegals, without identifying which attorney or paralegal did what task, or for how long. Remarkably, both Chase and Zorc were vacationing in the Virgin Islands on January 2, 2002 when they billed their combined 8 hours (1709-1712). Even more remarkably, on January 3, 2002, while still in the Virgin Islands, Chase billed Nassau County 5 hours *plus* 4 more hours to another Z&C client, the Town of Amherst, while Zorc billed 3 hours to Nassau County, *plus* 4 more hours to Amherst (Amherst Bills, RB-20).

Z&C's billing practices created yet another problem. In 2004, when Chase attempted to reformat the 2002 bills to conform to the contract's requirement of specifying each individual's tasks and times, she had no original time records. Because, as Chase testified, when entering tasks and times into her computer each day she overrode or deleted the earlier entries (1399), ending up with a combined block narrative, she had to rely on guesswork and conjecture.

This problem is amply demonstrated by taking Z&C's reformat of the same January 2, 2002 entries (RB-19) cited above. The original bills charged 28 hours for 3 attorneys and anonymous paralegals. In reformatting those January 2002 bills on March 1, 2004 RB-21) more than *two years* after the work was allegedly performed, again, with no original individual time

19

records, Chase was somehow able to break down those block narratives to represent, for example, that in District 2 she worked 1 hour, but Zorc worked 2 hours, and Mittendorf only 0.5 hours, on "development of concept and methodology of (1) 'personification' of over 100 consulting engineers'"; that Zorc *alone* worked 1.5 hours on "Update of chart" etc., but Chase now *added* 0.5 hours for herself for the same task in District 3; and that Chase worked 0.5 hours and paralegals 3 hours on "commencement of on-line research" etc. in District 2, rather than 6 in the original, but then shifting 3 paralegal hours for "REM continued reorganization" and paralegal preparation of seven sets of each binder" and "paralegal preparation of three sets of Volume 18-A" and "REM supervision of same" in the reformatted bill.

In another example of, first, the impossibility of determining from the original bills which attorney was doing which task and for how long, and second, the arbitrary division of those components by Chase in reformatting the bills, take January 14, 2002. In the original District 2 bill for January 14, 2002 (RB-19) Z&C listed 10 separate activities for 3 attorneys and an unspecified number of anonymous paralegals in billing a combined 31 hours. Instead of identifying which attorney did which of the 10 tasks, and for how long, Chase billed 8 hours each for herself and Zorc, 9 hours for Mittendorf and 6 hours for paralegals, a total of 31 hours. For District 3 on that same date Chase repeated the first 4 activities described in District 2, adding 2 hours each for herself and Zorc and 1 hour for Mittendorf, a total of 5.0 more hours. Thus, on January 14, 2002 Z&C charged 36 hours without ever identifying who did which of the 10 tasks, or for how long, at different hourly rates. Once again, Chase added 5 hours for Amherst (a 15-hour day) while Zorc added 4 hours for Amherst (a 14-hour day).

More than two years later, with no original source documentation other than Mittendorf's own invoice for January 2002, Chase attempted to break down the 36 hours by attorney and time

but again, was unable to separate names, tasks and times. Thus, in the District 2 reformatted bill
(RB-21) Chase collectively charged 2 hours for 3 separate tasks for herself, and 1.5 hours for
Zorc for the same 3 tasks, then added 2 hours each for herself and Zorc for the identical 3 tasks
in District 3 (*id.*). Therefore, even in attempting to reformat the bills, Chase simply could not
break down either her 4 hours, or Zorc's 3.5 hours, for the 3 tasks.

 Further, in many instances, Chase was utterly unable to break down or reformat the
original bills, as shown by comparing the September 3, 2002 District 2 bill with the "reformat."
Comparing the original (RB-22) with the reformat (RB-23) for September 3, 2002), it is
painfully obvious that two bills are *absolutely identical*. Each bills 20 hours for 3 attorneys and
anonymous paralegals, all performing 9 separate tasks. For the 9 distinct tasks, Chase and Zorc
billed 6 hours each, Mittendorf 4, and paralegals 4 without specifying who did what, or for how
long, at their varied hourly rates.

 The same pattern continued on September 4 and 5, 2002: 33 combined hours for 10
tasks on September 4, and 31 hours for 11 tasks on September 5, with exactly the same entries.
The reformatted bills provided the County with no clearer information than the originals in
determining the costs charged by Z&C on an individual, per activity and per hour basis.

## APPLICABLE LAW

 "[T]he first step in determining reasonable attorney's fees is an evaluation of the number
of hours reasonably expended. Moreover, 'the fee applicant bears the burden of establishing
entitlement to an award and documenting the appropriate hours expended and hourly rates. The
applicant . . . should maintain billing time records in a manner that will enable a reviewing court
to identify distinct claims.'" *Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 324 (5th
Cir. 1995), *citing Hensley v. Eckerhart*, 461 U.S. 424 at 434 (1983). The attorney seeking

reimbursement "can meet that burden only by presenting evidence that is adequate for the court to determine what hours should be included in the reimbursement." *Bode v. United States*, 919 F.2d 1044, 1047 (5th Cir. 1990). The supporting documentation 'must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended.'" *United Slate, Tile & Composition Roofers v. G&M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 n. 2 (6th Cir. 1984). Where the documentation is inadequate, or recently compiled retrospective estimations of time expended [here, Z&C's reformatted bills], the district court would do violence to its judicial obligations were it to accept the amounts claimed at their value." *Id.*

The ability of the Panel in this case to determine what hours should be included in the reimbursement to Z&C is seriously hindered, because Z&C maintained its time records in the "block billing" format. Block billing occurs "where the attorney simply lists a string of tasks performed on a particular day and the total time spent on them, without indicating how much time was spent on each of the tasks." *Francis. v. Snyder*, 2006 U.S. Dist. Lexis 29946 at *8. "Block billing is a form of time-keeping that involves stating the total daily time spent on a case, rather than separating out the time into individual entries describing specific activities." *Sea Spray Holdings, Ltd. v. Pali Financial Group, Inc.*, 277 F. Supp.2d 323, 325 at n. 3 (S.D.N.Y. 2003), *citing Rodriguez v. McLoughlin*, 84 F. Supp. 2d 417 (S.D.N.Y. 1999).

The difficulty with block billing is that this "commingling of activities within one time entry impedes the court's efforts to evaluate the reasonableness of any of the listed activities." *Commission Express Nat'l, Inc. v. Abhijit Rikhy*, 2006 U.S. Dist. Lexis 8716 at *18 (E.D.N.Y. 2006), *citing Soler v. G&U Inc.*, 801 F. Supp. 1056 (S.D.N.Y. 1992). "The problem it creates is that the court cannot assess the reasonable number of hours spent on a given task when the time

spent on the task is not segregated from time spent on other tasks." *Oberdorfer v. Glickman*,

2001 U.S. Dist. Lexis 14677 at *13 (D. Oregon 2001). "[B]lock billing has a tendency to

obfuscate the amount of time expended on distinct tasks and introduces an element of vagueness

into a fee application, making it difficult to determine if the reported hours are 'duplicative or

unnecessary.'" *Ass'n of Holocaust Victims v. Bank Austria*, 2005 U.S. Dist. Lexis 28880 at *18

(S.D.N.Y. 2005) (*citing Sea Spray, supra*).

Standard block billing disputes involve *one* attorney lumping his or her own time into a

single daily entry. Drastically more problematic is Z&C's billing practice of commingling

*multiple daily activities of all three attorneys, and also multiple paralegals*, billing at different

rates, into one daily block entry. This "lumping" or block billing makes it literally impossible to

determine which attorney or paralegals did what work, at what hourly rate, and for how long.

This alone renders Z&C's fee claim untenable.

## THE REMEDY FOR BLOCK BILLING IS TO DENY PAYMENT, OR MAKE SIGNIFICANT ACROSS-THE-BOARD DISCOUNTS

"The remedy for 'block' accounting is to apply percentage cuts in the attorneys' fees."

*Commission Express*, 2006 U.S. Dist. Lexis at 17. "Reduction in the fees requested is

appropriate for the over-staffing, excessive hours and office conferences. The Court "can

exclude excessive and unreasonable hours from its fee computation by making an across-the-

board reduction in the amount of hours." *Luciano v. Olsten Corp.*, 109 F.3d 111 (2d Cir. 1996).

While courts have applied a range of percentage cuts in deciding fee disputes, *see, id.*, 109 F.3d

at 117 (50% reduction for excessive hours); *Ace Ltd. v. Cigna Corp.*, 2001 U.S. Dist. Lexis

16508 (S.D.N.Y. 2001) (50% across-the-board reduction for overstaffing, duplicative hours,

performing functions in tandem); *Gillberg v. Shea*, 1996 U.S. Dist. Lexis 21847 (S.D.N.Y. 1996)

(33% reduction for excessive staffing, internal conferences); *In re: Leonard Jed Co.*, 103 B.R.

706, 713 (Bankr. D. Md. 1989) (Lumping "prevents the Court from determining whether individual tasks were expeditiously performed within a reasonable period of time because it is impossible to separate into components the services which have been lumped together"). *In re: Horn & Hardart Baking Co.*, 30 B.R. 938, 945 (Bankr. E.D. Pa. 1983) ("[T]his Court has denominated the practice of placing several legal services together in one time frame as 'lumping'. As a matter of law, services which have been lumped together cannot be compensated. . . . [I]t is impossible to justify an award of fees when counsel has lumped several services together under one entry").

In this case, the Panel must recall that the County has *already* paid Z&C 50%, nearly $700,000, of the firm's bills for 2002 without contesting the problems inherent in the firm's billing methods, particularly the daily block billing format for three attorneys and multiple, anonymous paralegals. Given the many additional problems inherent in Z&C's invoices (duplication of work, tandem attorney billing, unnecessary work, inflated hours on reformatting, lack of work product), and the questionable nature of Z&C's testimony and evidence, the County submits that it would be fair and equitable for this Panel to adjudicate a 25% discount for block billing and discount the remaining balance for the reasons stated herein, *i.e.*, that Z&C should be awarded nothing in this arbitration.

### THE FIRM SHOULD NOT BE COMPENSATED FOR DUPLICATIVE TIME AND TANDEM BILLING BY JUDITH CHASE AND JOSEPH ZORC

One of the most disturbing revelations the County discerned in carefully reviewing Z&C's bills was that two-thirds of all billing entries for Chase and Zorc were for the identical activity, *see,* Chart at RB-24 tracking each time entry showing identical activities by Judith Chase and Joseph Zorc in their reformatted 2002 invoices. The startling numbers prove that Chase billed 2,144.50 hours in 2002, while Zorc billed 2,316 hours, total of 4,460.50 hours.

24

Deducting 609 hours for case management leaves 3,851.50 combined total hours for both Chase and Zorc. Of those 3,851.50 hours, Chase and Zorc billed 2,505.50 hours in tandem for exactly the same work. This amounts to $626,375 charged to the County for, the most part, duplicative work by the two attorneys for the same research, excessive internal meetings, jointly participating in nearly every telephone conference, clerical filing of exhibits, jointly drafting memoranda and letters, etc. In fact, Z&C's billing records show that included in that 65% joint time, Chase and Zorc jointly charged an astounding 309 out of 349, or 88% of their "telephone conferences" in 2002 (RB-25).

While it is certainly common for attorneys in a complex case to consult each other or work on a particular draft, to work in tandem a full 65% of the year's time, including 88% of all telephone calls, is clearly duplicative, unnecessary and wasteful of the client's resources. This critical problem in Z&C's joint activity billing practices is perfectly characterized in the case of *Morese Delray Cooper v. Sunshine Recoveries, Inc.*, 2001 U.S. Dist. Lexis 8938 at *9 (S.D.N.Y. 2001), where the court cut a two-attorney firm's fee application where they "performed most functions in tandem, reviewing each other's drafts and participating in the same conferences. Moreover, an inordinate amount of time was spent by counsel communicating among themselves about what had already been done or what was planned for the future." This apt description of Z&C's invoices is mirrored in *ACE Ltd.*, 2001 U.S. Dist. Lexis 16508 at *14, where the court explained its 50% fee reduction because "numerous attorneys and paraprofessionals engaged in duplicative tasks, *performed functions in tandem,* engaged in an excessive number of conferences and billed an excessive number of hours to research" (emphasis added).

As explained above, the County's position is that Z&C should be awarded nothing in this arbitration, as the 50% payment to date serves as fair and sufficient compensation. However,

looking alone at the 65% joint time issue (including 88% joint telephone calls), even Z&C

concedes that at least 50%, or $313,187.50 of the $626,375 charged, should be cut from the

claim.  As Chase herself testified,

> If Mr. Zorc and I each spent four hours, and let's suppose it was identical work, well,
> take away the four hours that I spent and Mr. Zorc did the work, and now it's not
> duplicative of anything.  So if you're saying that these eight hours are a waste, you
> can't really say that because four hours, at least, even under Mr. Reissman's theory,
> four hours is not duplicative, only the second four hours would be duplicative (3924).

However, in the event this Panel would consider making an award to Z&C in this

arbitration, while the firm concedes that *at least* $313,187 should be deducted for joint time

entries, since the County has shown that much of the billings were for unnecessary and

duplicative work, half of that figure, $156,`93, should be deducted.  Thus, of the $626,375

charged for joint time, the Panel should make an across-the-board 75% deduction, for a balance

of $156,593 for all of Chase and Zorc's joint time entries.

## THE CONTRACT AND NEW YORK LAW PROHIBIT ANY
## RECOVERY  FOR CASE MANAGEMENT OR REFORMATTING FEES

As noted above, 21 of the 24 original bills for 2002 were received by the County between

January 10 and March 3, 2003 (RB-2), billing only for hourly attorney time.  However, when

Z&C submitted reformatted bills between February 19 and March 4, 2004 (C. Vols. 3a, 3B,

(including the missing bills for February, March and April 2002), the firm added a charge of

$153,375 for "case management."  This charge must be completely denied.  There is no

provision anywhere in the parties' contract contemplating "case management" in addition to the

hourly fees and collateral expenses specified in the contract (RB-1, pp. 12-13, "Entitlement

Services" and Evaluation Services").

As to the "reformatting" charge, in her January 14, 2003 letter (RB-9), Executive Chief

Deputy County Attorney Feinman was simply asking Z&C to submit its bills to conform to "the

contract provision that requires that the bills/vouchers specify the services performed on a per

individual and per hour basis." As explained in the numerous cases above, the courts require

attorneys' contemporaneous billing statements to set forth exactly what task, and the nature of the

work each attorney or staff member performed, and for how much time. This rule was declared

by the Second Circuit as early as 1982 in *New York State Assoc. v. Carey*, 711 F.2d 1136, 1148

(2d Cir. 1982) when it held that henceforth, all fee applications "should specify, for each

attorney, the date, the hours expended, and the nature of the work done." *See also, Aiello v.*

*Town of Brookhaven*, 2005 U.S. Dist. Lexis 11462 at *9 (E.D.N.Y. 2005); *King v. Madonna, 325*

*F. Supp. 2d 162, 166* (E.D.N.Y 2004); *Tokyo Electron Arizona, Inc. v. Discreet Industries Corp.,*

215 F.R.D. 60, 62 (E.D.N.Y 2003) (the fee application "must be supported by contemporaneous

time records that describe with specificity, by attorney, the nature of the work done, the hours

expended, and the dates").

  Z&C limited its proposed services to "Evaluation Services to assist the County in

identifying and evaluating and its grant funding entitlements . . . and Entitlement Services to

assist the County in effectuating these strategies," *id.*, p. 1. Other than additional payments for

"associates, consultants or professionals," *id.*, p. 1 and "Reimbursable Costs and Expenses," *id.*,

p. 6, ¶ B, such as "transportation, lodging, meals, copying and telecommunications, transcripts,

court costs and fees for witnesses and experts," there is absolutely no authorization in the

contract for Z&C to charge for the highly dubious "case management" fees. Nor can Z&C claim

case management fees even under "Miscellaneous Service," *id.*, p. 5, because the County

certainly never *requested* the firm to perform "case management" outside the scope of its hourly

fees for professional services. In the case of the $38,500 charge for reformatting its bills, this

was certainly not a "service" Z&C was providing to the County, in contravention of the contract.

## ALL AMENDMENTS TO THE CONTRACT HAD TO BE IN WRITING. Z&C'S CHARGES FOR CASE MANAGEMENT AND REFORMATTING, NEVER AGREED TO BY ANY COUNTY OFFICIAL, ARE THEREFORE VOID

In seeking fees for case management, Z&C belatedly claims it is entitled to an extra charge for "managing" the very cases for which it was already being paid. These charges never appeared in any Z&C bills from 1993 through contract termination in 2003, appearing for the first time in 2004 when Z&C issued its reformatted bills, and adding charges for the very act itself of reformatting. In effect, what Z&C claims is a right to compensation under the contract *as amended*. Such unilateral amendments, and certainly oral unilateral amendments, are barred both by the express terms of the contract and by well-established New York law, which governs the contract (RB-1, p. 9, ¶ 13).

### A.  The Contract Required All Amendments to be in Writing

Z&C's contract with the County provided that any amendment to the contract required the written signature of the County Attorney or any other County official or employee designated by her. Contract, General Conditions, p. 16 states in relevant part at ¶ E, that::

> Any amendment to the agreement created by the County's acceptance of this Proposal *shall be made in a writing* signed by the County Attorney or any other County official or employee designated by him, and by Judith L. Chase, Esq. and Joseph P. Zorc, Esq. [Emphasis added.]

In fact, the contract was amended 12 separate times, and each of the 12 amendments was executed in writing by both parties (Contract, Amends. 1-12). By contrast, neither party ever drafted, let alone executed in writing, an amendment granting case management or reformatting fees to Z&C. Z&C's claims for case management and reformatting fees are barred by the express terms of the contract.

## B. The "Four Corners" Rule Prohibits Alteration to the Contract

Under New York law, a party may not alter the terms of an executed contract without the consent of the other contracting party. The Court of Appeals held in *W.W.W. Associates, Inc.. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990):

> A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing. That rule imparts "stability to commercial transactions by safeguarding against fraudulent claims, perjury, death of witnesses * * * infirmity of memory * * * [and] the fear that the jury will improperly evaluate the extrinsic evidence." (Fisch, New York Evidence § 42, at 22 [2d ed].)

As recently confirmed in *Beal Savings Bank v. Sommer*, 8 N.Y.3d 318, 324 (2007), the Court held, "Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *See also, Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 1 N.Y.3d 470 (2004); *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569 (2002). Since the contract at issue here required all amendments to be in writing, the firm cannot alter its terms by alleging either oral or unilateral amendment entitling the firm to case management or reformatting fees.

## C. New York General Obligations Law § 15-301 Prohibits Oral Amendments

In addition to being barred by the contract, Z&C's claims for case management and reformatting fees are prohibited by New York General Obligations Law ("GOL") § 15-301(1)::

> A written agreement or other written instrument which contains a provision to the effect that it cannot be changed orally, cannot be changed by an executory agreement unless such executory agreement is in writing and signed by the party against whom enforcement of the change is sought or by his agent.

In applying GOL § 15-301(1) the courts of New York uniformly hold that where an original agreement requires all modifications to be in writing and signed by the party to be charged, alleged oral modifications are a nullity. *Kennedy v. Arcadian Ford, Inc.*, 1979 U.S.

29

Dist. Lexis 11598 at *5 (S.D.N.Y. 1979) (contract's requirement that all modifications be in

writing barred claim of subsequent oral modification); *Lewis v. Raham*, 147 F.Supp.2d 225, 235

(S.D.N.Y. 2001) ("Where, as here, the contract to be modified provides that all modifications

must be in writing, a purported oral modification violates the Statute of Frauds [GOL § 15-

301[1]"); *Tierney v. Capricorn Investors, L.P.*, 189 A.D.2d 629, 631 (1st Dept. 1993) ("When a

written contract provides that it can only be changed by a signed writing, an oral modification of

that agreement, as here, is not enforceable").  Z&C has produced absolutely no evidence that any

County official executed any such amendment and, in any event, any oral amendment would be

void and unenforceable.

Under New York law, which governs the contract (Contract, ¶ 13), such an "extra" claim

is barred in the absence of the consent of both parties to the contract.  Obviously, since the

County never consented to reimburse Z&C for "case management," the entire claim for $153,375

must be rejected.

### D. As a Municipality, the County Cannot be Liable for Either Extra Fee

New York State law bars contractual obligations against a municipality from agreements

which have not been approved in the manner required by law.

> Where the Legislature provides that valid contracts may be made only by specified
> officers or boards and in a specified manner, no implied contract to pay for benefits
> furnished by a person under an agreement which is invalid because it fails to comply
> with statutory restrictions and limitations can create an obligation or liability of the city.

*Seif v. City of Long Beach*, 286 N.Y. 382, 387 (1941) ("Mere acceptance of benefits by the city

under a contract made without authority does not estop a municipal corporation from challenging

the validity of the contract and from denying liability for materials furnished or services rendered

under a contract not made or ratified by a board or officer acting under authority conferred by

law and in the manner prescribed by law. *Accord, Parsa v. State of New York*, 64 N.Y.2d 143,

147 (1984) ("Inasmuch as claimant's contract was neither executed by the state nor approved by the Comptroller, he may not maintain an action on it" (citation omitted); *Granada Buildings, Inc. v. City of Kingston*, 58 N.Y.2d 705, 708 (1982) ("Municipal contracts which violate express statutory provisions are invalid"); *Business Jet Airlines v. County of Nassau*, 105 A.D.2d 679 (2d Dept. 1984) (no recovery under a theory of implied contract or in quantum meruit where County officials never executed contract in manner prescribed by law).

For all of these four reasons, (a) the contract's requirement that all amendments be in writing, (b) the "four corners" rule, (c) GOL § 15-301 and (d) the County cannot be estopped from denying liability where the alleged agreement was not executed in the manner prescribed by law, Z&C is not entitled to any recovery for either case management or reformatting fees.

### THE COUNTY NEVER WAIVED THE REQUIREMENT THAT THE FIRM'S BILLS SPECIFY THE SERVICES PROVIDED ON A PER INDIVIVDUAL AND PER HOUR BASIS

The County anticipates that Z&C will argue that by accepting the firm's bills from 1983 to 2001 in the block billing format, in reviewing the 2002 bills, the County waived its right to enforce ¶ 6 requiring the firm to specify "the services provided on a per individual and per hour basis." This argument is fatally flawed for two reasons.

First, under basic contract law, the County never waived any condition contained in its contract with Z&C. "A waiver is the voluntary and intentional abandonment of a known right." *Town of Hempstead v. Inc. Village of Freeport*, 15 A.D.3d 567, 569 2D Dept. 2005), *citing Nassau Trust Co. v. Montrose Concrete Products Corp.*, 56 N.Y.2d 175, 184 (1982) ("[W]aiver requires no more than the voluntary and intentional abandonment of a known right which, but for the waiver, would have been enforceable"). There is no written or testimonial evidence that the County ever intentionally waived its right to enforce the specificity as to task, individual and

31

hours contained in ¶ 6, especially for the 2002 bills at issue in this arbitration, which brings us to the second reason.

When the dispute as to payment arose in late 2002, by Chief Deputy County Attorney Elizabeth Botwin's letter of December 16, 2002 (RB-5), the County compromised by agreeing to pay 50% of the outstanding July 2000 – November 2001 bills without review, but reserved its right to "review the additional charges [*i.e.*, all future invoices] when we have the time and resources to perform the careful analysis necessary." It is crucial to note that as of the date of this letter, December 16, 2002, *the County had not received any bills for 2002 work* which, as Walter Henneberger testified, he never received until January 10, 2004, and did not forward them to the County attorney's office until three days later (2170-72). Neither had Meredith Feinman received or reviewed any 2002 bills as of January 14, 2002 (3099). Therefore, by reminding Z&C of its contractual duty to specify the firm's services per individual and per hour, Feinman directive by definition had to apply to the 2002 bills, which she had never seen or reviewed as of the date of her letter. Simply stated, the County could not have waived its right to enforce the "per individual/per hour" clause for the 2002 bills because they had never been either received or accepted.

Nor may Z&C argue that the County was estopped from enforcing the specificity in its bills required by ¶ 6 of the contract. Under New York law, "estoppel may not be invoked against a governmental agency to prevent it from discharging its statutory duties." *E.F.S. Ventures Corp. v. Foster*, 71 N.Y.2d 359, 369 (1988); *Parkview Assoc. v. City of New York*, 71 N.Y.2d 274 (1988); *New York State Medical Transport. Assoc. v. Perales*, 77 N.Y.2d 126, 137 (1982) ("We have repeatedly made clear that estoppel cannot be invoked against a governmental agency to prevent it from discharging its statutory duties. Among other reasons, to permit estoppel

against the government "could easily result in large scale public fraud." While we have not absolutely precluded the possibility of estoppel against a governmental agency, our decisions have made clear that it is foreclosed "in all but the rarest cases") (citations omitted). In short, the County never waived its right to enforce the specificity requirement set forth in ¶ 6 of the contract, nor can Z&C argue that the County is estopped from enforcing ¶ 6 in its review and analysis of the 2002 bills.

In addition to denying any recovery for either the case management or reformatting fees, the Panel should recall that claimants' own testimony defeats these claims. First, as to case management, Chase conceded that the irregular assessment of these fees, even when no work was performed on certain days, was based solely on her "estimation" (1589-1605). These "estimations," amounting to $153,375, clearly violate ¶ 6 of the contract requiring that Z&C specify the services, the individuals and the hours performed. No recovery can be granted for these fees.

As to the $38,500 reformatting charge, in attempting to explain the calculation of this charge, Judith Chase provided completely contradictory testimony on two separate hearing days as to the who did what, and for how long, in reformatting the bills. When asked to explain the calculation of the $38,500 on August 24, 2006, Judith Chase testified that she calculated a combined *seven hours* per invoice for time only she and Zorc spent reformatting (2844-45), at the rate of $250 per hour for each attorney (RB-26). The source of that calculation, she claimed, was "notes" which were never produced either in discovery, despite the County's demand, or at the hearings. Yet, subsequently testifying on June 8, 2007, Chase completely contradicted her prior testimony by now claiming that she and Zorc spent only *two* hours per bill to allocate the time, plus *one* hour for Chase alone to "finalize" that allocation, for a new total of *three* hours per

bill (3967). Further undermining her prior testimony that only she and Zorc worked on the

reformatting (as confirmed in her March 28, 2003 letter (RB-28), Chase now testified that

Mittendorf and the unnamed, unnumbered "paralegals" also performed (and charged the County

for) the reformatting (3957) to arrive at, not so coincidentally, the identical $38,500.

### DISTRICT 3 BILLS CREATED IN 2004

Although Z&C submitted District 2 bills for February, March and April 2002 in January

2003 (RB-2 , the firm never submitted any *District 3* bills for these three months until March

*2004.* This two-year delay makes these belated billing statements inherently suspicious. Further

evidence of these bills' unreliability is the nature of the work portrayed in them: most of the

District 3 entries simply duplicate the District 2 entries. Consequently, Z&C should not be

credited with any part of the combined $70,750 claimed for February-April 2002 for District 3.

### MYSTERY PARALEGALS

Z&C billed Nassau County $394,975 for 1,529 combined hours in time charges for an

unidentified, unnumbered paralegals, who never created any individual time records, and for

whom Z&C has *never* documented any payment. There is no evidence in the record of the

arbitration to support claimants' paralegal billings of $76,450. There are no paralegal time

records (1394-96), or pay records in evidence. There are no memoranda or any other writings

authored by paralegals in the record. Despite her testimony that more than one paralegal

worked for Z&C in 2002 (831), in response to questioning, Judith Chase offered the name of

only one, Paulette Powell (1546).

From Respondent's opening statement at the outset of this arbitration, the County has

contested the paralegal time charges. Yet, over the past two years claimants have presented no

evidence to support their claim based on paralegal billing. While claimants provided copies of

34

billing statements from their consultants and subcontractors, *see, e.g.*, Dvirka & Bartilluci in

Claimants' Vol. C-4; Mittendorf's invoices in Respondent's Vol. 8), there are no records to

support the contention that Zorc and Chase actually paid paralegals for work performed for

Nassau County. Claimants have failed to support their claim to County for all paralegal billings.

Accordingly, claimants have failed to support that portion of the 2002 bills to the County for

paralegal work; an amount of $76,450.

### FICTIONAL BILLING STATEMENT FOR SEPTEMBER 2001

Z&C attempted to mislead the Panel with a fraudulent billing statement (2442 ff). First,

as of the first hearing date of June 27, 2005, the document contained in claimants' Vol. C-7B, Ex.

107(A) (RB-27) was a June 24, 2003 letter from Z&C to Lorna Goodman, attached to a billing

statement dated September 21, 2003. The letter represented that the *original* bill for September

2001 was submitted to the County on September 5, 2002, and that "this invoice [the attached bill

dated September 21, 2003] fulfills the obligations of our contract with Nassau County." This bill

was for services performed in District 3 in September 2001. Z&C later submitted the original

District 3 bill for September 2001, dated September 5, 2002, as exhibit C-107(B). (RB-28).

On August 15, 2006 Deputy County Attorney Ralph J. Reissman received a Fedex

package from Z&C (RB-29) containing two documents, one of which was:

> A copy of the original (non-reformatted bill for September 2001, which should be
> inserted as new Tab A to Volume C-7B (the June 24, 2003 letter to the County
> Attorney asking her to review that bill)[.]

However, instead of the original bill for *District 3* for September 2001 which, we have

seen, was dated September 5, 2002 (RB-28), Z&C attached in its Fedex package an invoice for

services performed in *District 2* in September 2001 (RB-29, Statement dated *September 6, 2002.*

This never-before seen document version dated September 6, 2002 stated a charge of $9,962.50.

However, as part of respondent's exhibits Vol. 11, Ex. 9 (RB 30), the County had in fact included the *one and only original* invoice for September 2001 for District 2, but this invoice was dated *September 21, 2003* and charged the County *$14,300*, not the $9,962.50 charged in the September 6, 2002 version seen for the first time on August 15, 2006 (RB-29). When Deputy County Attorney Reissman questioned Chase about the origin of the never-before seen September 6, 2002 version, Chase initially declared that this September 6, 2002 invoice was indeed sent to the County in 2002 (2458-59).

However, comparison of the original September 21, 2003 version with the newly-presented September 6, 2001 version revealed significant differences in the narrative of work performed as well as specific time charges. Chase acknowledged that the activities listed in one version simply did not correspond to the other version (2475-76, 2485-86). In response to pointed questioning from the Panel, Chase could not explain the contradictions between the two versions, nor could she confirm that the September 6, 2001 version had ever been sent to the County in 2002 or, indeed, at any time (2490). She simply could not explain away the radical discrepancies between the two versions:

> MR. FARBER: How do you explain to us two bills that we're seeing, and tell me if I'm wrong, but I think I'm seeing two bills from your firm to the County for the same time period, September '01, for the same district, namely District 2, and we just did the first day, September 1st, which is three hours for you, three hours for Mr. Zorc on both bills, but I don't understand. How could there be two different bills? (2476-2477) ***
> Because I just don't understand how the computer can change a bill. I mean, the computer doesn't have a brain that can add in words like quantum meruit and Chevron (2479-2480).

36

**CHASE**: No, I mean they're totally different activities, and I don't understand it.

Even more compelling is the fact the when Z&C sent out a list of outstanding bills on November 22, 2002 to Houdek (RB-31), that list showed that as of that date, *no invoice* for District 2, September 2001 services was ever issued by Z&C.   Instead, the list went from August 2001 directly to October 2001, with no entry whatsoever for September 2001, completely contradicting Chase's testimony that the September 2001 invoice dated September 6, 2001 (R-29) was sent to the County on September 6, 2002.  Then, to completely contradict Chase's claim that she "mistakenly" attached the wrong bill to her June 24, 2003 letter to the County (RB-27), the County produced in evidence Z&C's Exhibit List from the second arbitration, specifically, Exhibit 43 (RB-32) (erroneously indicating June 24, 2001; Z&C acknowledged it should read "2003).  That document proved that the bill attached to the firm's June 24, 2003 letter was *not* the never-before seen District 2, September 6, 2002 version with a charge of $9,962.50 but was in fact the original *District 3*, September 2001 invoice in the amount of $122,475.

The inescapable conclusion is that the September 6, 2002 version (RB-29) *never existed prior to August 15, 2006*, and that Z&C simply created the September 6, 2002 version between the hearings on August 10 and August 23, 2006 in an attempt to mislead the Panel into believing that Z&C had sent the County a bill for District 2, September 2001 *before* the true bill of September 21, 2003 (RB-31) was in fact sent.

## COMBINED NASSAU COUNTY AND AMHERST HOURS

In a series of highly suspicious time entries for January and February 2002 Z&C double-billed Nassau County and another Z&C, the Town of Amherst, New York an incredible number of days and hours, in addition to charging 104 hours to Nassau County for "case management, even when no work was performed.  *See*, Z&C billings (RB-20) and Chart of combined Nassau

37

County and Amherst hours for January and February 2002 (RB-33). Among the most egregious billing facts revealed from the invoices for the County and Amherst:

1. In the 59 calendar days contained in January and February 2002, Joseph Zorc and Judith Chase each billed on 53 of those 59 days billed on 27 of the 31 days in January 2002, and on 26 of the 28 days in February 2002, a total of 53 billing days of the 59 calendar days in those two months.

2. In the 27 days between January 28 and February 23, 2002, Joseph Zorc and Judith Chase each billed on 26 of those 27 days.

3. Chase billed a suspiciously high number of hours to Nassau County combined with the hours charged to Amherst on the same days. Examples include: 15 hours on January 14, 14 hours on January 25, 14 hours on January 28, 13 hours on January 30, 17 hours on February 1, 15 hours on February 2, 13 hours on February 4, 16 hours on February 5, 15.5 hours on February 13, and 17 hours on February 20. As to Joseph Zorc, he billed an equally suspicious number of hours to Nassau County combined with the hours charged to Amherst on the same days, including 14 hours on January 14, 14 hours on January 23, 16 hours on February 1, 18 hours on February 5, 15 hours on February 15, 14 hours on February 14, and 15 hours on February 26.

4. Further, as if this incredible number of hours were not enough, when reformatting their bills for January and February 2002, in reformatting their bills in 2004, Z&C *added 104 hours* for "case management," 62 more hours for Zorc, plus 42 for Chase.

Courts reviewing fee applications containing such extraordinary hours, and consecutive days of unusually high hours, will question the reliability and accuracy of such bills. *See, e.g., Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir. 1983) ("We consider it doubtful that one lawyer . . . would work 20 of a consecutive 21-day period, never spending less than 5.5 hours on the

case and spending between 11.80 hours and 20.75 hours on 15 of those days"); *Metro Data Systems, Inc. v. Durango Systems, Inc.*, 597 F.Supp. 244, 246 (D. Ariz. 1984) (18.9 hours deemed excessive: "To have accomplished this, he would have had to have been in his office from 5:06 in the morning until midnight, without taking any time for meals, to relieve himself or to do anything else"); *Chrapliwy v. Uniroyal, Inc.*, 583 F.Supp. 40, 50 (N.D. Ind. 1983) ("This Court is also deeply concerned about the excessive hours billed by lead counsel Ewald. On 34 occasions, Ewald has billed for 10 hours or more. On 17 occasions, Ewald has billed for 12 hours or more. Ewald has billed for one 20 hour day as well as 8 days wherein the hours which Ewald billed equaled or exceeded 15 hours").

### Z&C BILLED NASSAU COUNTY FOR AMHERST WORK

A close review of the time Z&C charged the County with the work product Z&C provided to Amherst reveals a deeply disturbing pattern leading to one conclusion: Z&C charged the County thousands of dollars for work that was actually performed, not for Nassau County, but for Amherst. It must first be noted that Amherst imposed an annual cap of $75,000 on fees charged by the firm (RB-34), thereby leading Chase and Zorc to continue to provide work product to Amherst, but to charge the time involved to the County..

For a first example, on January 30, 2002 Chase billed 3.0 hours in District 2 plus 3.5 hours in District 3 for "Review and analysis of new cases on the retroactivity application of regulations and cases on the imposition of interest by the Federal government on municipal grantees." Zorc billed 2.0 hours in District 2 and 2.0 hours in District 3 for exactly the same activity. Then, on January 31, 2002, Chase and Zorc each billed 1.5 more hours for a continuation of the activity described on January 20, 2002 (RB-21). By letter dated April 7, 2006 (RB-35), Deputy County Attorney Goldin listed 242 specific references in the bills establishing

or suggesting that a document was created, and asked Z&C to produce any work product, notes, memos, briefs, etc. to support the billing references. At ¶ 12 of his letter, Goldin specifically identified the January 30, 2002 entries on the subject of the "imposition of interest." However, in its May 24, 2006 response (RB-36) Z&C cited no actual work product but, instead, referred to binders of copied cases; there were no notes, memos or briefs relating to work for the County.

Strikingly, on February 4, 2002 Z&C's issued a lengthy letter on behalf of Amherst to EPA (R-37), just 5 days after the January 30, 2002 Nassau County bills referring to "imposition of interest." At p. 16, Point VII of that document Z&C argued "EPA's Demand for Repayment is Premature: Assessment of Interest is Improper," followed by a discussion of the case law on the imposition of interest against municipal grantees. The timing of the Nassau County billing entries with *no* work product, compared to the work product on behalf of Amherst, leads to the inescapable conclusion that the firm charged Nassau County for Amherst's work product.

In another such instance, Respondent's Ex. 38 is an October 30, 2002 filing by Z&C for Amherst to EPA in response to a September 30, 2002 Region 2 "Decision on Reconsideration." Z&C, however, had reached its $75,000 fee cap already by February 2002, as shown by Amherst's FOIL response (R-20) providing its redacted bills for 2001, 2002 and 2003). Yet, numerous billing entries in Z&C's bills to Nassau County contain references that are jarringly similar to the contents of the October 30, 2002 filing. For example, on September 30, 2002 Z&C billed the County 11.5 hours in Districts 2 and 3 for work related to reviewing a recent EPA Region 2 "Decision on Reconsideration" interpreting the requirements of Public Law 106-377. The actual time entry for both Nassau County Districts (RB-23) reads:

> Review and analysis of recent EPA Region 2 decision on reconsideration interpreting the requirements of the "Z&C Grantees' Bill of Rights" incorporated into Public Law 106-377.

As is clear from the Amherst document, the recent decision was the September 30, 2002 Region

2 decision of Amherst's grant appeal. But, in responding to ¶ 185 of Goldin's April 7, 2006 letter

Z&C responded that they had no written work product, or even any notes, resulting from the

September 30, 2002 charges to the County regarding the "Decision on Reconsideration" of

Public Law 106-377.

Moreover, in their October 30, 2002 filing to EPA Headquarters on behalf of Amherst,

Z&C addressed the following issues, *inter alia*: scope of P.L. 106-37 (p. 3), force account costs

(p. 7), necessity for a deviation request (p. 4), and EPA declination of review on grounds that the

dispute involves "Issues of National Significance" (pp. 7-8). Nassau County is billed for all four

research topic on October 5 (both districts), October 21 (District 2), October 25 (both districts)

and October 29 (both districts) for a total of 31 hours attorney time, plus 6 hours of paralegal

time (RB-39). But, when the County asked Z&C to produce the work product of those four days

and 37 hours, the only documents Z&C produced were Tabs 24 and 25 of Claimants' Volume C-

6F (RB-40). Tab 24 is simply an undated list of EPA cases from 1986-1991, and Tab 25 is

another undated list of EPA cases from 1984-1989. For the 13 hours of attorney time billed to

the County on October 25, 2002, Z&C refused to produce it (if it ever existed) because the work

product "was outside the scope of the arbitration," as Z&C responded at ¶ 203 of their response

to Goldin's letter. It is therefore apparent that Zorc & Chase engaged in the dishonest practice of

billing Nassau County for work the firm performed not for Nassau, but for Amherst.

## VISITS TO HILL AND INTERNET RESEARCH RE
## CONGRESSIONAL STAFFING CHANGES

On 5 days in 2002 – January 15 and 28, February 5, and March 4 and 14 – Zorc and

Chase bill the County for visits to "the Hill", telephone calls and internet research regarding

Congressional appropriations, and committee and staff appointments. Claimants attribute 27

hours worth of work to these tasks, but they have produced no record of this work – no notes, memoranda, and/or copies of computer research. There is no record of who claimants spoke to and what specifically resulted from the alleged work  (2088).

The lack of work product is itself enough to warrant no fee. Judith Chases' testimony -- general responses to specific questions about why this alleged work was done and what value it provided to the County – adds nothing. (2079-2105). After reading the billing entries and hearing Ms. Chase's testimony, Arbitrator Berger observed that "you're just trying to figure out who these people are and ruminating about the impact of the new cast of characters or trying to find out some background about some of these persons" (2104).

Additionally this billing is further suspect because a number of the billing entries - February 5, 2002 - correspond to extremely heavy -18 and 16 hour - billing days when the County bills are combined with the Town of Amherst bills.  As Arbitrator Farber observed, the extraordinary heavy billing hours coupled with the work described raises the issue of credibility (2089). The lack of work product and Ms. Chase's testimony in response to questions about the specific work done do not erase the credibility problem.  An equitable resolution would be to reduce the time Judith Chase and Joseph Zorc billed to Nassau County in January and February 2002 by 50%, from $198,125 to $99,062.

### TELEPHONE CALL TO EPA'S NATIONAL DISPUTE'S OFFICER

There are numerous highly troubling entries, including the July telephone call to EPA's National Disputes Officer ("NDO") simply to request additional time for Z&C to submit certain documentation in connection with a pending petition.  However, the firm's July 2002 time records (RB-41) show that both Judith Chase and Joseph Zorc each billed the County for exactly the same activities on 3 days totaling *37 hours, or $9,250.00* to obtain this adjournment as: "Prep

for telecons" (16 hours on 7/15/02); "Continued prep for telecons" and "telecons with NDO" (11 hours on 7/16/02) then, one week later, drafting a letter to the NDO confirming the telephone call (10 hours on 7/23/02) simply to obtain an adjournment. Previously, on February 5, 2002 Chase and Zorc billed *8 hours* "preparation for and telecons" with the National Disputes Officer, followed by an "internal strategy meeting." The entire 37 hours, or $$9,250, should be deducted.

## DUPLICATIVE OR NON-EXISTENT RESEARCH

By Chase's own testimony, the firm billed the County at least $150,000 in 2002 for legal research. However, the record contains *no actual work product* of this research – no original briefs or memoranda. When asked in pre-hearing discovery to produce actual work produce to support the hundreds of hours of purported "research," Z&C responded multiple times, "Documents prepared during 2002 were superseded by work performed during 2003, which is outside the scope of this arbitration. We did not retain drafts which were superseded" (RB-36). Then, in complete about-face at the hearings, Z&C mysteriously produced a series of undated drafts which Chase had earlier described as "superseded" and "not retained."

## QUANTUM MERUIT BRIEFS

Of the $150,000 Z&C billed the County in 2002 for "legal and regulatory research," 182.5 hours (without including case management time) were spent on the issue of quantum meruit. *See,* RB-42, a chart indicating Z&C's billing for quantum meruit based on Judith Chase's review of 2002 billing entries. According to Chase, no work product or document resulted from the 182.5 hours in 2002, except that in *May 2003,* Z&C did produce a 15-page memorandum (RB-43) which opens Respondent's Vol. 4 (the remainder of the volume consisting of nothing more than claimants' photocopies of the cases cited in the 15-page memorandum). Disturbingly, Z&C's prior 1997, 19-page memorandum on exactly that same topic (RB-44) clearly shows that

for the 182.5 hours, or $45,625 the firm charged the County in 2002, Z&C barely did any actual work at all. The 2003 version is virtually an identical copy of the 1997, save for the addition of *four new case citations*.

In testifying on this subject on August 8, 2006 (1668-73), Chase never mentioned, or referred to, any further incarnation of either the 1997 quantum meruit work product, or the barely different 2003 version. Nonetheless, on June 1, 2007 the County received what was purported to be a *November 2003*, 64-page version of a memorandum on quantum meruit (included in Z&C's August 15, 2006 Fedex, RB-29) which, Chase claimed, was also the result of work performed in 2002 (4002-05). Yet, despite repeated pre-hearing discovery demands that all work product, notes and drafts related to quantum meruit, as referenced in the bills, be produced, *see*, Goldin letter (RB-35) at ¶¶ 3, 4, 7, 73, prior to June 1, 2007 the County never saw this purported November 2003 version. Even more troublesome is Chase's memorandum dated October 27, 2003 to Jane Houdek on the status of Z&C's research into quantum meruit (RB-45), Chase *never mentioned* the existence of a "November 2003" version. She did refer to the May 2003 version as having been submitted to EPA in June 2003 but which, of course, was a virtual copy of the 1997 version.

Starkly put, since the product of Z&C's research on quantum meruit as of May 2003 had to include all research done between 1997 and 2003 (the 4 added cases), any additional work between May 2003 and the newly-discovered November 2003 draft, by definition, *had* to be the result of work performed *outside* the scope of this arbitration, which is strictly limited to claims under the 2002 bills. That is, although Z&C brought in the November 2003 draft to support its claim for payment of its 2002 bills, that document has absolutely no bearing on the claims presented to this Panel.

The only conclusion to be drawn is that Z&C manufactured the November 2003 version

between the 11th hearing date of November 14, 2006, and June 1, 2007, when the County first

received the belated November 2003 version.  The County has already paid 50% of Zorc &

Chase's 2002 charges for quantum meruit which produced no actual work product. The County

should not be charged any of the remaining 50% for work that was clearly performed, if at all, in

2003. *See, Soler v. G&U, Inc.*, 801 F.Supp. at 1064  (cutting by 33% fees charged in 1991 for

rewriting 1984 version of motion because the work was duplicative).

## DUPLICATIVE OR NON-EXISTENT RESEARCH:
## COMPARE BILLS IN DECEMBER 2001 AND MAY 2002

In yet another example of duplicative or non-existent research, on May 13, 2002 Chase

and Zorc billed the County 3 hours for:

> Continued legal and regulatory research re: project scope issues, including review and
> analysis of "cardinal change rulings of the Inspector General of the United States over
> the past twenty years.  Internal conference re same.  (RB-46.)

On May 15 Chase added 0.5 hours in District 2, and also 8.0 hours in District 3, for the same

activity.  Then, on May 16, 2002 Chase and Zorc added 4.0 more hours in District 2, plus 10

hours in District 3, for a total of 33.5 hours on the same activity for 3 days.  However, when

asked to produce the work product resulting from those 33.5 hours of research, in Goldin's letter

covering those three dates (RB-35, ¶ 96) Z&C responded (RB-36, ¶ 96), "Copies of our notes are

enclosed at Tab 96" of Z&C's document production).  Chase identified that document  (RB-47)

which was merely a 36-page photocopy of extracts from 32 cases, as the work product referred

to on May 13, 15 and 16, 2002 (2856-2857).

Chairman Farber, however, observed that the 36 pages contained almost nothing but case

extracts, with no original analysis from Z&C "other than parenthetical commentaries like one

signatory was so and so or no date in our file[.]"  When Mr. Farber asked Chase, "[A]re you

saying that all the text, to your understanding, represents extracts from the actual decisions?" Chase answered, "I believe that's what it is, yeah" (2864). This is further, disturbing proof that there was little, if any, original legal analysis contained in the 36 pages, which goes to buttress the County's claim that it received barely any work product in 2002 from the firm.

That, however, is not the end of the problem with that document. Even more troubling is the revelation from Z&C's billing records for December 2001 (RB-48). Looking at December 4, 19 and 20, 2001 in District 2, that bill proves without any doubt that Z&C billed the County 34 hours for exactly the same research *on the same 32 cases*, case for case (2865-2866). With Z&C's claim for the 34hours from 2001 already adjudicated in the first arbitration, what the firm is trying to do is recover $8,375 for the 33.5 hours charged to the County for the identical work it charged for 6 months earlier, in December 2001, a clear example of double-billing the County.

### LITTLE OR NON-EXISTENT WORK PRODUCT IN DISTRICT 3:  GRANT 1139-03

Another stark example of Z&C billing the Country for little or non-existent work is Grant 1139-03. In responding to Goldin's April 7, 2005 letter (RB-35) asking the firm to produce written work product arising from the time entries attributed to grant project 1139-03 (¶¶ 94, 99, 103), referring specifically to "Outline of Brief on the eligibility of more than $14 million in construction costs disallowed under Grant Project 1139-03", Z&C produced not a single document, *see*, RB-36, ¶¶ 94, 99, 103. This total lack of any retained work product did not, however,  stop Chase and Zorc from billing 46 hours in May 2002:  May 9, 6 hours each for Chase and Zorc; 4 hours each on May 15; 8 hours each on May 20; and 5 more hours each on May 22 (RB-46). That comes to $11,500 charged, but no benefit to the County.

### ODOR CONTROL

By Z&C's own accounting, in 2002 the firm billed on 33 separate occasions for work on

Odor Control in District 3 (RB-54), a charge of $22,050. However, that very same 2002 Odor

Control work was one of the claims already presented in quantum meruit by Z&C in the third

arbitration (RB-54), fn.1. On October 14, 2005 the Panel awarded Z&C $1,170,005.66). By

definition, this award, paid by the County in December 2005, constitutes a final and binding

adjudication of the Z&C's Odor Control claims for 2002. Z&C presented that claim in quantum

meruit, and received compensation for that claim. The firm may not now be allowed, once again

in this fifth arbitration, to claim compensation and recoup a double recovery for the very same

Odor Control fees. Thus, $22,050 should be deducted from any potential award to Z&C in this

arbitration.

## 982 ANALYSES CREATED FOR THIS ARBITRATION

Still another example of Z&C billing the County in 2002 for no actual work product is

found in the May 2002 bills for District 3, specifically, on grant projects 982-01 and 982-06.

Moreover, Chase's futile attempts to explain blatant contradictions in her testimony on this issue,

is more evidence of claimants' poor credibility.   In the bill for May 2002 (RB46) the firm listed

four entries representing that 13.5 hours were expended on "Commencement of preparation of

detailed analysis of Grant Projects 982-01 and 982-06 and all decisions on same to date"

(5/21/02, Chase 3.0, Zorc 1.0); 5/23/02 (Chase 3.0 Zorc 2.0); 5/28/02 (Chase 1.0, Zorc 1.0); and

5/29/02 (Chase 1.5, Zorc 1.0), in which Chase wrote, "Completion of detailed *written* analyses of

Grant Projects 982-01 and 982-06" (emphasis added). Z&C never provided any documents to

support these charges despite Goldin's demand (RB35, 36 at ¶ 105).

In testifying on June 27, 2005 Chase testified that she and Zorc prepared two documents,

the first one consisting of 23 pages and second of 13 pages, but neither document was dated or

paginated (RB-49, RB-50). Z&C never produced either document in pre-hearing discovery.

Then, at the first hearing, Chase testified on direct examination that she never presented them to

Houdek because "She didn't seem interested," she did not respond to phone calls, and did not

make herself available for these briefings" (301-306). Chase added, "Basically, we were getting

... the cold shoulder from the County Attorney's Office (1762). On cross-examination, Chase

confirmed that she "Never discussed these particular documents with Jane Houdek" (1762). In

testifying to the foregoing, Chase contradicted her prior testimony from second arbitration on

September 8, 2004 by stating that in May 2002 she "had numerous conferences with [Houdek]

going through specific grant projects such as the 982 series . . . walking and talking her through

it, giving her whatever information she wanted on the background of that, yes" (RB-51). Chase

had no way to resolve these contradictions when questioned by the Panel (1771-72).

Yet another indication of the contradictions in Chase's testimony, of the dubious nature of

claimants' documentary evidence and, indeed of claimants' entire case, is the firm's own exhibit,

a list of "Specific Status Reports to County Officials – 2002" (RB-52). While, as shown above,

Chase testified in this arbitration that she could not get to speak with Houdek in May 2002, the

entry for May 29, 2002 in this exhibit reads, "5/29/02 – Discussions with Jane Houdek re: 982-

01, 982-02, 982-04, 982-06 and 982-08 grant appeals." But Z&C's time records show

differently. According to the entry for May 29, 2002 in District 3 (RB-46), the only activity on

that date was "Completion of detailed written analyses [sic] of Grant Projects 982-01 and 982-

06, with absolutely *no* reference to any telephone conference or discussion with Houdek, as

alleged in the Status Report.

So, when is Chase telling the truth, and when is she not telling the truth? She testified in

the second arbitration that she had numerous discussions with Houdek about the 982 series, and

then testified in the fifth arbitration that she did *not* speak with her in May 2002. The firm's list

48

of "Status Reports Sent to County Officials" states that Chase and Zorc had discussions with

Houdek on May 29, 2002, but the time sheet for May 29, 2002 indicates that no telephone

conference with Houdek took place.  She testified that she sent the two documents to the County,

and the Status Reports *Sent* to County Officials would appear to support that contention, but

Z&C could not produce of ever having sent either document, and Henneberger testified he never

received them. This is further, irrefutable proof that Z&C's testimony, its documents and entire

case are simply not credible.

## CONCLUSION

For all the foregoing reasons, Respondent Nassau County respectfully requests that the

Panel issue a finding making no award to Claimants, and that the Panel award the attorney's fees

and costs incurred by Nassau County in defending against the claims asserted in this arbitration.

Dated:   Mineola, New York
        July 31, 2007


                        LORNA B. GOODMAN
                        Nassau County Attorney

                        By: _____
                            Ralph J. Reissman
                        Deputy County Attorney
                        One West Street
                        Mineola, New York 11501
                        Tel. (516) 571-3046