# EXHIBIT D

AGREEMENT FOR LEGAL/REGULATORY SERVICES

THIS AGREEMENT, effective as of the 24 day of August 1993, by and between the COUNTY OF NASSAU, a municipal corporation of the State of New York, having its principal office at One West Street, Mineola, New York 11501 (hereinafter referred to as the "County"), acting for and on behalf of the DEPARTMENT OF PUBLIC WORKS OFFICE ("Public Works") and the OFFICE OF THE COUNTY ATTORNEY ("County Attorney") and the law offices of ZORC & CHASE having a principal office at 2238 Que Street, N.W., Washington, D.C. 20008 (hereinafter referred to as "Contractor")

W I T N E S S E T H :

WHEREAS, the County is desirous of obtaining the services of a law office with expertise in obtaining additional funding from the United States Environmental Protection Agency ("EPA") and from the New York State Department of Environmental Conservation ("NYSDEC") for grant funded wastewater treatment construction projects such as those constructed by the Nassau County Department of Public Works; and

WHEREAS, Contractor, in view of its background and expertise and the background and expertise of its subcontractors and associated firms and consultants, is eminently and uniquely qualified to render the desired services; and

WHEREAS, the services contemplated by this Agreement are personal services within the intent and purview of Section 2206 of the County Government Law of Nassau County; and

WHEREAS, Contractor is willing to perform the said services on the terms and for the consideration hereinafter set forth;

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereby agree as follows:

1.  The Contractor hereby agrees to provide legal and regulatory services (the "Services") to the County, in the area of EPA construction grants and grant funding, in order to assist the County in an attempt to recover additional grant funding from EPA and/or NYSDEC and to preserve the County's entitlement to over Nine Million dollars which EPA's Office of Audit has threatened to recapture. The Services are more particularly described in the Contractor's proposal dated July 27, 1993 (the "Proposal"), a copy of which is incorporated as a part of this contract and annexed hereto as "Attachment A." The Contractor will provide the Services on the terms and conditions and for the compensation set forth in this contract, including Attachment A.

2.  The Contractor hereby agrees to provide the Evaluation Services described in the Proposal to assist the County in identifying its grant funding entitlements and to establish preliminary legal, administrative and/or other strategies for pursuing and preserving the County's grant funding entitlements. The Contractor hereby agrees to provide the Entitlement Services described in the Proposal to assist the County in developing, reviewing and updating its strategies and to represent the County before EPA, NYSDEC, Congress and/or in the Courts of the United States in pursuit of its claims for additional grant funding and preservation of previously awarded grant funds.

3.  The Services shall commence upon receipt by the Contractor of a duly executed duplicate original of this Agreement and shall be completed in an expeditious manner appropriate to the circumstances upon the receipt of any necessary assistance and/or authorizations from the County, as set forth in the Proposal.

4.  In compensation for the Contractor's performance of the Services, the County shall pay the Contractor at the hourly rates set forth in the Proposal and shall reimburse the Contractor for Reimbursable Costs and Expenses as described in the Proposal.

Contractor may not adjust its hourly rates upward during the term of this Agreement; however, in consideration of Contractor's obtaining additional grant funding for the County, Contractor will receive a fee for successful results equal to five per cent (5%) of grant entitlements received by the County as a result of the Services; provided, however, that the amount of said five per cent (5%) fee shall be reduced by the total aggregate amount previously paid to the Contractor at the hourly rates in accordance with this Paragraph 4.

5.    The County has advised the Contractor and the Contractor acknowledges that, at this time, the County has only encumbered the amount of Twenty-Five Thousand dollars ($25,000.00) for the payment to the Contractor hereunder and that the County intends to encumber an additional One Hundred Thousand Dollars ($100,000.00) (or more, if and as necessary for litigation purposes) out of its fiscal year 1994 funds for the payment to the Contractor under this Agreement. The Contractor shall have no obligation to perform Services or incur Reimbursable Costs and Expenses hereunder in excess, in the aggregate, of the amount then encumbered by the County for payment to the Contractor, unless this Agreement is amended to provide additional funding.

6.    The Contractor agrees that payments by the County shall be made monthly, in arrears, as promptly as possible upon Contractor's submission of itemized standard County claim vouchers specifying the Services performed on a per individual and per hour basis. Such vouchers shall be approved by the County's Comptroller who shall acknowledge the satisfactory performance of the Services rendered and shall set forth the payments to be made. Such vouchers shall be filed in the County's Office of the Comptroller. Contractors's subcontractors and/or associated firms shall not submit independent claims vouchers to the County.

7.  Contractor agrees that it is, and at all times shall be deemed to be, an independent contractor and shall not, in any manner whatsoever by its actions or deeds, commit the County to any obligation or be deemed to be an employee of the County.

It is further understood and agreed that no agent, servant or employee of the Contractor shall, at any time, or under any circumstance, be deemed to be an agent, servant or employee of the County.

8.  Contractor agrees that it shall be solely responsible for the payment to its employees, agents, subcontractors and associated firms of any compensation due them as a result of their performance of Services hereunder and that, so long as the County duly pays Contractor's claim vouchers in accordance with Paragraph 6 above, the Contractor shall hold the County harmless from any claims for compensation by Contractor's employees, agents, subcontractors and associated firms. The County agrees that all assignments made hereunder shall be made to Joseph M. Zorc and/or Judith L. Chase, as Contractor, who shall have the sole authority to delegate any Services to be performed hereunder to Contractor's subcontractors, consultants and/or affiliated firms.

9.  Contractor shall (and shall require its subcontractors and associated firms to) maintain full and complete books and records of accounts in accordance with accepted accounting practices in the legal profession.  Such books and records shall be retained for a period of five (5) years and shall, at all times upon reasonable notice, be available for audit and inspection by the County's Comptroller or his duly designated representative.

10.  This entire Agreement shall be void and of no effect unless Contractor shall secure any legally-required Workers' Compensation insurance for the benefit of such of its employees

as must necessarily be so insured and shall keep such insurance in full force and effect during the term of this Agreement in compliance with the provisions of the Workers' Compensation Law. Certificates of Workers' Compensation Insurance (or a sworn statement that Contractor has no employees requiring such insurance) shall be furnished to the County upon written request.

11.   Contractor warrants that it is not in arrears to the County upon any debt or contract and that it is not in default as surety, contractor or otherwise upon any obligation to the County.

12.   Contractor shall not assign, transfer or otherwise dispose of this Agreement without prior written consent of the County Executive, which consent shall not be unreasonably withheld; provided, however, that Contractor may, upon written notice to a Deputy County Attorney, assign or transfer this Agreement to any successor law office into which Zorc & Chase is integrated or, in the event of the death or disability of Judith L. Chase, Esq. or Joseph M. Zorc, Esq. to the survivor of them.

13.   This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the law of the State of New York.  In the event of any dispute, claim or controversy arising hereunder or in connection herewith, the matter will be submitted for binding arbitration to a panel of three commercial arbitrators qualified by the American Arbitration Association, pursuant to the rules, regulations and guidelines of the American Arbitration Association.  The parties agree that the decision of the arbitrators will be binding and not subject to appeal, except solely and exclusively on the grounds set forth in the New York Civil Practice Law & Rules. The venue of any such arbitration and hearing will be exclusively at the Garden City, New York regional offices of the American Arbitration Association.

14.   The Contractor hereby warrants that it does not dis-
criminate based upon age, religion, gender or disability.

15.   This agreement is subject to the provisions of Article
18 of the General Municipal Law of the State of New York as
amended, to Section 22-4.2 of the Administrative Code of Nassau
County and to the provisions of the Anti-Discrimination Order of
Nassau County.

16.   The Contractor agrees to pay the County a One Hundred
Dollar ($100.00) administrative service charge for the processing
of this Agreement pursuant to Ordinance No. 74-1979.   Said sum
shall be due and payable upon Contractor's execution of this
Agreement.

17.   This Agreement consists of this eight (8) page document
and the Proposal, which is "Attachment A" hereto.   There are no
written or oral representations or agreements by the parties
except as set forth in this Agreement.

18.   Any notice required or permitted to be given hereunder
shall be deemed to have been duly given if sent by certified U.S.
mail, return receipt requested, or by Federal Express overnight
delivery, and addressed, if to Zorc & Chase, at 2238 Que St.,
N.W., Washington, D.C. 20008 to the attention of Judith L. Chase
and Joseph M. Zorc, and if to the County to the County Attorney
at the address set forth above, or to such other individuals at
such other addresses of which the parties may duly notify one
another in accordance herewith.   Notices shall be deemed to have
been given on the date of delivery evidenced by the certified
mail or Federal Express delivery receipt.

IN WITNESS WHEREOF, ZORC & CHASE have duly executed this
Agreement and the COUNTY OF NASSAU has duly executed this Agree-
ment, in duplicate originals, effective as of day, month and year
first written above.

APPROVED BY:                              COUNTY OF NASSAU

_____            BY: _____
ROBERT W. SCHMIDT                      FOR: COUNTY EXECUTIVE
County Attorney


APPROVED AS TO FORM:

_____            BY: _____
OWEN B. WALSH, First                   Judith L. Chase
First Deputy County Attorney           ZORC & CHASE

APPROVED BY:

_____            BY: _____
JOHN M. WALTZ, Acting Comm.            Joseph M. Zorc
Department of Public Works             ZORC & CHASE

STATE OF NEW YORK:
                      : ss.:
COUNTY OF NASSAU :
      On this ___ day of _____, 1993, before me personal-
ly appeared THOMAS S. GULOTTA, County Executive of the County of
Nassau, the municipal corporation described herein, and who
executed the foregoing instrument, to me known and known to me to
be such County Executive and he being by me duly sworn, did
depose and say:  That he is the County Executive of Nassau
County; and that he executed the same as such County Executive
for the purposes therein mentioned.



                        _____
                              Notary Public


STATE OF NEW YORK:
                      : ss.:
COUNTY OF NASSAU :
      On this 20 day of September, 1993, before me personal-
ly appeared ROBERT L. OLDEN, SR., Deputy County Executive of the
County of Nassau, the municipal corporation described herein, and
who executed the foregoing instrument, to me known and known to
me to be such Deputy County Executive and he being by me duly
sworn, did depose and say:  That he is the County Executive of
the County of Nassau and that, pursuant to Section 205 of the
County Government Law of Nassau County, he executed the same as
such Deputy County Executive for the purposes therein mentioned.


                        _____
          DORIS GRIFFIN        Notary Public
NOTARY PUBLIC, State of New York
        No. 30-4661899
    Qualified in Nassau County
Commission Expires June 30, 19 95     Page No. 7 of 8 Pages

DISTRICT OF COLUMBIA:
          : ss.:
CITY OF WASHINGTON :

    On this 2th day of *August* , 1993, before me personally appeared JUDITH L. CHASE, to me known and known to me to be the Judith L. Chase of ZORC & CHASE, the law offices described in and which executed the above agreement and she, being by me duly sworn, did depose and say that she executed the above agreement for the purposes therein described.


*Robbyn M. Wherry*
_____
Notary Public

    My Commission Expires May 21, 1995.


DISTRICT OF COLUMBIA:
          : ss.:
CITY OF WASHINGTON :

    On this 2nd day of *August* , 1993, before me personally appeared JOSEPH M. ZORC, to me known and known to me to be the Joseph M. Zorc of ZORC & CHASE, the law offices described in and which executed the above agreement and she, being by me duly sworn, did depose and say that she executed the above agreement for the purposes therein described.


*Robbyn M. Wherry*
_____
Notary Public

    My Commission Expires May 21, 1995.


Page No. 8 of 8 Pages

# EXHIBIT E

ZORC & CHASE
ATTORNEYS-AT-LAW
2300 QUE STREET, N.W.
WASHINGTON, D.C. 20008
TEL: (202) 667-5000
FAX: (202) 234-1616

NEW YORK OFFICE
200 PARK AVENUE
SUITE 2920
NEW YORK, NEW YORK 10166
(212) 692-9111

CONNECTICUT OFFICE
1983 SHIPPAN AVENUE
STAMFORD, CT 06902
TEL: (203) 325-8412
FAX: (203) 975-8422

July 27, 1993

PROPOSAL
FOR EXPERT LEGAL/REGULATORY SERVICES
RE: ADDITIONAL EPA GRANT FUNDING
FOR NASSAU COUNTY, NEW YORK

Zorc & Chase's proposed services consist of Evaluation Services to assist the County in identifying and evaluating its grant funding entitlements and to establish an effective strategy for pursuing and preserving these entitlements; and Entitlement Services to assist the County in effectuating these strategies through representation of the County in administrative and judicial procedures and through encouraging and orchestrating Congressional support for the County's position.

Evaluation Services and Entitlement Services will be performed on the basis of hourly rates, plus reimbursement of costs and expenses. Applicable hourly rates are as follows:

| | |
|---|---|
| Joseph M. Zorc | $250 per hour |
| Judith L. Chase | $250 per hour |
| Theodore Rogowski | $200 per hour |
| Robert Mittendorff | $175 per hour |
| James A. Grafton | $150 per hour |
| Bee & Eisman | $150 per hour |
| Jerome C. Rosenthal | $135 per hour |
| Paralegals/Law Clerks | $ 50 per hour |

These and other regular Zorc & Chase associates, consultants or professionals will be utilized on a cost-effective basis at their normal billing rates, subject to the direction and control of Joseph M. Zorc or Judith L. Chase. Other consultants or professionals will be utilized if approved by a Deputy County Attorney. In consideration of their bringing additional grant funding opportunities to the County's attention, Zorc & Chase will receive an additional fee for successful results equal to five per cent (5%) of grant entitlements established by their services.

A. EVALUATION SERVICES. Evaluation Services will consist of:

1.    Scope of Performance. We will conduct an initial legal/regulatory review of Nassau County's CWA project records to determine and recommend to the County a grant funding strategy. Specifically, this will cover:

a.    CWA Title II Grant Entitlement: Review of County projects for a preliminary identification of grant entitlements that may yet be claimed under CWA Title II, including, but not limited to, the following:

ZORC & CHASE
Zorc & Chase Proposal re Grant Funding
To: Nassau County

July 27, 1993
Page No. 2 of Six Pages

     (1)    Engineering costs during construction that were barred or limited by NYSDEC under TIP 33; and

     (2)    Final asphalt coating or other road restoration costs (Item 244) for which grant payment was arbitrarily limited by NYSDEC.

    b.    **Final Decisions; Appeals.** Preliminary survey of NYSDEC or EPA draft or final determinations and any appeals or requests for review or reconsideration pending before NYSDEC, EPA Region II or EPA Headquarters, to identify favorable substantive arguments not yet raised and the optimal procedural steps to resolve these matters favorably and expeditiously;

    c.    **Audits.** Preliminary overview of current EPA draft and final audit reports, and the County's draft or final comments in response thereto, to identify other measures to preserve previously paid grant funds, avoid premature repayment prior to final determination of eligibility and unjustified interest assessments, or serve as the basis for obtaining additional payments or entitlements;

    d.    **Additional Reimbursement under CWA Section 206.** Review of County projects for a preliminary assessment as to whether and to what extent costs were incurred after January 31, 1974 that may be eligible for reimbursement under CWA Section 206, including, but not limited to:

     (1)    Construction Claims Settlements, Judgments or Awards; and

     (2)    Construction Claims Litigation and Settlement Costs.

2.    **Basis of Performance.** The Evaluation Services described above will be commenced upon the County's written acceptance of this Proposal and will be performed on the following basis:

    a.    **Document Review; Coordination.** Evaluation Services will include consultation regarding grant project history and review and copying of grant project records. The County will arrange for our consultation with Ernst & Young regarding EPA audit status and issues and, to the extent necessary or advisable, with one or more of its prior private consulting engineers. We will consult with the County to mutually identify persons that we will interview and documents that we will review.

    b.    **Report and Recommendations.** Evaluation Services will include our presentation of an outline Report summarizing our initial review and setting forth our preliminary recommendations to the County. The purpose of the Report will be to provide the County with proposed grant funding options and strategy.

    c.    **Confidentiality.** Our report and recommendations will be presented on a confidential attorney-client and attorney-work-product privileged basis, since they will comment upon or recommend positions taken or to be taken in pending or potential quasi-judicial administrative proceedings or litigation.

    d.    **Report Presentation.** Evaluation Services will conclude with a Report Meeting with the County at its offices in Mineola, N.Y. This will be held with County personnel at the department-head or higher level.

**B. ENTITLEMENT SERVICES.** Entitlement Services will include:

1.    **Strategy.** In conjunction with the County and (at the direction of the County) any of its consultants:

    a.    Development, periodic review and updating of a strategy to optimize the County's CWA grant funding;

    b.    Strategic advice and coordination, from the legal/regulatory standpoint, as to the activities conducted by or for the County that affect its CWA grant funding;

    c.    Timing of and arrangements for meetings with NYSDEC, EPA Region II and EPA Headquarters to assist the County's grant funding prospects through the administrative procedure, to expedite the decisionmaking process and to encourage a favorable outcome; and

    d.    Periodic evaluation of results and cost-effectiveness of implementing the County's grant funding strategy.

2.    **Additional Reimbursement under CWA Section 206.** In cooperation with the County, the development of information and collection/analysis of documents necessary to complete identification and evaluation of additional CWA Section 206 reimbursement grant entitlements and to develop and present claims to EPA for reimbursement of same. This will include:

    a.    Advisory assistance in connection with the preparation and submittal to EPA Region II of (a) request for payment(s) of the Federal share of these costs;

    b.    Preparation and submittal to EPA Headquarters, EPA Region II and/or NYSDEC (concurrently or *seriatim*) of one or more Request(s) for Deviation(s);

    c.    Conference(s) with NYSDEC to explain the nature and Federal fiscal source(s) of the additional funding being sought and to enlist the State's support;

    d.    Conference(s) with EPA Region II to enlist its support for the County's Deviation Request(s); and

    e.    Meeting(s) with EPA Headquarters (Grant Administration Division, Office of Water and Office of General Counsel) as necessary and advisable to steer the Deviation Request(s) through the administrative procedure, to expedite the decisionmaking process and to encourage a favorable outcome.

ZORC & CHASE
Zorc & Chase Proposal re Grant Funding
To: Nassau County

July 27, 1993
Page No. 4 of Six Pages

---

3.    Other CWA Title II Grant Entitlements. In cooperation with the County, the development of information and collection/analysis of documents necessary to complete identification and evaluation of the County's additional grant entitlements and to develop, present to EPA and pursue grant funding claim(s). This will include:

    a.    Advisory assistance in connection with the preparation and submittal to EPA Region II of grant funding request(s);

    b.    Conference with EPA Region II to expedite and support the County's request;

    c.    Conference with NYSDEC to explain the nature of the additional grant funding being sought and to enlist the State's support;

    d.    Meetings and correspondence with EPA Headquarters to steer the County's application(s) or appeal(s) through the most favorable administrative route, expedite the decisionmaking process and encourage a favorable outcome;

    e.    With the concurrence of the County, preparation and filing of a Notice of Intent to File Suit as authorized by CWA Section 505(a)(2), to encourage full and favorable attention to the County's grant funding request by EPA Headquarters and Regional decision-makers; and

    f.    Should it subsequently appear advisable, recommendation to the County that its institute litigation against EPA and, if the County elects to do so, representation of the County in such litigation.

4.    Final Decisions; Appeals. In cooperation with the County, evaluation of any NYSDEC or EPA Region II determination pending or issued on or after the County's acceptance of this Proposal, and filing of any appropriate administrative or judicial action. This will include:

    a.    Preparation and submittal to NYSDEC, EPA Region II and/or EPA Headquarters of a grant appeal; request for review or reconsideration; time extension request or other appropriate motion or action; request for deviation; and/or filing of a Notice of Intent to File Suit under CWA Section 505(a)(2), as appropriate, in response to any adverse administrative determination as to which there is a reasonable basis to do so;

    b.    Representation of the County at any NYSDEC or EPA hearing or conference concerning any of the above;

    c.    At the request of the County, participation in any internal County meeting, or any conference with a County consultant, regarding the above;

    d.    Meetings or other communication(s) with NYSDEC, EPA Region II and/or EPA Headquarters offices to steer the actions taken on behalf of the County through the administrative procedure, to expedite the decisionmaking process and to encourage a favorable outcome; and

ZORC & CHASE
Zorc & Chase Proposal re Grant Funding
To: Nassau County

July 27, 1993
Page No. 5 of Six Pages

c.   Upon approval by the Office of the County Attorney, filing of any appropriate judicial action and representation of the County as Special Counsel in such action.

5.   EPA Audit Process. In cooperation with the County and (as approved by the County) any of its consultants, evaluation of any draft or final EPA audit pending or issued on or after the County's acceptance of this Proposal and preparation of the County's response or the legal/regulatory aspects of the County's response. This will also include:

a.   Participation in any EPA or NYSDEC conference(s) or meeting(s) with the County or its consultants regarding any draft or final audit; and

b.   At the request of the County, attendance at any internal County meeting(s) or conference(s) concerning a draft or final audit.

6.   FOIA Review. Preparation and submittal of Freedom of Information Act requests to EPA Headquarters and/or EPA Region II and/or of Freedom of Information Law (FOIL) requests to NYSDEC to obtain access to additional project, audit, grant appeal and CWA program documents and information as we deem necessary or advisable in connection with any appeal, audit or grant funding request; Collection and inspection of documents; Review and analysis of same.

7.   Congressional Support. We will provide:

a.   Development of strategy for Congressional support of additional grant funding for the County and preservation of take-back amounts targeted by EPA's Office of Audit;

b.   Arrangement, orchestration and representation of the County at meetings with the staff of appropriate members of Congress to solicit Congressional support; and

c.   Coordination and (if requested by the County) attendance at meeting(s) by County official(s) with any Congressman or Senator a principal purpose of which is to solicit Congressional support for additional CWA grant funding.

Miscellaneous Services. If the County requests any additional work beyond the Evaluation and Entitlement Services these will be performed as Miscellaneous Services on the basis of hourly fees and reimbursable costs and expenses. Miscellaneous Services include any other specialized environmental legal/regulatory services, e.g., services in connection with the issuance, renewal or appeal of the County's SPDES permits. At the County's request, we will be pleased to negotiate lump-sum or not-to-exceed fees for individual tasks in the category of Miscellaneous Services for which the scope of work and quantum of effort can be defined.

Case 2:08-cv-00082-TCP-WDW   Document 19   Filed 12/05/08   Page 16 of 42 PageID #: 243

## GENERAL CONDITIONS

A. **Payments.** Invoices will be rendered monthly. Payments will be made as promptly as possible. Statements for all services rendered, costs incurred, or fees due will be issued by, and payments will be made by check payable to "Zorc & Chase" and will be transmitted to our Washington office.

B. **Reimbursable Costs and Expenses.** Reimbursable costs and expenses will include out-of-pocket and other customary costs and charges, such as transportation, lodging, meals, copying and telecommunications, transcript, court costs and fees for witnesses and experts.

C. **Contingent Fee.** In consideration of their bringing additional grant funding opportunities to the County's attention, Zorc & Chase will receive a contingency fee for successful results equal to five per cent (5%) of grant entitlements established by their services. Any such contingency fee will be invoiced and paid within four (4) months following establishment of entitlement.

D. **Authorizations.** Any Entitlement Services requiring the County's prior approval, authorization or request shall be deemed to have been duly approved, authorized or requested if so designated by the County Attorney or any Deputy County Attorney or other official or employee designated by the County Attorney.

E. **Amendments; Assignment.** Any amendment to the agreement created by the County's acceptance of this Proposal shall be made in a writing signed by the County Attorney or any other County official or employee designated by him, and by Judith L. Chase, Esq. and Joseph M. Zorc, Esq. This agreement may be assigned, upon written notice to the County, to any law firm or law practice to which Joseph M. Zorc and Judith L. Chase, or the survivor or successor of them, may become affiliated.

F. **Key Personnel.** Zorc & Chase will be responsible for coordination and supervision of all services hereunder. The professionals who will direct and control these services and who will personally provide a major portion of these services are Joseph M. Zorc, Esq. and Judith L. Chase, Esq. We will utilize other professionals identified in or pursuant to this Proposal as appropriate and cost-effective.

G. **Cooperation; Coordination.** The County agrees, in order to assure optimum representation and grant funding results, to

(1)     cooperate by making its project and grant records and employees and pertinent consultants directly available to us, in a timely manner, upon reasonable notice;

(2)     transmit Fax and Federal Express copies immediately to us and coordinate promptly with us regarding correspondence, determinations or other communications received from EPA or NYSDEC; and

(3)     designate an attorney in the Office of the County Attorney and a supervisory-level employee in the Department of Public Works as the primary points of contact for those offices respecting our services. The County agrees that a Deputy County Attorney may authorize us to prepare and file any grant appeal, reconsideration request or take other administrative actions necessary to protect the County by insuring that EPA's strict filing deadlines are met.

H. **Governing Law.** The agreement resulting from the County's acceptance of this Proposal shall be governed by and construed in accordance with the law of the State of New York.

# EXHIBIT F

AMERICAN ARBITRATION ASSOCIATION
--------------------------------------------------------X
JUDITH L. CHASE, JOSEPH M. ZORC
and ZORC & CHASE,                                Case No. 13Y 194 02690 04

                              Claimants,          Case Manager:  Hannah R. Cook

THE COUNTY OF NASSAU,                            Arbitrators: Eugene I. Farber, Esq.
                                                              Edna R. Sussman, Esq.
                              Respondent.                     Michael G. Berger, Esq.
--------------------------------------------------------X

<u>**RESPONDENT'S REPLY BRIEF**</u>

<u>**INTRODUCTION**</u>

Respondent Nassau County submits this Reply Brief in response to the Post-Hearing

Brief of claimants Judith Chase, Joseph Zorc and the law firm of Zorc & Chase ("Z&C").

In their Brief, claimants take a scattershot approach in attempting to divert the Panel from the

sole issue in this straightforward fee evaluation case.  That issue, clearly defined by Arbitrator

Berger, was whether Z&C could meet its "burden ... to show us the services performed [and] the

validity of the billing" (1142-43).  The evidence in the record conclusively demonstrates that

claimants failed to meet that burden.  Instead, the record proves that Z&C's 2002 bills are not in

fact valid, accurate or truthful; that the firm did not perform all of the work claimed and

described in the bills; that the firm produced little, if any, actual work product to justify its

enormous billings in 2002; Z&C charged the County in 2002 for work it performed, and was

paid for, in prior years; that in certain time sequences the hours charged are excessive relative to

the ascribed tasks; and, that in other sequences, the hours charged simply cannot be believed.

Then, after the hearings began and these deficiencies in their bills became increasingly obvious,

Judith Chase and Joseph Zorc simply resorted to fabricating other documents in trying, but

failing, to meet their burden.

Now, seeing the factual and legal underpinnings of their case discredited in the hearings, and realizing that their billing statements do not support their claim for additional compensation for 2002, claimants' Post-Hearing Brief directs the Panel's scrutiny away from the bills themselves, and instead asserts that the bills are beyond review.  Z&C mistakenly relies on arguments of waiver, estoppel and account stated which, for reasons explained below, do not apply in this case.  As though this were a contingency case, Z&C boasts about the recoveries it claims it produced on the County's behalf in an attempt to justify its bills, without recognizing that this arbitration is, instead, about evaluating the firm's 2002 hourly fees.  Z&C's Brief liberally asserts "facts" and "demonstrative evidence" found nowhere in the record before this Panel, attempting, and failing, to explain away the many contradictions between Judith Chase's testimony and the County's plentiful contrary evidence.  Z&C repeatedly recites the mantra of the County's "bad faith" despite the fact that in 2002 and early 2003, the County accommodated Z&C by paying over $900,000 of the firm's outstanding without question or review (but still reserved the County's right to review the accuracy and reasonableness of the 50% balance of the 2002 bills), and that the firm consistently rejected the County's offer to mediate any disputes. Z&C resorts to unfounded *ad hominem* attacks on each County witness, and even the County's attorneys, in its effort to distract the Panel from the three critical questions:  Were claimants' 2002 bills accurate, truthful and reasonable?

The hearing testimony and documentary evidence proves that the answer to these three questions is unquestionably, "no."  In short, claimants failed to prove they are entitled to any award in this arbitration in addition to the $678,962 the County already paid the firm for the firm's claimed services in 2002.  In addition to this $678,962 to Z&C for the firm's billing, the County paid Z&C $276,138 for the work performed by the firm's subconsultants, Dvirka &

2

Bartilucci and Fox & Company (C.Vol. C-4), for a total County payment in 2002 of $955,100. By any measure, comparing this $955,100 paid by the County to the scant work product in evidence produced by Z&C in this arbitration, the County has already made sufficient payment to claimants for the services claimed in 2002. Therefore, Z&C's claim should be denied in its entirety, and the County should be awarded its fees and costs incurred in this arbitration.

### BECAUSE Z&C DID NOT PERFORM THE WORK CLAIMED IN ITS 2002 BILLS, THE FIRM IS NOT "CONTRACTUALLY ENTITLED" TO ANY RECOVERY IN THIS ARBITRATION

Claimants' first argument, that the firm is "contractually entitled" to payment of the balance of its 2002 bills, is based on the false premise that "The one overriding and inescapable fact . . . is that Z&C has performed its obligations under the Agreement and Nassau County has not." CB ¶ 1. Bizarrely, Z&C cites a June 1, 2004 statement from a Judge Bucaria (C. Vol. 1-A, Tab 49) who *never even saw a single 2002 bill* in the context of only a consolidation motion. In fact, Judge Bucaria's June 2004 statement predates Z&C November 18, 2004 filing of this arbitration by over ten months. Thus, the quoted statement, "it is apparent that Zorc & Chase has rendered performance pursuant to the agreement," cannot possibly have any relevance or probative value as to whether Z&C actually performed any of the work claimed in the 2002 bills.

The truthful "one overriding and inescapable fact" established in this arbitration is that the Z&C *did not* perform the work certified in the firm's 45 Claim Vouchers for 2002 to the Nassau County Comptroller. Nassau County Charter Article IV, "Comptroller," § 403, "Restrictions on Payment of Claims," states in pertinent part:

> No claim against the county . . . shall be paid except upon a voucher verified by the oath of the claimant to the same effect as is required on an account to be verified by affidavit, and certified by the head of the appropriate department, institution, office or agency of the county government, and by means of a warrant of the Treasurer signed by the Comptroller.

3

Section 403 expressly *prohibits* the Comptroller from issuing payment of any Claim Voucher unless and until the "head of the appropriate department, institution, office or agency of the county government," here, *both* the Department of Public Works *and* the Office of the County Attorney. Thus, as required by § 403, Judith Chase certified in each and every one of the 45 Claim Vouchers the firm submitted for both its original and reformatted bills:

> I hereby certify that this claim voucher is *just, true and correct*; that the amount claimed is actually due and owing and has not been previously claimed. * * * *I further certify that all items and/services were delivered or rendered as set forth in this claim* [emphasis added].

*See, e.g.*, Claim Vouchers included with Exhibits RB-19, 21-23, and all Claim Vouchers included in (C.Vols. 2A, 2B, 3A, 3B). To the contrary, the evidence in the record proves that Chase's certifications were false, and that Z&C *did not* perform the services it represented in the invoices attached to the 45 Claim Vouchers. Despite ample opportunity before the hearings, the firm failed to identify and produce actual work product sufficient to justify any compensation above the $678,962 the County already paid for 2002. *See*, Exhibits RB-35, Deputy County Attorney David Goldin's detailed request to Z&C to produce the documents cited or suggested in Z&C 2002 invoices, and RB-36, Z&C's paltry and evasive response, and the discussion at RB pp. 2-3, 39-41, 47. Nor did Z&C identify or produce actual *2002* work product, other than documents copied from prior or later years, to justify any award in this case.

Specific examples of non-performance already set forth in Respondent's Post-Hearing Brief include duplicative work (RB pp. 24-26), billing 37 hours for no more than two or three telephone calls to EPA's National Disputes Officer (RB pp. 42-43), billing 182.5 hours for "quantum meruit" research resulting in virtually no change to a 1997 version of the same document for the same research (RB pp. 43-45), billing in 2002 for work already paid for from

2001 (RB 45, 46), and billing for bogus Grant Series 982 "memoranda" (RB 49, 50) which were never provided in pre-hearing discovery, but mysteriously first appeared just prior to commencement of hearings (RB pp. 47-49), billing an incredible number of hours in January and February 2002 for two clients, Amherst and Nassau County, at the same time (RB pp. 37-39), billing Nassau County for Amherst work (RB pp. 39-41) and billing for "visits to the Hill" producing absolutely no written records (RB pp. 41-42).

In its Brief at CB ¶ 25, Chase and Zorc attempt to justify their excessively long workdays in January and February 2002. For pages they go on – with argument mostly not in the record - about the workings of Congress and "inclement winter weather precluding recreation and social life," CB ¶ 25(d). Yet they never explain what County work product resulted from these long hours. Despite billing the County for many hours of "congressional work," Z&C produced no evidence in the record – no notes or letters - of their alleged meeting and discussions regarding "wheeling and dealing" and "cooked agendas," CB ¶ 25(b) . Claimant's Vol. C-6A, their chronological documents from January to March 2002, contains no actual work product to support the hours Z&C billed the County during that period. At CB ¶ 25(c)(iii) Z&C tries again to justify the excessive billing by referring to "the need to review documents" received in December 2001. Yet there is only a single billing entry, on January 28, 2002 for both Districts, as the only reference to "review of documents" received in December. As a side note, in response to Z&C's argument at CB ¶ 19(n) that Houdek could not have been concerned in 2002 about the Amherst bills because she did not receive those bills until after commencement of this arbitration in November 2004, Houdak did in fact receive copies of Z&C's 2001 Amherst bills in 2003, nearly an entire year before this arbitration was filed (RRB-60), which bills raised Houdek's suspicions.

5

## FURTHER EXAMPLES OF NON-PERFORMANCE
## OF WORK CLAIMED IN THE 2002 BILLS

A further example of Z&C's billing the County in 2002 for either non-existent work, or for work performed and paid for in prior years, includes fees charged in 2002 for "Research re: The Filing of Notice of Intent to Sue under the Clean Water Act."  Starting on June 10 and continuing on June 11, 12, 13 and 20, Z&C's 2002 bills charged 48.5 hours for Chase and Zorc time, plus 22 hours of paralegal time for alleged "research and analysis" on this topic.  *See*, June 2002 reformatted bills for Districts 2 and 3 (RRB-55). In his April 7, 2006 letter at ¶ 122 (RB-35) David Goldin quoted the June 10 entry:

> "JLC and JMZ development of initial research assignments and ensuing paralegal on-line *research* re the filing of Notices of Intent to Sue Under the Clean Water Act and other federal statutes; Development of further *research assignments*; Review and analysis of *research results* to date" (6/10 BP)." [Goldin then asked:]  This is one of multiple references to this activity. *Italicized material, and any notes, should be produced* [emphasis in original].

However, the record in this arbitration contains *absolutely no documents* to support the 60.5 hours charged for this alleged research.  Z&C's response refers to "Copies of cases and other materials obtained and our notes" as "being provided to you in the appropriate case binders" (RB-36 at p. 13, ¶ 122) yet, none of these "appropriate case binders" were ever made part of the record.  The Panel has already remarked on the dubious and scanty nature of Z&C's "notes" (RB pp. 45-46; Tr. 2864).

More disturbing is the inescapable fact that the County had *already paid* claimants for the same alleged "research and analysis" in 2001.  *See*, RRB-56, excerpts from Z&C's 2001 bills (RHE Vol. 7), where the billing entries for both District s for March 22, April 20, May 1, June 4 and 30, July 25 and August 8, 2001 contain numerous references to "Research re: current requirements for the filing of Notices of Intent to Sue Under the Clean Water Act" and the like.

6

As Jane Houdek explained in detail (3249-3256), since the issues regarding Notice of Intent to Sue are extremely narrow, there was no need for Z&C to bill the County for dozens of hours repeatedly researching the same issues, year after year or, at the very least, receiving the client's approval to repeat that research *ad infinitum*. Z&C's rebuttal (3796-3802) offered no explanation as to why there was no work product resulting from this research or why this extremely discrete legal issue needed to be revisited less than one year later.

Therefore, since Z&C produced no work product to support its 2002 charges for "Notice of Intent to Sue," and as the same charges were made and paid for in 2001, the County should not be directed to pay again in this arbitration for this same research.

### EXCESSIVE AND DUPLICATIVE CHARGES FOR LEGAL RESEARCH

As Judith Chase testified, in 2002 Zorc and Chase billed the County $150,000 for legal research (1173). When asked to produce the work product that supported those charges, Z&C produced the May 2003 Quantum Meruit brief (*see*, RB pp. 43-45 and RB-43), but little else. In responding to David Goldin's request for work product cited or suggested in their invoices (RB-35, 36), instead of producing actual work product, Z&C consistently referred to "legal research binders" that claimants never placed in evidence (*see* Z&C's responses to ¶¶ 3, 4, 7, 8, 9,11,12, 39, 89 and 96 of Goldin's letter). Again, instead of producing any actual work product, Z&C referred to nothing but photocopies of reported cases culled from their "proprietary database" (C.Vol. 6-C, nos. 4 and 11). More glaringly, in numerous responses to Goldin's requests, Z&C simply refused to produce the suggested work product, stating that "the 2002 work was subsumed into the 2003 work, so that the 2002 work no longer exists as such. The 2003 work product is outside the scope of this arbitration." (*see, e.g.*, RB-36, ¶ 242).

While this lack of work product for $150,000 in legal fees charged to the County is

7

damning on its own, it is shown to be even worse when Z&C's 2000 and 2001 billings for "legal research" are compared to the 2002 billings.  Over the course of 2000 and 2001, the County was continuously billed for the same research topics that appeared in the 2002 bills, such as "research into exhaustion of administrative remedies," "deference," "retroactive application of regulations," and "scope."  Attached as RRB-57 are more than 50 pages containing entries for legal research repeatedly citing these very same issues in 2000 and 2001.  Query, if Z&C had already performed significant legal research and billed the County for these same topics in 2000 and 2001, and since Z&C had been analyzing the same County construction projects for almost eight years already (1993-2001), why then did Z&C charge so much time *researching the same issues in 2002*? We will never know, since Z&C failed to produce any evidence of actual work product to support these charges.  Further, anticipating that Z&C may refer to the documents contained in its DVD as evidence of 2002 work product, the County has already paid $955,100 to Z&C and its subconsultants for this work, and that payment is more than sufficient to compensate claimants for their services in 2002.  The multicolored charts and the so-called "Superchart" in evidence should not mislead the Panel into thinking that these documents were the product of 2002 work alone.  Rather, Z&C's work on documents and charts listed in the DVD were commenced *before* 2002, and have already been paid for by the County under invoices submitted by Z&C in those prior years.

## Z&C'S ARGUMENT FOR "ACCOUNT STATED" IS
## CONTRARY TO THE LAW AND FACTS OF THIS CASE

Z&C mistakenly asserts an argument for an "account stated" because, Z&C contends, "by retaining Z&C's 2002 bills without review and without objecting to the amount of those bills, the County converted them into accounts stated." CB ¶ 9. Nothing could be further from the truth. Meredith Feinman did in fact immediately begin reviewing Z&C's 2002 bills after they were finally submitted between January and March, 2003, *see*, Feinman's letters of January 14, April 2 and April 16, 2003 (RB 7, 8, 9). As explained at RB p. 11, Z&C fully understood that Feinman's objections covered *all* of the 2002 invoices, clearly demonstrated in Z&C's March 28, 2003 letter (RB-10, fn. 1): "Although Ms. Feinman's letter only address the two August 2001 bills . . . it is obvious that her comments would be as applicable to all the Z&C bills, including those submitted (and paid) for services prior to August 2001 *as well as those now awaiting payment for August 2001 through December 2002*."

However, Z&C's block billing format prevented Feinman from deciphering which attorney (or anonymous paralegal) performed which of the many tasks described in each block, or for how long (3092-3097). Thus, while reserving the right to challenge both the accuracy and the reasonableness of the bills ("Such payment shall not be construed as a waiver of he County's rights to challenge, *inter alia*, the accuracy or appropriateness of such bills", RB-8), Feinman could not, in the absence of more detail, define more specific objections such as excessive hours, tandem billing or lack of work product. A year passed while Z&C flatly refused to provide the detail required to enable Feinman and Houdek to evaluate the bills (RB-10, declaring that the bills "will not be restated"). Note, claimants never informed the County that Z&C never maintained any individual daily time records and could not simply provide original daily time sheets (3096-3097), but instead said they *would not* provide the details required by the contract.

9

As for Z&C's contention that the County's partial payment of 50% of the 2002 bills implied an account stated (CB ¶ 9) that payment, rather than expressing approval of the 2002 bills without review, was strictly an accommodation to Z&C, with the County expressly reserving its right to contest both the accuracy and reasonableness of all 2002 bills. Feinman testified directly on point: "Q. By agreeing to pay the 50%, did you or the County waive any right to review the remaining 50%?" "A: No" (3089).

Z&C's contention that the County first asserted specific objections to the reasonableness of the 2002 bills during cross-examination (CB ¶ 11) completely ignores the fact in this arbitration that when the County served its Answer to Z&C's July 2005 Revised Demand, the County specifically objected to the reasonableness of the bills at ¶¶ 3 and 11 (RB-58):

> 3.    Respondent disputes the nature, the propriety, the amount and the value of the services allegedly performed by Claimants.
>
> 11.   Respondent objects to the fees charged by Claimants in their bills as being grossly excessive for the nature and extent of the work actually required to process the County's grant appeals. The Claimants charged the County for needless and repetitive work . . . . The inescapable conclusions are that Claimants performed too much unnecessary work, or did not actually perform the work they claim to have performed.

Z&C's claim of "post-hoc, bad faith rationalizations"(CB ¶ 10) is therefore completely contradicted by the facts in this case.

New York law fully supports the County's position that no account was ever stated between the parties as to the 2002 bills at issue in this arbitration, and negates any argument by Z&C to the contrary. The critical point is that "Recovery premised upon an account stated will fail where a dispute about the account can be shown to have existed." *Farley v. Promovision Video Displays Corp.*, 198 A.D.2d 122, 123 (1st Dep't 1993) *citing Waldman v. Englishtown Sportswear, Ltd.,* 92 AD2d 833, 836 (1st Dep't 1983). "An account stated claim requires

ultimate proof of an agreement, express or implied, between the parties, because "an essential element of an account stated is an agreement regarding the amount of the balance due." *Meadowbrook-Richman, Inc. v. Associated Fin. Corp.*, 325 F. Supp. 2d 341 (S.D.N.Y. 2004), *citing Sisters of Charity Hosp. of Buffalo v. Riley*, 231 A.D.2d 272 (4th Dep't 1997). Here, as explained above in detail, no account was ever stated because the County properly and timely objected to both the accuracy and reasonableness of Z&C's 2002 bills.

> Under federal and New York law, an account stated "refers to a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due." It is incumbent upon a party in receipt of an account "to examine the statement and make all necessary objections" because "an agreement to pay an indebtedness may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable amount of time unless fraud, mistake or other equitable considerations are shown."

*Hackensack Cars, Inc. v. Lifestyle Limousine Service Corp.*, 1990 U.S. Dist. Lexis 6391 at *9-10 (S.D.N.Y. 1990) (internal citations omitted). Similar formulations are stated in *Morrison Cohen Singer & Weinstein, LLP v. Ackerman,* 280 A.D.2d 355, 356 (1st Dep't 2001) ("The receipt and retention of an account, without objection, within a reasonable period of time, coupled with an agreement to make partial payment, gives rise to an account stated entitling the moving party to summary judgment in its favor"), and in *M&A Construction Corp. v. McTague*, 21 A.D.3d 610, 611-612 (3d Dep't 2005):

> An account stated represents an agreement between the parties reflecting amounts due on prior transactions. Where either no account has been presented or there is any dispute regarding the correctness of the account, the cause of action fails. *Abbott, Duncan & Wiener v. Ragusa,* 214 A.D.2d 412, 413 [1995] (emphasis added).

Thus, the critical components required to sustain a claim for account stated, are:

1. A promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due.

2. The receipt and retention of an account, without objection, within a reasonable period of time.

3. The making of an unqualified partial payment.

In this case, the facts and circumstances surrounding the parties' relationship concerning the firms' 2002 bills demonstrate beyond question that Z&C's claim of account stated must fail. As to the first element, there is no evidence anywhere in the record that the County ever agreed upon an amount due to Z&C for 2002. *See*, Feinman's three letters (RB-7, 8, 9) and the testimony of Goodman (2952) and Feinman (3102). As to the second element, requiring the party receiving bills to express her objection, Feinman's three letters timely and repeatedly objected to the 2002 bills. The record establishes that the County first received Z&C's 2002 bills no earlier than January 10, 2003, when Walter Henneberger marked his receipt, then forwarded them to Jane Houdek on January 13, 2003 (RRB-59). Feinman thus objected within a matter of weeks after she received the bills no later than March 4, 2003. Under any calculation, her objections were reasonably timely and sufficient to defeat any claim for an account stated.

As to the third element, the County's 50% partial payment in April 2003 (RB-8), far from expressing agreement as to the sum claimed by Z&C, was clearly qualified as only an accommodation payment carrying with it absolutely no agreement as to either the accuracy or reasonableness of the bills ("Such payment shall not be construed as a waiver of the County's right to challenge, *inter alia*, the accuracy or appropriateness of any such bills").

In addition, under *Hackensack Cars, supra*, a showing of "fraud, mistake or other equitable considerations" will defeat a claim for account stated. The evidence in the record shows that Z&C has indeed practiced a fraud by billing the County for alleged work never

12

performed in 2002, by billing the County for work properly billed to the Town of Amherst, and by presenting a fraudulent bill in this arbitration (RB-29).

*Herrick, Feinstein LLP v. Stamm*, 297 A.D.2d 477 (1st Dep't 2003) is a case closely on point demonstrating that there was no account stated between the County and Z&C. In that case, in the underlying litigation lasting seven years, the client had already paid his lawyers more than $1 million. That litigation settled after jury selection and two days of negotiation in September 19, 2000. After the law firm then issued four invoices between October and December 2000 amounting to nearly $181,000 for work between August and November 2000, the client telephoned the law firm in late December 2000 to state "that he was 'very troubled by the size of the bills then in hand,' and that he needed additional time to review them." *Id.* at 478. The client further sent two faxes to his lawyers on December 28, 2000 and in January 2001 stating that "he needed additional time to review the invoices," and that "he was 'still troubled by the unexpectedly large amount involved here'" compared with the law firm's projected billings, *id.* The law firm filed an action against the client and moved for summary judgment for an account stated. In affirming the lower court's denial of summary judgment, the Appellate Division held:

> Under the circumstances of this case, it cannot be said that defendant's first objection to the four invoices at issue on December 21, 2000, approximately two months after receipt of the first of the invoices at some point during October, came so late that the delay constituted, as a matter of law, "an unequivocal assent to the balance[s] stated" (*Epstein Reiss & Goodman v Greenfield,* 102 AD2d 749, 750).

297 A.D.2d at 477-479. Similarly, in this arbitration, the record proves that the County received Z&C's 2002 bills between January 10, 2003 and March 4, 2003 (RB-2). Meredith Feinman objected to those bills by letters dated January 14, April 2 and April 16, 2003 (RB 7, 9, 9 ) in a manifestly reasonable amount of time after receipt. Under no interpretation can the County be said to have retained those invoices without objection, nor can the County be said to have agreed

13

to the amounts charged by Z&C in its invoices and, as already explained, the County issued the 50% partial payment in April 2003 with full reservation of its right to challenge the accuracy and reasonableness of the remaining 50%..

None of the cases cited by Z&C in its Brief support its claim for and account stated. The case of *Davis, Markel & Edwards v. Solomon* cited at CB p. 9 held that the client "failed to introduce evidence of any objection to the accounts rendered by" his attorney. Here, by contrast, Meredith Feinman's letters timely objected to Z&C's 2002 bills within a matter of weeks after receipt. Similarly, in *Samara v. Gangemi & Gangemi* the court held that the client's alleged oral objections were "vague and unsupported" while the attorney's testimony was credible," adding that "conclusory and unsubstantiated objections are insufficient to defeat an account stated". Here, by contrast, Feinman's timely written objections, as well as the testimony of all Nassau County witnesses were fully substantiated, credible and therefore sufficient to defeat Z&C's claim for account stated. Z&C's mistakenly relies on *Caldor v. Newburgh Mall* in CB ¶ 10 in arguing that the County waived its objection to the reasonableness of the 2002 bills. The dispute in *Caldor* was whether a lessor or lessee was responsible to repair a roof. The lessor failed to assert a notice provision in 1985 when the issue first arose, then tried to assert that provision *ten years* later when the issue reoccurred; the court denied the lessor's defense. In our case, however, although Z&C claims the County waited two years to object to the 2002 bills, the record shows the County did not even receive the last of Z&C's 2002 bills until March 3, 2003 (RB-2) and, less than six weeks later, Feinman expressly reserved the County's right to challenge the appropriateness of the billings (RB-8). Moreover, as explained above, it was not reasonable to expect the County to assert specific objections to the reasonableness of the bills immediately upon receipt, since Z&C's block billing format prevented the County from deciphering the

content of those bills (3092-3097).  Finally, all three cases cited in CB ¶ 11 are inapposite because they all involve belated objections while here, the County promptly objected to Z&C's 2002 bills upon receiving them between January and March 2003.

In sum, Z&C has failed to prove any of the three necessary components for recovery under a theory of account stated, because (1) the County never agreed to any amount due to Z&C for services claimed in its 2002 bills, (2) the County timely and repeatedly expressed its objections to those bills and, given the difficulties presented by the block billing format and the timing of Z&C's filing of multiple arbitrations, coupled with Z&C's refusal to mediate, the County expressed its specific objections within a reasonable time after receiving the reformatted bills, and (3) the 50% partial payment in April 2002 was not an assent to the correctness of any bills but was, instead, only an accommodation payment with full reservation of rights to challenge both the accuracy and reasonableness of the remaining 50% balance of the 2002 bills.

## Z&C'S EQUITABLE CLAIMS FOR WAIVER AND ESTOPPEL ARE CONTRARY TO LAW, AND SHOULD BE REJECTED

Recognizing that the firm's bills cannot stand up to the detailed scrutiny the Panel will apply in determining this fee evaluation case, Z&C instead invokes in its Brief principles of equity, specifically, that the County waived its contractual rights by "course of conduct," and that the County is estopped from objecting to the firm's 2002 bills under the theory of "waiver by estoppel." CB-2, 3, 6, 7. All three arguments – waiver, waiver by estoppel and "course of conduct" – are equitable doctrines. However, Z&C may not invoke the principles of equity where, as here, they come to this arbitration with unclean hands.

> A court of equity, in its endeavors to maintain, promote, and enforce the interests of justice, stringently demands good faith, fairness, and uprightness from the litigant parties who come before it either as plaintiffs or defendants. This salutary and basic rule is stated in the form or an ancient and most favored principle or maxim that he who comes into equity must come with clean hands. . . . A party who comes into court with unclean hands, seeking relief in equity to be granted by the affirmative exercise of the power of equity, should be denied relief.

55 N.Y. Jur.2d § 117 (footnotes omitted). *See also, Cendant Mortgage Corp. v. Saxon Nat'l Mortgage*, 2006 U.S. District Lexis 96371 at *4 (E.D.N.Y. 2006) ("The touchstone of equity is the maxim, 'he who seeks equity must do equity'"); *Agusta v. Agusta*, 2007 N.Y. Misc. Lexis 2790 (Sup. Ct. Nassau Co. 2007) ("[H]e who seeks equity must do equity"); *Ajettix Inc. v. Raub*, 9 Misc.3d 908 (Sup. Ct. Monroe Co. 2005 (same); *Fattorusso v. Urbanowicz*, 3 Misc.3d 502, 506 (Westchester Co., 2004) ("Plaintiff comes to this court seeking relief in equity with unclean hands. . . .[O]ne who seeks equity must do equity. Under the circumstances, any claim sounding in equity is barred by the doctrine of unclean hands").

Claimants in this case are barred from invoking any relief in equity. First, as shown in multiple examples, claimants did not perform their contractual obligations, first and foremost, by

not performing all of the work claimed in the 2002 bills, while all the time certifying on each

Claim Voucher that all such work had in fact been performed.  Second, even if Z&C were

allowed to invoke equity, the same equitable theories must work *against* Z&C, because during

the life of the contract, the firm consistently violated its own obligation to submit bills every

month (General Conditions, ¶ A (RB-1, p. 16: "Invoices will be rendered monthly").  As shown

in the chart setting forth the remarkably late submission of Z&C's 2002 bills (RB-2), those bills

were rendered many months, even years after the services were allegedly performed.  In effect,

claimants' *own* course of conduct from 1993 through 2002 waived the County's obligation to

issue payments "as promptly as possible" (*id.*).  Z&C would have this Panel abrogate the *firm's*

obligations, but hold the *County* responsible for immediate payment.  As Chairman Farber

questioned Judith Chase (Tr. 21):

> MR. FARBER:  What I'm really trying to understand is if, and I really
> would appreciate an explanation, is if you waited many months for
> submission of the bills, why wouldn't the County be entitled to as many
> months to voice an objection to deal with your account stated claim.

Claimants' Brief never addresses this issue.  Instead, Z&C proffers a completely distorted version

of the contract's billing and payment procedures in contending, "From 1993 through 2002 Z&C

submitted its bills when the funding necessary to pay them had been encumbered, a contract

amendment has been approved by the Legislature and funds were available" (CB ¶ 2).  While

Z&C may have chosen *on its own* to adopt that practice, such language is to be found nowhere in

the contract.  Obviously, Z&C has created a fictional contract clause to excuse its nine years'

noncompliance with the contract's requirement that the firm submit bills monthly.  Z&C cannot

come before this Panel to excuse its contractual breach of performance, that is, the proven failure

to actually perform the work claimed in its 2002 invoices, and instead ask for equitable relief

barring the County (and this Panel) from analyzing the accuracy and reasonableness of the bills.

## THERE IS NO "WAIVER BY ESTOPPEL" AGAINST THE COUNTY

Moreover, Z&C's demand for equitable relief is barred by the New York Court of Appeals' "emphatic warning that equitable powers of the courts may not be invoked to sanction disregard of statutory safeguards and restrictions." *Clark v. Mercado*, 2002 U.S. Dist. Lexis 4209 at *28 (W.D.N.Y. 2002), *citing Seif v. City of Long Beach*, 286 N.Y. 382 (N.Y. 1941) and *Novak v. New York State Office for the Aging*, 226 A.D.2d 859 (3d Dep't 1996). Claimants' arguments at CB ¶¶ 2, 5-7 for waiver by estoppel, based on course of conduct against "the County," are contradicted by both statutory and case law, and must be rejected.

Z&C conceives "the County" as a monolithic, unchangeable municipal body (CB ¶ 2):

> It is irrelevant that Nassau's waiver results from eight years of conduct of the prior administration and one year by the current administration. Zorc & Chase's contract was with the County and not with a particular administration.

Under Z&C's theory, when certain officials and executives from "the County" entered into a contract with Z&C in 1993 and administered the contract in certain ways, any succeeding administration became barred from administering and enforcing the contract in any different manner, even if the prior administrations' actions or interpretations contravened public policy and the very terms of the contracts. This is not the law in New York. Z&C's theories are contrary to the Nassau County Charter and the contract itself. Under well-established New York law the County is *not* in fact estopped from interpreting and enforcing the parties' contract different from the way it was administered from 1993 to 2002

Z&C entered into the contract with the County of Nassau "acting for and on behalf of the Department of Public Works and the Office of the County Attorney" (RB-1, p. 1, ¶ 1). Payments under the contract were governed by ¶ 6 which, as we have seen, not only provides that Z&C was required to submit "itemized standard County claim vouchers specifying the

Services performed on a per individual and per hour basis", but also mandates:

> Such vouchers shall be approved the County's Comptroller who shall
> acknowledge the satisfactory performance of the services rendered and
> shall set forth the payments to be made. Such vouchers shall be filed in
> the County's Office of the Comptroller.

As we have seen at pp. 3-4, *supra*, in submitting the claim vouchers, Z&C was required to certify

that "this claim voucher is just, true and correct; that the amount claimed is actually due and

owing and has not been previously claimed" and further, "that all items and/services were

delivered" *See, e.g.*, Claim Vouchers included with Exhibits RB-19, 21-23. In conjunction with

all contacts and payments issued by the County, pursuant to Nassau County Charter Article IV,

"Comptroller" at § 402, subd.(4) (included with separate Reply Brief Authorities), the

Comptroller is required to:

> 4. audit and approve all bills, invoices, payrolls and other evidence of
> claims, demands, or charges against the county, and determine the
> regularity, legality, and correctness of the same[.]

Further, as seen at p. 3, supra, Nassau County Charter Article IV, § 403 entitled

"Restrictions on Payment of Claims" *expressly prohibits* the Comptroller from issuing payment

of any Claim Voucher unless and until the "head of the appropriate department, institution, office

or agency of the county government," here, the Office of the County Attorney:

> § 403. Restrictions on Payment of Claims. No claim against the county . . .
> shall be paid except upon a voucher verified by the oath of the claimant to
> the same effect as is required on an account to be verified by affidavit, and
> certified by the head of the appropriate department, institution, office or
> agency of the county government, and by means of a warrant of the
> Treasurer signed by the Comptroller.

Here, the "appropriate department, institution, office or agency" was the Office of the County

Attorney. Based on these contractual and statutory provisions, the process by which Z&C's

vouchers could be paid required review and approval first, by the County Attorney's Office and

second, by the Comptroller (2221, 2271, 2314, 3124-25).

Therefore, if the County Attorney's Office could not approve to the Comptroller that the bills were in fact "just, true and correct"; "that the amount claimed [was] actually due and owing and [was not] previously claimed"; or "'that all items and/services [were] delivered or rendered as set forth in this claim" as certified by Judith Chase on behalf of the firm on each of the 45 vouchers, the County Attorney could not recommend that the Comptroller issue payment. *Absent approval from the County Attorney's Office, the Comptroller was statutorily prohibited from issuing payment of any questionable voucher to Z&C.*

Case law definitively supports the County's position that, while prior administrations' employees or officials may have interpreted the contract to accept block billing or late submission of invoices, the succeeding administration was *not* bound to continue those prior practices if they contravene the contract and public policy. "It is established law in [New York] that where there is a lack of authority on the part of agents of a municipal corporation to create a liability, except by compliance with well-established regulations, no liability can result unless the prescribed procedure is complied with and followed." *Genesco Entertainment v. Koch*, 593 F. Supp. 743, 748 (S.D.N.Y. 1984), *citing Lutzken v. City of Rochester*, 7 A.D.2d 498, 501 (4th Dep't 1959). A case on point is *Modern Amusements, Inc. v. Marriott Corp.*, 599 F.Supp. 1548 (S.D.N.Y. 1985) where the plaintiff corporation, Modern, claimed a $30,000 balance due under a written lease for an amusement ride at Rye Playland with the Marriott Corp., which lease contained an express representation that Marriott was authorized to represent Westchester County as its managing agent in executing the lease. After the one-year lease between Modern and Marriott terminated in 1982, the County entered into a modification of the prior lease for the 1983 season. Subsequently, when questions arose about the validity of the original lease

between Modern and Marriott, the County terminated the modified lease on the ground that the original lease was void *ab initio* for non-compliance with applicable statutory requirements.

Marriott asserted a cross-claim against the County claiming, *inter alia,* that by accepting the benefits of the lease, the County was equitably estopped from challenging its validity, while the County contended that the acts or omissions of *individual County employees* could not work to estop the County from denying liability in violation of the statutory mandates. The court agreed and dismissed the case against the County, holding that "New York courts have rigidly enforced statutory restrictions governing the authority of officials to commit municipalities to contractual obligations." 599 F.Supp. at 1552. The court explained:

> [N]o sort of ratification can make good an act without the scope of the corporate authority. So where the charter or a statute binding upon the corporation, has committed a class of acts to particular officers or agents, other than the general governing body, or where it has prescribed certain formalities as conditions to the performance of any description of corporate business, the proper functionaries must act, and the designated forms must be observed, and generally no act of recognition can supply a defect in these respects.

The same analysis applies in this arbitration to defeat Z&C's argument for equitable estoppel. Although prior Nassau County officials and employees, including Nassau County Attorneys and Comptrollers, may have issued payment based on Z&C's block billing format, which failed to identify the specific attorney (or paralegal) performing which specific task, and for how long, this cannot equitably estop succeeding County officials from following their statutory mandate to examine Z&C's bills before certifying that the services claimed in the firm's invoices were actually performed. Here, because the record proves that because Z&C *did not perform* all of the work claimed in its 2002 bills, County Attorney Lorna Goodman and the Nassau County Comptroller, were absolutely correct determining that the initial 50% payment of $678,962 was more than sufficient to compensate Z&C for 2002.

21

Finally, the Attorney General of the State of New York expressly rejected the same type

of equitable estoppel argued by Z&C, in *1951 N.Y. Op. Att'y Gen. 156*. The City of Elmira

Water Board had contracted to supply water to the State Reformatory in Elmira. The contract

was dated July 1, 1948 and provided for the payment for water in accordance with a schedule

contained in the contract. However, for the 12 months between January 1, 1951 and December

21, 1951 date of the Opinion, the State Reformatory submitted bills according to a different

schedule, which had the effect of increasing charges to the State by about 14% beyond the

contract price, and payment had already been made in accordance with the submitted bills.

Nevertheless, the Attorney General determined that the State could not be liable for the increased

payment, even though payments had already been made, stating, "It is my further opinion that

payment of the bills submitted in accordance with the revised schedule *cannot work an estoppel*

*against the State*" (emphasis added).

None of the cases cited by claimants at CB ¶ 7, asserting that waiver by estoppel applies

to municipalities, are on point, since all of those cases involve a municipality's waiver of only

contractual rights, but not statutory mandates, such as Nassau County Charter §§ 402 and 403.

Thus, Z&C's arguments that the County is estopped from denying liability based on prior course

of conduct or waiver must be rejected.

### CLAIMANTS' FEE APPLICATION IS GROSSLY EXAGGERATED

The County's position is that claimants' should not be awarded any amount in this

arbitration, because the County should be determined as the prevailing party, hence, no fees or

costs should be granted to Z&C. However, if the Panel determines that claimants should be

awarded fees and costs, the County opposes Z&C's fee application for $1,466,307 on the ground

that it is grossly exaggerated. As an initial matter, there is no justification for Judith Chase and

Joseph Zorc each to charge $500 per hour for their handling of this case.  Claimants argue that

Z&C provides no case law support for this figure.  Moreover, Z&C performed few, if any,

services in Manhattan, but instead in Nassau County and in Albany where, as the Panel knows,

the legal billing rates are significantly lower than Manhattan, more along the lines of $200 per

hour for mere collection work.  More importantly, Chase and Zorc did not act here as experts in

environmental law pursuing grant appeals, but rather, acted as routine collection attorneys in this

straightforward fee-collection case.

> A reasonable hourly rate is one that is consistent with the "prevailing
> market rates in the relevant community," that is, *what similarly skilled
> attorneys in the area would charge for similar work.* The fee applicant
> shoulders the burden of establishing that the prevailing market rate and that
> the requested hourly rates are similar. *Those who submit a schedule of their
> regular billing rates have done half the work of setting a reasonable hourly
> rate* to use in the lodestar calculation. The other essential part is that the
> applicant establish the *rates that attorneys in the community regularly
> charge for similar work.* Only after producing both pieces can applicants
> demonstrate to the court that their requested rates are within prevailing
> market rates. (Emphasis added; citations and footnote omitted.)

*King v. Madonna*, 325 F.Supp.2d 162, 169 (E.D.N.Y. 2004).  Z&C may not therefore justify a

billing rate of $500 per hour for this standard collection case.  The rate of $200 per hour is

appropriate, thus, Z&C's proposed rate of $500 per hour should be reduced by 60% to $200 and

further, as shown in this arbitration, the firm bills excessively for unnecessary and duplicative

work, much of which was on display here: tens of thousands of pages of "demonstrative

evidence" which was never introduced into the record, exhibit volumes repeatedly changed or

"updated," duplication of exhibits under different names in multiple binders, never used either in

the hearings or as documentary evidence, and twelve full hearing days over more than one year

due, in large part, to Z&C's refusal to follow the Panel's instruction to focus on the relevant

issues.  Thus, a 60% reduction in hours and in costs (office supplies, travel, etc.) is warranted.

Of course, the County asserts that Z&C should not be awarded *any* fees or costs in this

arbitration. However, if the is Panel inclined to issue fees and costs to Z&C, the total demand of

$1,466,307 in fees and costs, should be reduced by at least 60%, if not more.

## OBJECTIONS TO CLAIMANTS' PROPOSED AWARD

Respondent Nassau County objects to each and every element constituting claimants'

proposed Award, essentially for the reasons and explanations set forth in the County's Post-

Hearing Brief and Reply Brief. Specifically, the County objects to Z&C's claim for $749,712.50

as a claim for unpaid 2002 fees because Z&C *did not* perform all of the services described in the

bills; the bills were *not* submitted in accordance with the terms of the contract, in failing to

describe individual attorneys performing specific tasks, and for how long; there is no valid

argument for waiver, estoppel or "course of conduct" binding the County from enforcing the

contract pursuant to County officials following their statutory duties; there was no "account

stated" because the County (Meredith Feinman) immediately and repeatedly objected to Z&C's

2002 bills upon receiving them in 2003. Further, the additional $4,375 Z&C belatedly adds to its

claim must be rejected as unsupported by any credible explanation as to why Z&C failed to bill

the two items previously.

As to Z&C's claim that the County "received over $23.5 million as a result of Claimants'

2002 services," entitling Z&C to recovery in quantum meruit, there is absolutely no evidence in

the record to support such a claim, and no such finding of fact can be made from this proceeding.

Claimants are not entitled to any recovery for "case management" or "reformatting"

charges because such charges were never contemplated by the parties in the contract, and

because no amendment was ever executed by the County approving such extra charges. If the

Panel decides that Z&C is due any amount, no interest should be added to such amount, because

Z&C's delays in submitting the bills, in adding baseless extra charges, and repeatedly delaying this arbitration due to purported health issues, should not justify any interest. As explained above, Z&C's claim of over $1.45 million in fees and costs is wildly overstated and, if any award would be made, such figure should be cut by 60%.

Finally, pursuant to the parties' contract and the rules of the American Arbitration Association, all claims presented by either party in this arbitration must be decided with finality, with the effect of imposing *res judicata* and collateral estoppel upon all claims presented and adjudicated by this Panel. Z&C's proposed instruction that the firm may pursue in any forum what Z&C deems to be an inadequate award must be fully rejected by this Panel, and must not be made part of any award.

## CONCLUSION

For all the foregoing reasons, Respondent Nassau County respectfully requests that the Panel issue a finding making no award to Claimants, and that the Panel award the attorney's fees and costs incurred by Nassau County in defending against the claims asserted in this arbitration.

Dated:   Mineola, New York
         August 27, 2007

                                        LORNA B. GOODMAN
                                        Nassau County Attorney

                                        By: _____
                                              Ralph J. Reissman
                                        Deputy County Attorney
                                        One West Street
                                        Mineola, New York 11501
                                        Tel. (516) 571-3046

25