-------------------------------------------------------------------
-x

COUNTY OF NASSAU,

                                    Petitioner,

                                                08-CV-0082 (TCP) (WDW)

           - against -


JUDITH L. CHASE, JOSEPH M. ZORC

and ZORC & CHASE,


                                    Respondents.
-------------------------------------------------------------------
-x


PETITIONER'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION TO VACATE, AND
IN SUPPORT OF CROSS-MOTION TO CONFIRM,
ARBITRATION AWARD

**LORNA B. GOODMAN**
Nassau County Attorney
One West Street
Mineola, New York 11501
*Attorney for Petitioner*

Dennis J. Saffran
Deputy County Attorney
(516) 571-3966
*Of Counsel*

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Background, Facts and Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.    Applicable Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B.    The Scope of This Court's Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C.    "Manifest Disregard of the Law" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.    Continued Validity of the "Manifest Disregard" Test Has Been
             Seriously Called into Question by the Supreme Court in *Hall*
             *Street Associates* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.    Even Before *Hall Street Associates* "Manifest Disregard" Was
             a "Doctrine of Last Resort" Applied Only in Cases of
             "Egregious Impropriety" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.    Zorc & Chase's "Manifest Disregard" Claims Here Are
             Frivolous . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D.    "Evident Partiality" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## Cases

*Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*,
    274 F.2d 805 (2d Cir. 1960), *cert. denied*, 363 U.S. 843 (1960) . . . . . . . . . . . . . . . . . 12

*Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691 (2d Cir. 1978) . . . . . . . 18

*ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 18

*Banco de Seguros del Estado v. Mutual Marine Office, Inc.*,
    344 F.3d 255 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18,19

*Burchell v. Marsh*, 58 U.S. (17 How.) 344 (1854)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.*,
    119 F.3d 847 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818 (2d Cir. 1997) . . . . . . . . . . . . . 17, 19, 21

*Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*,
    333 F.3d 383 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14,17-21

*Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . 21

*GMS Group, LLC v. Benderson*, 326 F.3d 75 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 18

*Hall Street Assocs. v. Mattel, Inc.*, 2008 U.S. LEXIS 2911,
    76 U.S.L.W. 4168 (U.S. Mar. 25, 2008) . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 13-17, 21

*Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . 20, 21, 24

*Hardy v. Walsh Manning Securities, L.L.C.*, 341 F.3d 126 (2d Cir. 2003) . . . . . . . . . . . . 19, 20

*Hoeft v. MVL Group, Inc.*, 343 F.3d 57 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . 11, 17-20, 22, 24

*Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752 (N.D. Ill. 2005) . . . . . . . . . . . . . . . . 24

*I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424 (2d Cir. 1974) . . . . . . . . . . . . 17

        *- continued -*

*Authorities, continued*

*In re: Arbitration No. AAA13-161-0511-85 under Grain Arbitration Rules*,
    867 F.2d 130 (2d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Litvak Packing Co. v. United Food & Commercial Workers,*
    *Local Union No. 7*, 886 F.2d 275 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Martin v. Camp*, 219 N.Y. 170 (1916) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*New York Telephone Co. v. Communications Workers of America,*
    256 F.3d 89 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*O'Shea v. Brennan*, 2004 U.S. Dist. LEXIS 4723 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . 23

*Perma-Line Corp. of America v. Sign Pictorial & Display Union,*
    639 F.2d 890 (2d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 21

*Porzig v. Dresdner Kleinwort Benson, N. America, LLC,*
    497 F.3d 133 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rich v. Spartis*, 516 F.3d 75 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14, 18, 20

*Roadway Package System, Inc. v. Kayser*, 257 F.3d 287 (3d Cir. 2001) . . . . . . . . . . . . . . . 9, 10

*Rosenman Colin Freund Lewis & Cohen*, 93 A.D.2d 745 (1st Dept. 1983) . . . . . . . . . . . . . . . 23

*Siegel v. Titan Industrial Corp.*, 779 F.2d 891 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211 (2d Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Tillman v. Komar*, 259 N.Y. 133 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Volt Information Sciences, Inc. v. Board of Trustees of*
    *Leland Stanford Junior University*, 489 U.S. 468 (1989) . . . . . . . . . . . . . . . . . . . . . 8-11

*Wallace v. Buttar*, 378 F.3d 182 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17-21

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200 (2d Cir. 2002) . . . . . . . . . . . . . . . . . 20

*Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471 (2006) . . . . . . . . . . . . . . . . . . 17, 18

*Wilko v. Swan*, 346 U.S. 427 (1953),
    *overruled, Rodriguez de Quijas v. Shearson/American Express, Inc.*,
    490 U.S. 477 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-17

                                      - *continued* -

*Authorities, continued*

*Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*,
    103 F.3d 9 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## **Statutes**

Age Discrimination in Employment Act, 29 U.S.C.A. § 621 *et seq.* . . . . . . . . . . . . . . . . . . 19-21

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-11

Federal Arbitration Act § 2, 9 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Federal Arbitration Act § 9, 9 U.S.C. § 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Federal Arbitration Act § 10, 9 U.S.C. § 10 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15-17, 21

Federal Arbitration Act § 10 (a), 9 U.S.C. § 10 (a) . . . . . . . . . . . . . . . . . . 11, 14, 16, 18, 21, 25

Federal Arbitration Act § 11, 9 U.S.C. § 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 17

N.Y.C.P.L.R. Article 75 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11

N.Y.C.P.L.R. § 7510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

N.Y.C.P.L.R. § 7511 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Securities Act of 1933, 15 U. S. C. § 77a *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Preliminary Statement**

Petitioner County of Nassau ("County") submits this memorandum in opposition to the motion of respondents Chase, *et al.* ("respondents" or "Zorc & Chase") to vacate, and in support of the County's cross-motion and underlying petition to confirm, an arbitration award which, a) denied in its entirety Zorc & Chase's claim for approximately $900,000 in additional fees and $350,000 in interest for legal work performed for the County in 2002; b) denied Zorc & Chase's further claim for approximately $1.45 million in fees and costs allegedly incurred in connection with the arbitration proceeding; and, c) granted the County's application for approximately $190,000 in fees and costs for the proceeding.

The arbitration panel based this award upon findings, reached after twelve days of hearings producing 4,100 pages of transcripts, that, *inter alia*:

- "Zorc & Chase billed extraordinarily high hours for 2002 given the very minimal legal work shown to the Tribunal;"

- "there was serious question as to whether Zorc & Chase billed the County for work done for [an]other municipality," with which it had a contract that capped its fees;

- "Zorc & Chase did not retain contemporaneous records of lawyer time" and otherwise "completely failed to comply" with the contractual requirement of itemized bills;

- "the County acted reasonably in asking for more information about the Zorc & Chase 2002 bills" and requesting that they be reformatted to show an itemized breakdown of time;

- the reformatted bills, submitted only "after enormous resistance," were "neither accurate nor credible;" many contained errors and "every single error was in favor of Zorc & Chase;"

- "The Tribunal had serious doubts as to Zorc & Chase's credibility regarding the veracity and accuracy of [its] bills because of the highly questionable and arguably unprofessional conduct of Zorc & Chase;"

- "The County acted in good faith" in paying 50% of Zorc & Chase's bills despite

- 1 -

their dubious validity, and that payment "completely satisfied the County's obligation" to Zorc & Chase for services rendered in 2002;

- the "arbitration was unduly protracted because Zorc & Chase did not comply with the Tribunal's discovery orders and did not comply with the directions and/or suggestions of the Tribunal regarding the conduct of the hearing" and "unnecessarily prolonged the hearings by continuously providing evidence and strenuous and prolonged arguments about irrelevant matters."

As will be discussed below, arbitration awards such as the one here are subject to only extremely limited review by the courts; indeed, the standard of review is "among the narrowest known to the law." They may be vacated only in cases of the most "egregious impropriety" on the part of the arbitrators, and must be confirmed if the court can infer any "barely colorable justification" for the outcome, even if it reflects "obvious legal error" or is against the great weight of the law. Moreover, in its first major statement on arbitration in several years, fortuitously handed down just three weeks ago, the United States Supreme Court seems to have narrowed this standard even further by seriously calling into question the continued viability of the "manifest disregard" test upon which respondents rely. *Hall Street Assocs. v. Mattel, Inc.*, 2008 U.S. LEXIS 2911, 76 U.S.L.W. 4168 (U.S. Mar. 25, 2008). As will be seen, the Court also cautioned against allowing disappointed arbitrants to mount "full-bore legal and evidentiary appeals" requiring a "cumbersome and time-consuming judicial review process," lest the entire purpose of informal arbitration be brought "to grief in post-arbitration process." The Court's pronouncements highlight both the frivolousness of Zorc & Chase's challenge to the arbitrators' award here, and the inappropriateness of its voluminous submission to this court.

## Background, Facts and Procedural History

The background and facts of the dispute giving rise to this arbitration are noted in the arbitrators' award (Exh. A to the accompanying Declaration of Dennis J. Saffran ["Saffran Decl."])

("Award") and are discussed in more detail in the County's Pre-Hearing Brief (Saffran Decl. Exh. C) at 2-11, and Post-Hearing Brief (Saffran Decl. Exh. D) at 8-12, and thus need not be repeated at length here. To summarize, the arbitration challenged here is the fifth of six such proceedings brought by Zorc & Chase against the County concerning fees for legal work between 2001 and the County's termination of its 1993 retainer agreement with the firm in November, 2003. Under this agreement, Zorc & Chase, a two-partner firm based in Washington, DC, was to assist the County in securing grant funding available under the Clean Water Act to help defray costs associated with the County's construction of wastewater treatment facilities and associated sewage systems. The agreement required that itemized bills "specifying the Services performed on a per individual and per hour basis" be "rendered monthly" by Zorc & Chase. Agreement For Legal/Regulatory Services ("Agreement") (Saffran Decl. Exh. E) ¶6 & Attach. A "General Conditions" ¶A at p. 6.

In January, 2002, a new County Administration took office and found that notwithstanding the monthly invoicing requirement there was a significant backlog in receiving bills from Zorc & Chase – with some bills not being submitted until a year or more after the work was performed, thus making it difficult to budget for these expenses. Even more problematic was the firm's practice of "block billing" in violation of the Agreement's requirement of itemized billing. As later described by the arbitrators, this practice consisted of "lumping the work of Mr. Zorc, Ms. Chase and [an] associate together" in a daily narrative, thus making it "impossible to determine from the bills which attorney had performed which services and how long each task had taken." Award ¶B.2 at p. 6. Negotiations were largely unsuccessful at resolving these problems.

The bills at issue in the present arbitration, for the period from January to December, 2002, were submitted to the County in 21 installments between January and March, 2003. They totaled $1,357,925 and, like the previous bills, were in "block billing" rather than itemized format. *See*

- 3 -

Post-Hr'g Br. at 1; Award ¶ B.1 at p. 5.  Moreover, insofar as the bills were decipherable, they seemed to reflect they type of duplicative billing and overbilling for little work later found by the arbitrators.  *See id.* ¶¶ A.1-A.10 at pp. 2-5.  Nonetheless, in April, 2003, the County Attorney authorized payment of 50% of this amount, or $678,962.50, to Zorc & Chase, but requested that the bills be reformatted in the required itemized manner prior to making any further payment.  *Id.* at p. 1; *id.* ¶ B at p. 5.  The Chief Executive Deputy County Attorney stressed in a letter to Zorc & Chase that "[s]uch payment shall not be construed as a waiver of the County's rights to challenge . . . the accuracy or appropriateness of any such bills."  Post-Hr'g Br. at 12.

"After enormous resistance," Zorc & Chase finally submitted the reformatted bills in 24 installments during February and March, 2004 – "for many of the bills more than 2 years after the services were rendered."  Award ¶ C.2 at p. 7.  In addition to the $1,357,925 originally billed, however, these new bills contained additional purported charges of $153,375 in unexplained "case management fees," a $38,500 "reformatting fee" for revising the bills to comply with the Agreement, and a $70,750 charge not previously billed for work two years earlier in connection with one of the sewage treatment plants.  *See id.* ¶ H at p. 9; Post-Hr'g Br. at 1.  Thus the total charges for 2002 had now ballooned by $262,250, or almost 20%, to $1,620,550.

Moreover, as later found by the arbitrators, the reformatted bills were "not accurate, not reasonable and not credible" because, among other reasons:

> The reformatting was done without reference to any notes, time sheets, or other contemporaneous records of service rendered, since Mr. Zorc and Ms. Chase did not maintain such records although . . . required to do so.

> Many of the reformatted bills contained errors including hours billed which did not match the original bills.  Every single error was in favor of Zorc & Chase.

> In many instances, the reformatting effort by Zorc & Chase seems to have consisted of little more than taking one paragraph of the original bill and breaking it into two paragraphs for the reformatted bill.

*Id.* ¶¶ C, C.2 - C.4 at p. 7.

After the County refused to make further payment, Zorc & Chase filed a demand for arbitration in November, 2004.  Discovery was exchanged over the next eighteen months, and pre-hearing briefs were submitted in June, 2006.  Twelve days of hearings were held, and 4,100 pages of testimony were taken, before a panel of arbitrators between June 27, 2006 and June 8, 2007, and the parties submitted extensive post-trial briefs and reply briefs in July and August, 2007.

Zorc & Chase's claims in the arbitration eventually totaled over $2.7 million, including the $678,962.50 (50%) unpaid share of their original bills, the $262,250 in additional charges for "case management," "reformatting," and previously unbilled work added to the revised bills, another $4,375 for 2002 work billed for the first time during the arbitration, and $365,262.80 in interest, plus $1,264,437.50 in attorneys fees and $166,005.14 in expenses for the arbitration proceeding itself.  *See* Mot. to Vacate, Exhs. J.6 & J.7.  By contrast, the County sought $90,062.50 in attorneys fees and $102,184.56 in expenses for the proceeding.  Award ¶¶ I.1, J.2-J.4 at pp. 10-11; Ver. Pet. to Confirm Arbitration Award ¶¶ 10, 11.  Thus Zorc & Chase's total claim for fees and expenses in connection with the proceeding was over $1.4 million,[1] while the County's claim was approximately $190,000.

The panel issued its award on October 17, 2007.  As noted in the Preliminary Statement, the panel denied Zorc & Chase's claims in their entirety, and instead awarded the County its full claim for $192,247.06 in fees and costs.  The arbitrators' 12-page award decision, which bears reading in full and merits quotation at length, explains why.  In addition to its findings regarding the reformat-ted bills quoted above, the panel found, based upon "review of the extensive documentary evidence

---

[1]     The total stated in Zorc & Chase's filings were $1,430,442.64, while the arbitrators stated that the total was $1,466,307.00.  *See* Exhs. J.6 & J.7 to Motion to Vacate; Award ¶ I.1 at p. 10.

and . . . evaluation of the credibility of the witnesses," that:

    A.   . . . Claimants' bills to the County for legal services for 2002 were not accurate, not reasonable, and not credible for the following reasons:

    1.  Zorc and Chase billed extraordinarily high hours for 2002 given the very minimal legal work shown to the Tribunal. This is especially so, since in 2002 Zorc and Chase made no court appearances, participated in limited agency appearances or . . . meetings, submitted no briefs or memoranda of law, and prepared . . . very few letters.

    2.  It is not credible that on such a high number of days, Mr. Zorc and Ms. Chase allegedly performed exactly the same work for exactly the same number of hours. 65% of all time entries in 2002 for Mr. Zorc and Ms. Chase were identical. . . . [I]t was not reasonable to duplicate efforts to the great extent reflected in the bills.

    3.  It is not credible that Mr. Zorc and Ms. Chase performed so much work and rendered so many billable hours while they were in Italy and in the Virgin Islands in 2002.

    4.  It is not credible that especially in January and February 2002 . . . Mr. Zorc and Ms. Chase each had many days with billable hours approaching 18 hours a day. When asked to explain, they advised that they were faced with significant deadlines, although the "deadline" for the County's work was several months in the future. Additionally, much of the alleged work . . . during this deadline period consisted of updates of congressional staff changes. It also does not seem credible that if there were pressing deadlines leading to 18 hour work days that Mr. Zorc and Ms. Chase would spend so much time obtaining and reviewing information regarding congressional staff changes. . . .

    5.  Zorc and Chase's bills for services rendered in 2002 reflect 182 hours of legal time for *quantum meruit* research. However, the memorandum of law regarding *quantum meruit* submitted by Zorc and Chase in May 2003, reflected virtually no changes from a memorandum of law drafted years earlier by Zorc and Chase. . . .

    6.  The Zorc and Chase time sheets contained 242 references to work done . . . in connection with legal documents. Yet virtually no such documents were produced by Zorc and Chase to the County in response to document requests and virtually no such documents were introduced by Zorc and Chase in evidence at the hearings.

* * *

    8.  Many of Zorc and Chase's very busy days in early 2002 were also occupied with rendering services for another municipality . . . Based upon a review of both the issues referred to on the bills and . . . the legal work performed for the other municipality, there was serious

- 6 -

question as to whether Zorc and Chase billed the County for work done for the other municipality, which has a cap on billing of $75,000.00 per annum.

\* \* \*

10.    Some of the Zorc and Chase work allegedly performed in May 2002 consisted of reviewing 32 decisions of the Environmental Protection Agency.  However, this work seemed entirely duplicative of work performed and billed for by Zorc and Chase in 2001. . . .

11.    Zorc and Chase did not retain contemporaneous records of lawyer time.  Rather, their practices was to have Ms. Chase take notes on her computer . . .  These notes were . . . overwritten when bills were prepared months later.  In preparing the final bills, Ms. Chase consolidated all attorney time descriptions into one block billing entry.  Without the . . . original notes, it was not possible . . . to analyze the actual work performed by each attorney. . . .

B.    We Find that the County acted reasonably in asking for more information about Zorc and Chase 2002 bills including a request . . . that such bills be reformatted to comply with the Retainer Agreement. . . .

\* \* \*

2.    The Retainer Agreement required that the Zorc and Chase bills reflect hours spent by each attorney on a daily basis.  Zorc and Chase completely failed to comply, instead using "block billing" lumping the work of Mr. Zorc and Ms. Chase, and the associate together. . . .  [I]t was impossible to determine from the bills which attorney had performed which services and how long each task had taken.

\* \* \*

4.    We Find that the County acted in good faith when . . . they paid 50% of the Zorc and Chase bills after requesting reformatting. . . .

\* \* \*

[I.]2.    [T]his arbitration was unduly protracted because Zorc and Chase did not comply with the Tribunal's discovery orders and did not comply with the directions and/or suggestions of the Tribunal regarding the conduct of the hearing.  Specifically, we find that Zorc and Chase unnecessarily prolonged the hearings by continuously providing evidence and . . . prolonged arguments about . . . irrelevant matters.

Award at pp. 2 - 6, 10.

The Award directed Zorc & Chase to pay the County's attorneys fees within thirty days, but

- 7 -

did not expressly apply this 30-day deadline to the payment of the County's expenses.  *Id.* ¶¶ J.2-J.4 at p. 11.  At the County's request, the panel issued an Order clarifying the Award on November 28, 2007 (Saffran Decl. Exh. B) specifying that all payments were to have been made within thirty days of the October 17 Award.  To date, Zorc & Chase has not paid any of the award.  On December 28, 2007, the County filed a Petition in State Supreme Court, Nassau County, to confirm the award pursuant to N.Y.C.P.L.R. ("CPLR") § 7510 and Agreement ¶ 13, which, as discussed below, provides for review of any arbitration decision under New York law.  On January 8, 2008, Zorc & Chase removed the confirmation proceeding to federal court, and on or about January 18, 2008 moved in this court to vacate the award.

A.   <u>Applicable Law</u>

Preliminarily, we note that Zorc & Chase is not correct that this matter is governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, rather than by CPLR Article 75, although, since the only difference between New York and federal arbitration law is the exceedingly narrow and now possibly discredited "manifest disregard" standard that has been applied in this and other circuits (*see* sec. C *infra*), we will analyze this case under FAA case law in the following sections.  It should be kept in mind, though, that to the extent that the "manifest disregard" test retains any content at all, the governing CPLR erects an even higher bar to vacatur of an award.

Paragraph 13 of the Agreement provides in pertinent part that the Agreement "shall be governed by and construed in accordance with the law of the State of New York" and that in the event of arbitration "the decision of the arbitrators will be binding and <u>not subject to appeal, except solely and exclusively on the grounds set forth in the New York Civil Practice Law and Rules</u>" (emphasis added).  In *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468 (1989), the Supreme Court held that a similar choice-of-law clause

- 8 -

providing that an arbitration agreement was to be governed by California law was binding even though it was "undisputed that th[e] contract falls within the coverage of the FAA, since it involves interstate commerce." *Id.* at 476; *see also id.* at 481 n. 4 (Brennan, J., dissenting) (joining in the Court's holding "that the FAA does not pre-empt state arbitration rules, <u>even as applied to contracts involving interstate commerce</u>, when the parties have agreed to arbitrate by those rules to the exclusion of federal arbitration law") (emphasis added); *accord id.* at 485 (Brennan, J., dissenting).[2] Thus the Court upheld a stay of the arbitration pursuant to California law pending the outcome of litigation between the respondent and a third party, even though it was also undisputed that "the FAA contains no provision authorizing a stay of arbitration in this situation." *Id.* at 476. The Court rejected arguments that this violated the federal policy favoring arbitration, and that the California stay provision was therefore preempted by the FAA, holding that "[t]here is no federal policy favoring arbitration under a certain set of procedural rules," and that "[w]here . . . the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA." *Id.* at 476, 479.

*See also Roadway Package System, Inc. v. Kayser*, 257 F.3d 287, 292-93 (3d Cir. 2001), in which the court specifically applied the *Volt Information Sciences* ruling to allow adoption of state rules governing review and vacatur of arbitration awards, stating that "parties may agree that judicial review of an arbitrator's decision will be conducted according to standards borrowed from state law. . . . We . . . join with the great weight of authority and hold that parties may opt out of the FAA's off-the-rack vacatur standards and fashion their own (including by referencing state law

---

[2]      The two dissenting judges in *Volt Information Sciences* disputed only that the parties there <u>had</u> adopted California law by means of a general and vague choice-of-law clause providing only that "[t]he Contract shall be governed by the law of the place where the Project is located." *Id.* at 470; *see id.* at 481 n. 4, 485, 490-91.  By contrast, the clause here, as noted, explicitly provides for judicial review "solely and exclusively on the grounds set forth in the New York Civil Practice Law and Rules."

standards)." *See id.* at 293 n. 3 (citing cases in accord). The court thus held that the parties to an arbitration agreement subject to the FAA were free to adopt Pennsylvania review rules that were narrower than those under the FAA in that they did not include a "manifest disregard" ground for vacatur applicable in the Third Circuit. *See id.* at 291 n. 2.[3]

Zorc & Chase cites *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52 (2003), for the proposition that all arbitration agreements affecting commerce are not merely "within the coverage of the FAA" as the *Volt Information Sciences* Court had acknowledged, but are also "governed" by the FAA notwithstanding an explicit provision in the agreement for review and enforcement pursuant to state procedural rules. But the Court's *per curiam* opinion in *Citizens Bank* did not overrule *Volt*, either expressly or implicitly. The issue in *Citizens Bank* was not, as in *Volt* and the present case, whether the parties to an arbitration agreement could agree to be governed by state law, but rather whether one party to an arbitration agreement that specifically provided that "the FAA shall apply to its construction, interpretation, and enforcement" could nonetheless avoid arbitration altogether and litigate its dispute in court because the underlying transactions did not have "a substantial effect on interstate commerce" and were therefore, the party claimed, not subject to the FAA. 539 U.S. at 54, 55. The Court rejected this argument, holding that "the term 'involving commerce' in the FAA," 9 U.S.C. § 2, is "the functional equivalent of the more familiar term 'affecting commerce' – words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power," and that therefore "the FAA encompasses a wider range of transactions than those actually 'in commerce.'" 539 U.S. at 56. Thus, *Citizen's Bank* merely reaffirmed what was undisputed in *Volt* and is undisputed here – that the agreements at issue are <u>subject to</u> coverage under the FAA.

---

[3]     The court went on to hold that the parties had not done so there, however, as the arbitration agreement there contained only a "generic choice-of-law clause" stating that the agreement would be governed by Pennsylvania law, and not an explicit adoption of state <u>judicial review</u> rules, *see id.* at 293-300, such as that contained in Agreement ¶ 13 here.

It said nothing about the validity of an agreement to be governed by state law instead; that issue had already been decided in *Volt*.

Zorc & Chase also relies on the statement in *Hoeft v. MVL Group, Inc.*, 343 F.3d 57, 64 (2d Cir. 2003) that "[t]he manifest disregard standard together with [FAA] § 10(a) represent a floor for judicial review of arbitration awards below which parties cannot require courts to go, no matter how clear the parties' intentions." However, *Hoeft* involved an arbitration agreement that purported to bar "any type of review or appeal whatsoever," *id.* at 60, rather than merely providing for review and enforcement pursuant to state rather than federal rules. As in *Citizens Bank*, and unlike here and in *Volt*, there was no issue of whether the agreement was governed by federal or state law – the parties had not agreed to be controlled by state law as they did here and in *Volt*, and, as the agreement involved commerce, it was therefore undisputed that the FAA governed. Thus the issue in *Hoeft* as in *Citizens Bank* was whether parties to an arbitration agreement concededly governed by the FAA could nonetheless simply ignore its requirements. By contrast, the issue here as in *Volt* is whether parties to an agreement within the scope of the FAA can agree to substitute an equivalent body of state law for these requirements. The Supreme Court held in *Volt* that they could, and therefore any contrary implication in a statement by the Circuit in *Hoeft* that was addressed to a different issue is of course dictum.

For these reasons, review of the arbitrators' decision is governed by CPLR Article 75 rather than by the FAA, although as noted at the outset of this discussion the differences between the two review standards are negligible – *compare* CPLR § 7511(b) with FAA § 10(a); *see Hall Street Associates*, p. 2 *supra*, 2008 U.S. LEXIS 2911 at *24 n.7 (noting that the FAA was based upon the predecessor of Article 75 and that the "grounds for vacatur . . . are virtually identical") – and may now be non-existent in the wake of *Hall Street Associates*' discrediting of the "material disregard"

test (*see* sec. C.1 *infra*).  Therefore, we will proceed to analyze this case under FAA case law without waiving the argument that Article 75 governs.

**B.**     **The Scope of This Court's Review**

It is useful to distinguish between the procedural scope of a federal court's review of an arbitration award and the substantive standard of review, and to address the former first.  As set forth below, the role of the reviewing court is cursory – merely to assure itself that the arbitrators have not engaged in gross impropriety.  This extremely circumscribed role is a necessary corollary of the extremely limited substantive review, and both are essential in order not to subvert the purposes of arbitration.

As noted in the Preliminary Statement and discussed in detail in the following sections, the substantive standard of review is among the narrowest in the law, allowing for vacatur only in cases of egregious impropriety and requiring confirmation if any "barely colorable justification" for the decision can be inferred.  The courts have stressed that this rule of extremely limited review is necessary "in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation."  *Rich v. Spartis*, 516 F.3d 75, 81 (2d Cir. 2008) (quoting *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12 (2d Cir. 1997)); *accord*, *e.g.*, *Siegel v. Titan Industrial Corp.*, 779 F.2d 891, 894 (2d Cir. 1985) ("necessary if arbitration is to serve as a quick, inexpensive and informal means of private dispute resolution"); *Amicizia Societa Navegazione v. Chilean Nitrate & Iodine Sales Corp.*, 274 F.2d 805, 808 (2d Cir. 1960) ("otherwise, the ostensible purpose for resort to arbitration, *i.e.*, avoidance of litigation, would be frustrated"), *cert. denied*, 363 U.S. 843 (1960).

In order to avoid undermining these goals, it is necessary not only that the reviewing court apply an exceedingly narrow <u>substantive</u> standard of review, but that it also refrain from engaging in

a comprehensive review process that would "thwart the usefulness of arbitration, making it 'the commencement, not the end, of litigation.'" *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003) (quoting *Burchell v. Marsh*, 58 U.S. (17 How.) 344, 349 (1854)).  "A motion to vacate filed in a federal court is not an occasion for de novo review of an arbitral award."  *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004).  Nowhere has this been better expressed than by the Supreme Court in the recent *Hall Street Associates* decision, in which it counseled the lower courts that they must not apply the confirmation, vacatur and modification provisions of FAA §§ 9 - 11 in a way that "opens the door to the full-bore legal and evidentiary appeals that can render informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process, and bring arbitration theory to grief in post-arbitration process."  2008 U.S. LEXIS 2911 at *22 - *23 (internal citations and quotations omitted).

This does not mean that the disappointed arbitrant is not entitled to any day in court.  What it does mean, though, is that if that arbitrant cannot tell the court quickly, clearly and concisely, with a minimum of paperwork, precisely what the egregious wrong perpetrated by the arbitrators was, then the standard of review has not been met and the process is at an end.  The very few cases where vacatur has been granted illustrate how such a streamlined process is sufficient to police against any genuine abuses.  A quintessential example is provided by *New York Telephone Co. v. Communications Workers of America*, 256 F.3d 89 (2d Cir. 2001), oft cited as one of the four cases in over forty years in which the Second Circuit vacated an arbitration award (*see* sec. C.2 *infra*).  In *New York Telephone*, the arbitrator expressly rejected controlling Second Circuit prece-dent in favor of contrary precedent from other Circuits which he preferred, noting that the Second Circuit precedent was 34 years old and "[p]erhaps it is time for a new court decision."  *Id.* at 91.  It is of course possible to quickly and concisely explain to a court why this decision crossed the line.

We just did.  *See also Perma-Line Corp. of America v. Sign Pictorial & Display Union*, 639 F.2d 890 (2d Cir. 1981) (vacating award that required violation of National Labor Relations Act).

By contrast, the voluminous submission by Zorc & Chase here, and the detailed review it is designed to invite, is precisely what the Supreme Court has just warned against in *Hall Street Associates*.  The 85-page Affidavit of respondents Chase and Zorc with its carton of supporting documents is not merely an evasion of this court's Individual Motion Practices limiting memoranda of law to 25 pages, but a defiance of the rule of limited review itself.  The court should not read the carton.  That was the unenviable task of the arbitrators.  Zorc & Chase cannot re-arbitrate the case here, or require the court or the County to do so.  Unless they can concisely articulate, without detailed rehashing of 4,100 pages of testimony and legal argument, why the arbitrators' decision was one of the few examples of "extreme arbitral conduct" meriting reversal under the exceedingly narrow vacatur standards, *Hall Street Associates*, 2008 U.S. LEXIS 2911 at *19, this court's role is at an end.  Zorc & Chase clearly cannot do so, as we discuss in the sections below.

## C.    "Manifest Disregard of the Law"

In addition to the grounds for vacatur of an award specified in FAA § 10 (a), 9 U.S.C. § 10 (a), the Second Circuit and some other Circuits have also permitted vacatur based upon "manifest disregard of the law," a doctrine which "finds its origins in dicta from *Wilko v. Swan*, 346 U.S. 427 (1953)."  *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, p. 12 *supra*, 333 F.3d at 388; *see also Hall Street Associates*, 2008 U.S. LEXIS 2911 at *16 - *17; *Rich v. Spartis*, p. 12 *supra*, 516 F.3d at 81-82.  Zorc & Chase relies primarily upon this "manifest disregard" test.  As set forth below, the "manifest disregard" doctrine has always been extraordinarily narrow, and now its legitimacy *ab initio* and continued viability has been seriously called into question by the Supreme Court in *Hall Street Associates*.

**1. Continued Validity of the "Manifest Disregard" Test Has Been Seriously Called into Question by the Supreme Court in** *Hall Street Associates*

In *Hall Street Associates*, the Supreme Court held that "the grounds for vacatur and modification provided by §§ 10 and 11 of the FAA are exclusive," 2008 U.S. LEXIS 2911 at *10, and therefore the parties to an arbitration agreement governed by the FAA cannot contract for more expansive judicial review than provided under these sections. The Court therefore ruled that a district court could not vacate an award for legal error even though the arbitration agreement expressly authorized the court to do so. *See id.* at *7 - *8. The Court thus let stand under the FAA an arbitrator's seemingly bizarre legal ruling that a lease provision requiring a commercial tenant to "indemnify the landlord for any costs resulting from the failure of the tenant or its predecessor lessees to follow environmental laws" did not obligate the tenant to pay for the cleanup of toxins discharged into the well water under the leased property because, in the arbitrator's view, the state Drinking Water Quality Act that was violated by the discharge was a "health" rather than an "environmental" law. *Id.* at *6 - *8.[4]

Among the arguments offered by the landlord for enforcing the expanded review provision of the agreement and thus vacating this award for legal error was that "expandable judicial review authority has been accepted as the law since *Wilko v. Swan*" (which, as noted above, gave rise to the manifest disregard standard). 2008 U.S. LEXIS 2911 at *15. The Court rejected this argument that "if judges can add grounds to vacate . . . so can contracting parties," *id.* at *17, noting that "apart from its leap from a <u>supposed</u> judicial expansion by interpretation [in *Wilko*] to a private

_____

[4]   While holding that the courts were powerless to disturb the award under the FAA, the Court remanded for consideration of whether the arbitration agreement, which had been entered into and approved by the district court during the course of litigation between the parties, was actually an exercise of the court's power to manage its cases under Fed. R. Civ. P. 16 or was otherwise governed by some other authority independent of the FAA. *Id.* at 26-30.

expansion by contract," *id.* (emphasis added), it was not at all clear that *Wilko* had ever meant to create or could be read as having created such an expansion.

As the Court explained, *id.* at *15-*16, *Wilko* had held that an agreement to arbitrate claims under the Securities Act of 1933, 15 U. S. C. § 77a *et seq.*, was prohibited by that Act notwithstanding the FAA.[5]  In finding that the two Acts could not be reconciled and that the FAA must give way to the investor protection provisions of the Securities Act, the *Wilko* Court was unpersuaded by the argument that "a failure of the arbitrators to decide in accordance with the provisions of the Securities Act would constitute grounds for vacating the award pursuant to section 10" of the FAA, 346 U.S. at 436, noting that the "power to vacate an award is limited," *id.*, and then adding the dictum from which "manifest disregard" sprung: "the interpretations of the law by the arbitrators <u>in contrast to manifest disregard</u> are not subject, in the federal courts, to judicial review for error in interpretation," *id.* at 436-37 (emphasis added).  Thus this cryptic phrase that gave rise to the manifest disregard doctrine came in the midst of a statement that courts are <u>not</u> empowered to vacate for errors of law.

Commenting on this irony, and "the vagueness of *Wilko*'s phrasing," the *Hall Street Associates* Court stated of manifest disregard and its genesis in the *Wilko* dictum:

> Hall Street reads this statement as recognizing "manifest disregard of the law" as a further ground for vacatur on top of those listed in § 10, and some Circuits have read it the same way. . . .
>
> But this is too much for *Wilko* to bear. . . .  Hall Street overlooks the fact that the statement . . . expressly rejects . . . general review for an arbitrator's legal errors.  Then there is the vagueness of *Wilko*'s phrasing.  Maybe the term "manifest disregard" was meant to name a new ground for review, but maybe it merely referred to the § 10 grounds collectively, rather than adding to them.  Or, as some courts have thought, "manifest disregard" may have been shorthand for § 10(a)(3) or § 10(a)(4), the subsections authorizing va-

---

[5]      This holding has since been overruled in *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989).

catur when the arbitrators were "guilty of misconduct" or "exceeded their powers."

2008 U.S. LEXIS 2911 at *16 - *18 (citations omitted).[6]  The Court added, with its own crypticness: "We, when speaking as a Court, have merely taken the *Wilko* language as we found it, without embellishment, and now that its meaning is implicated, we see no reason to accord it the significance that Hall Street urges."  *Id.* at *18 (citations omitted).

Clearly, if the "manifest disregard" standard survives *Hall Street Associates* at all, it is hanging by a thread, and courts must be extraordinarily reluctant to invoke it except in the most exigent circumstances.  As discussed below, however, they always have been.

### 2. Even Before *Hall Street Associates* "Manifest Disregard" Was a "Doctrine of Last Resort" Applied Only in Cases of "Egregious Impropriety"

The Second Circuit has repeatedly stressed that "'manifest disregard of law' is a 'severely limited' doctrine;" indeed, "'a doctrine of last resort – its use . . . limited only to those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent.' " *Wallace v. Buttar*, p. 13 *supra*, 378 F.3d at 189 (quoting *In re: Arbitration No. AAA13-161-0511-85 under Grain Arbitration Rules*, 867 F.2d 130, 133 (2d Cir. 1989), and *Duferco Int'l Steel Trading*, *p. 12 supra*, 333 F.3d at 389); *accord*, *e.g.*, *Hoeft v. MVL Group, Inc.*, p. 11 *supra*, 343 F.3d at 69; *DiRussa v. Dean Witter Reynolds, Inc.*, 121 F.3d 818, 821 (2d Cir. 1997); *Wien & Malkin LLP v. Helmsley-Spear, Inc.*, 6 N.Y.3d 471, 480 (2006) (applying federal law).  The doctrine "gives extreme deference to arbitrators," *Wallace v. Buttar*, 378 F.3d at 189 (quoting *DiRussa*,

---

[6]      Notably, one of the cases the Court cites is *I/S Stavborg v. National Metal Converters, Inc.*, 500 F.2d 424 (2d Cir. 1974), in which the Circuit, early in its "manifest disregard" jurisprudence, had indicated the same skepticism about the doctrine, stating that "[h]ow courts are to distinguish . . . between 'erroneous interpretation' of a statute . . . and 'manifest disregard' of it, we do not know: one man's 'interpretation' may be another's 'disregard,' " and suggesting that "perhaps the rubric 'manifest disregard' is after all not to be given independent significance; rather it is to be interpreted only in the context of the specific narrow provisions of 9 U.S.C. §§ 10 & 11."  500 F.2d at 430 n. 13, 431.

F.3d at 821), and thus an arbitration award must be confirmed "if there is even a barely colorable justification for the outcome reached." *Wien & Malkin LLP v. Helmsley-Spear*, 6 N.Y.3d at 479 (quoting *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 704 (2d Cir. 1978)); *accord*, *e.g.*, *Rich v. Spartis*, p. 12 *supra*, 516 F.3d at 81; *Wallace*, 378 F.3d at 190; *Hoeft*, 343 F.3d at 71; *Duferco*, 333 F.3d at 385, 391 ("[a]ny plausible reading of an award that fits within the law will sustain it"); *GMS Group, LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir. 2003) ("if any justification can be gleaned from the record . . . the award must be confirmed"). Therefore, as aptly phrased by one of the other Circuit Courts that has applied the manifest disregard test, "the standard of review of arbitral awards 'is among the narrowest known to the law' " even when this doctrine is used to supplement the other grounds for vacatur under FAA § 10(a). *ARW Exploration Corp. v. Aguirre*, 45 F.3d 1455, 1462 (10th Cir. 1995) (quoting *Litvak Packing Co. v. United Food & Commercial Workers, Local Union No. 7*, 886 F.2d 275, 276 (10th Cir. 1989)); *accord Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.*, 119 F.3d 847, 849 (10th Cir. 1997).

The Second Circuit has stated the manifest disregard standard as follows:

> An arbitral award may be vacated for manifest disregard of the law "only if a reviewing court finds both that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case."

*Wallace*, 378 F.3d at 189 (quoting *Banco de Seguros del Estado v. Mutual Marine Office, Inc.*, 344 F.3d 255, 263 (2d Cir. 2003), and *Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 28 (2d Cir. 2000)); *accord*, *e.g.*, *Rich v. Spartis*, 516 F.3d at 82;  *Hoeft*, 343 F.3d at 69.

While this statement of the standard may seem potentially somewhat broader than the Court's descriptions of it quoted above, the Court has made clear that it is not.  Thus, after setting forth the standard in *Wallace*, the Court went on to explain regarding the first factor that "[w]e

have emphasized that an arbitral panel's refusal or neglect to apply a governing legal principle 'clearly means more than error or misunderstanding with respect to the law.'" 378 F.3d at 189 (quoting *Hoeft*, 343 F.3d at 69). Rather, the courts are to "review only for a clear demonstration that the panel intentionally defied the law." *Duferco*, 333 F.3d at 393 (upholding award that "only arguably conforms to legal standards"). As to the second factor, "[a]s long as there is more than one reasonable interpretation of the governing law, the law is not well-defined, explicit and clearly applicable, and an arbitrator cannot be said to have manifestly disregarded [it] in rejecting either party's interpretation." *Hoeft*, 343 F.3d at 71 (emphasis added).

      Applying these rules, the *Wallace* Court stated:

> A federal court cannot vacate an arbitral award merely because it is con-
> vinced that the arbitration panel made the wrong call on the law. On the
> contrary, the award "should be enforced, despite a court's disagreement with
> it on the merits, if there is a barely colorable justification for the outcome
> reached."

378 F.3d at 189-90 (emphasis added) (quoting *Banco de Seguros del Estado*, *supra*, 344 F.3d at 260). To emphasize this, it then approvingly cited the Court's holding in *Hoeft* that "it 'is of no consequence' that [an] arbitrator's decision did not apply the 'clear majority view'" on an issue of law. *Wallace*, 378 F.3d at 190 (quoting *Hoeft*, 343 F.3d at 70-71). This principle is perhaps most starkly illustrated by the Court's decision in *DiRussa v. Dean Witter Reynolds*, p. 17 *supra*, 121 F.3d at 824, confirming an award despite the arbitrators' "obvious legal error" in not allowing the successful claimant attorneys fees under the Age Discrimination in Employment Act, 29 U.S.C.A. § 621 *et seq.* ("ADEA"), since there was "no persuasive evidence that the arbitrators . . . intention-ally disregarded" the ADEA's mandatory fee provision, *id.* at 822.[7]

---

[7]     Even in *Hardy v. Walsh Manning Securities, L.L.C.*, 341 F.3d 126 (2d Cir. 2003), in which an arbitration panel found a brokerage firm employee liable for a subordinate's securities fraud based upon respondeat superior, even though the clearly governing New York law was "was well defined and explicit" (continued...)

The Court has frequently cited its decision in *New York Telephone Co. v. Communications Workers of America*, p. 13 *supra* – in which the arbitrator expressly rejected controlling Second Circuit precedent in favor of contrary precedent from other Circuits and invited the courts to change the law in reviewing his award – as one of the few examples of intentional rejection of explicit governing law that was sufficient to satisfy both prongs of the manifest disregard standard. *See Wallace*, 378 F.3d at 190 (noting that "we have used the manifest disregard of law doctrine to vacate arbitral awards only in the most egregious instances of misapplication of legal principles"); *Hoeft*, 343 F.3d at 71 n. 4; *Hardy*, n. 7 *supra*, 341 F.3d at 133-34; *Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 217-18 (2d Cir. 2002) (noting that "party seeking vacatur must . . . demonstrate that the arbitrator . . . willfully flouted the governing law").

In this connection, the Court has noted that *New York Telephone* was one of only four cases in over forty years in which it vacated (or even partially vacated) an arbitration award based upon the manifest disregard standard.  *See Wallace*, 78 F.3d at 191; *Duferco*, 333 F.3d at 389. The others are *Halligan v. Piper Jaffray, Inc.*, 148 F.3d 197, 203 (2d Cir. 1998) (panel denied ADEA claim without explanation despite "overwhelming evidence" of age discrimination); *Perma-*

---

[7]       (...continued)
that respondeat superior did not lie, *id.* at 130, and the Court acknowledged that this finding did not merely "rest on a colorable interpretation of the law" but rather "contains a fundamental mistake of law," the Court was nonetheless "reluctant" to vacate the award outright but instead remanded for "clarification" of the basis for the supervisor's liability.  *Id.* at 133, 134.

    Similarly, in *Rich v. Spartis*, *supra*, handed down this February, the Circuit vacated the District Court's vacatur of an arbitration award to a former WorldCom employee for investment losses related to the collapse of that company and instead remanded for clarification of the basis for the award.  The District Court had found that the employee's claims were released by the judgment approving settlement of the WorldCom Securities Class Action, which the employee had not opted out of, and that therefore the arbitration panel had acted in excess of its authority.  However, the Circuit, noting the "strong presumption in favor of enforcing arbitration awards," 516 F.3d at 81, held that it could not "determine whether the . . . panel . . . exceeded its powers or [acted] in manifest disregard of the law" since the panel's lump sum award did not explain to what extent it was intended to compensate the employee for WorldCom losses as opposed to losses on other related investments.  *Id.* at 83.

*Line Corp. of America v. Sign Pictorial & Display Union*, p. 13 *supra*, 639 F.2d at 894-96 (vacating award that required violation of National Labor Relations Act); and *Fahnestock & Co., Inc. v. Waltman*, 935 F.2d 512, 519 (2d Cir. 1991) (vacating punitive damages award as governing New York law prohibited such damages in arbitration).  The Court has observed that "[a]ll of the four cases . . . except *Halligan*, involved an arbitral decision that exceeded the legal powers of the arbitrators" and thus "it is arguable that manifest disregard need not have been the basis for vacating the award, since vacatur would have been warranted under the FAA." *Duferco*, 333 F.3d at 389.[8]  Further, the Court has "cautioned against an over-broad reading of *Halligan*," *Wallace*, 378 F.3d at 193, noting that its discussion there "was confined to the unique concerns at issue with employment discrimination claims," *GMS Group, LLC v. Benderson*, p. 18 *supra*, 326 F.3d at 79, and reflected "the general misgivings courts and commentators have expressed" about arbitration of such claims.  *Id.* at 78-79 (citing *Halligan*, 148 F.3d at 201-03).[9]

### 3. Zorc & Chase's "Manifest Disregard" Claims Here Are Frivolous

In light of the foregoing standards, it is clear that Zorc & Chase's "manifest disregard" claims here are frivolous.  First and foremost, it must be noted that the arbitrators' denial of Zorc & Chase's claims for additional fees was <u>not</u> based primarily on the firm's violation of the Agreement provisions requiring timely and itemized billing.  Rather, it was largely based on the panel's

_____

[8]     Note that this suggestion foreshadowed the Supreme Court's recent decision in *Hall Street Associates*, 2008 U.S. LEXIS 2911 at *16-*17 (discussed at p. 16 *supra*) that the term "manifest disregard" may never have been intended "to name a new ground for review," but may have merely been a shorthand for some or all of the existing FAA § 10(a) grounds such as that the arbitrators "exceeded their powers."

[9]     The Court subsequently vacated an arbitral award for the fifth time since 1960 in *Porzig v. Dresdner Kleinwort Benson, N. America, LLC*, 497 F.3d 133 (2d Cir. 2007), which, like *Halligan*, involved an ADEA claim.  (The Court remanded for determination of proper attorneys fees for the successful claimant under the ADEA's mandatory fee provision, distinguishing *DiRussa*, p. 17 *supra*, on the ground that the claimant there had not expressly told the arbitrators that fees were mandatory under the statute.  497 F.3d at 142.)

detailed findings of precisely the kind of duplicative billing and gross overbilling for little or no work that such prophylactic provisions in a legal retainer agreement are designed to prevent. *See* Award ¶¶ A.1 - A.10 at pp. 2 - 5 (pp. 5 - 7 *supra*). Of course, Zorc & Chase do not and cannot cite any law – much less "well-defined, explicit and clearly applicable" governing law about which there can be only "one reasonable interpretation" (*Hoeft*, p. 19 *supra*, 343 F.3d at 71) – allowing a lawyer to bill a client for hours not worked, documents not written, services already paid for, work done for another client, or vacation time in the Virgin Islands. For this reason alone, Zorc & Chase's claims of "manifest disregard" of the New York law on waiver and billing errors are irrelevant and should be dismissed out of hand.[10]

Zorc & Chase's claims for payment based upon *quantum meruit* and account stated are attempts to suggest that it somehow <u>is</u> entitled to payment for work not done. Of course, the case law does not support its argument. Thus, in support of its *quantum meruit* claim it cites two cases, *Martin v. Camp*, 219 N.Y. 170, 176 (1916), and *Tillman v. Komar*, 259 N.Y. 133, 135-36 (1931), both of which held that a lawyer retained on a <u>contingency</u> basis is entitled to be paid in *quantum meruit* for hours actually worked if the client terminates the retainer. Of course, neither case held that a lawyer retained on an hourly basis is entitled to be paid in *quantum meruit* for hours <u>not</u> worked if the client terminates the retainer. It is no wonder that the arbitrators dispensed with this argument in a single sentence, Award ¶ F, citing "the reasons set forth above" (*i.e.*, including the findings of duplicative and essentially fraudulent billing detailed in ¶A).

Zorc & Chase's claim of an "account stated" is equally frivolous. Essentially, its argument

---

[10] We note in addition that on the threshold question of whether the law of waiver and estoppel applies to municipalities, Zorc & Chase cites one 1960 decision of the Court of Appeals, Resps' Mem. Law at 7, while the County cited three Court of Appeals cases from 1982 and 1988, Post-Hr'g Br. (Saffran Decl. Exh. D) at 32, noting that "in recent decisions" it had held "that estoppel may not be invoked against a governmental agency to prevent it from discharging its statutory duties." *See Matter of E.F.S. Ventures Corp. v. Foster*, 71 N.Y.2d 359, 369 (1988).

is that the County's request for documentation of the amounts billed in order to determine if these amounts were accurate or appropriate, and its express waiver of a right to challenge this accuracy or appropriateness (*see* p. 4 *supra*) upon review of (or upon Zorc & Chase's failure to supply) this documentation, was not a timely objection to the amounts billed, and thus the County had committed itself to payment in full under an "account stated" theory even while it was trying to find out what it was being billed for. *See* Resps' Mem. Law at 14-16. The same argument was rejected in *O'Shea v. Brennan*, 2004 U.S. Dist. LEXIS 4723 at *30-*32 (S.D.N.Y. 2004) [emphasis added]:

> . . . [U]nder New York law, where an attorney-client relationship is already deteriorating, a client's retention without objection of an attorney's bills, even after the signing of an acknowledgment of indebtedness, does not create a sufficiently clear inference of acquiescence to warrant granting summary judgment. *See Rosenman Colin Freund Lewis & Cohen*, 93 A.D.2d [745], 746 [(1st Dept. 1983)] (holding that silence does not imply acquiescence, where the attorney-client relationship has deteriorated contemporaneously with the client's receipt of bills).
>
> * * *
>
> . . . Brennan began questioning the reasonableness of the fees charged early in 2001 when he requested "back up" records from O'Shea. Thereafter, he refused to submit payment on the account pending an analysis of the invoices and raised explicit objections to the fees charged in letters dated May and June 2001. Under the circumstances, this appears to constitute a timely objection.

This case law alone is sufficient to provide "colorable justification" for the arbitrators' rejection of Zorc & Chase's "account stated" claim.[11]

     In sum, Zorc & Chase's manifest disregard argument is essentially that it cited many cases to the arbitrators but the arbitrators did not address them in their Award or, apparently, accept

---

[11]    Zorc & Chase's claim of "manifest disregarded of the law on fee forfeiture" sounds, from its title, like a third citation to a legal doctrine ostensibly entitling it to payment for work not done. However, it is not even that, but rather merely an attack on the findings in Section D of the Award concerning certain "bizarre conduct" on the part of Chase and Zorc in their relationship with County officials. *See* Award ¶ D.7 at p. 8. However, as noted above, the Award is based primarily on the findings of duplicity in Section A, and thus stands without regard to Section D.

Zorc & Chase's view of them; *ergo*, the arbitrators knowingly rejected explicit governing law. Resps' Mem. Law ¶ 5.  Of course, the Circuit has "stated repeatedly that arbitrators have no obligation" to explain their awards at all, much less justify their legal reasoning with citation to case law. *Halligan*, *supra*, 48 F.3d at 204; *Sobel v. Hertz, Warner & Co.*, 469 F.2d 1211, 1214 (2d Cir. 1972).  Moreover, as noted above (p. 19 *supra*), the Circuit has explained that "an arbitrator cannot be said to have manifestly disregarded the law in rejecting either party's interpretation" of it.  *Hoeft*, 343 F.3d at 71.  This was aptly summarized in *Holden v. Deloitte & Touche LLP*, 390 F. Supp. 2d 752, 776-77 (N.D. Ill. 2005), in a passage that is particularly applicable here:

> [T]he Holdens err when they suggest that their legal error claims really are fairly seen as "manifest disregard" claims because the Panel was aware of the "right" legal rules (because, for example, the Holdens briefed their view of the "correct" law) and the Panel thereafter "refused to apply it."  Parties in arbitrations typically brief the relevant legal and factual questions--often in pre- and post-arbitration briefs that are much lengthier than those typically permitted in federal court.  . . .  If a party's briefing of the "correct" legal rules (as that party saw them) and the panel's failure to apply that party's "correct" legal rules were enough to qualify as a "manifest disregard" scenario, then the repeated teaching of precedent, that even gross errors of fact or law are inadequate to vacate an arbitral award, would mean nothing.

Zorc & Chase also claims that the panel "manifestly disregarded the law" in awarding the County its $192,000 claim for fees and costs for the arbitration.  This claim is breathtaking in that, as noted above, Zorc & Chase itself sought <u>$1.45 million</u> in fees and costs. Since Zorc & Chase presumably devoted (or reasonably should have devoted) approximately the same time to the proceeding as the County, then the very authorities and arguments that Zorc & Chase relied upon in support of its fee application clearly provided the arbitrators with a colorable justification for granting the County's application for <u>one seventh</u> of this amount.

**D.     "Evident Partiality"**

Finally, Zorc & Chase argues that the award should be vacated under FAA § 10(a)(2) for

"evident partiality," but as they acknowledge this provision applies to situations in which "members of an arbitration panel have some . . . business, social or professional relationship with one of the parties."  Resps' Mem. Law ¶ 33.  Zorc & Chase's argument, for which they cite no law, is essentially that the arbitrators must have been biased because they ruled against them on every issue, and that the Court should search the record for evidence of this alleged bias.  The claim is frivolous and, like Zorc & Chase's other claims, must be dismissed.

**CONCLUSION**

The motion to vacate the arbitration award should be denied and the cross-motion and underlying Petition to confirm should be granted.

Dated: Mineola, New York
       April 16, 2008

Respectfully submitted,

LORNA B. GOODMAN
Nassau County Attorney
One West Street
Mineola, New York 11501
*Attorney for Petitioner*

By:

_____
Dennis J. Saffran (DS 6170)
Chief, Appeals Bureau
(516) 571-3966

*Of Counsel*

- 25 -